COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT

Suffolk County, ss.

Drew Katz and Melissa Silver, individually and as
the Co-Personal Representatives of the Estate of
LEWIS A. KATZ, deceased,

Plaintiffs,

v.

SK TRAVEL LLC, a North Carolina Limited
Liability Company; SPINIELLO COMPANIES, a
New Jersey Corporation; ARIZIN VENTURES
LLC, a Delaware Limited Liability Company;
CAROL MCDOWELL, in her capacity as
Personal Representative of the ESTATE OF
JAMES MCDOWELL, deceased, a resident of
Delaware; SHELLY DEVRIES, in her capacity as
Personal Representative of the ESTATE OF
BAUKE DEVRIES, deceased, a resident of New
Jersey   GULFSTREAM   AEROSPACE
CORPORATION,   a   Georgia   Corporation;
GULFSTREAM AEROSPACE CORPORATION,
a   Delaware   Corporation;   GULFSTREAM
AEROSPACE   SERVICES   CORPORATION,
d/b/a Gulfstream Aerospace Corporation, a
Delaware Corporation; ROCKWELL COLLINS,
INC., an Iowa Corporation; HONEYWELL
INTERNATIONAL,   INC.,   a   Delaware
Corporation; and the MASSACHUSETTS PORT
AUTHORITY, an independent public authority of
the Commonwealth of Massachusetts,

Defendants.

_____/

Civil Action No.: 16-888B

## AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

### General Allegations

Podhurst Orseck, P.A.

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

1.     This is a civil action for the wrongful death of LEWIS A. KATZ, who was killed on May 31, 2014, when the Gulfstream G-IV airplane, Serial Number N121JM ("the Subject Aircraft"), in which he was a passenger crashed and burned at Laurence G. Hanscom Field in Bedford, Massachusetts ("the Subject Accident").  He was 72 years old.  As this Complaint shows, the Defendants, SK TRAVEL LLC, a North Carolina Limited Liability Company; SPINIELLO COMPANIES, a New Jersey Corporation; ARIZIN VENTURES LLC, a Delaware Limited Liability Company; CAROL MCDOWELL, in her capacity as Personal Representative of the ESTATE OF JAMES MCDOWELL, deceased, a resident of Delaware; SHELLY DEVRIES, in her capacity as Personal Representative of the ESTATE OF BAUKE DEVRIES, deceased, a resident of New Jersey; GULFSTREAM AEROSPACE CORPORATION, a Georgia Corporation; GULFSTREAM AEROSPACE CORPORATION, a Delaware Corporation; GULFSTREAM AEROSPACE SERVICES CORPORATION, d/b/a Gulfstream Aerospace Corporation, a Delaware Corporation; ROCKWELL COLLINS, INC., an Iowa Corporation; HONEYWELL INTERNATIONAL, INC., a Delaware Corporation; and the MASSACHUSETTS PORT AUTHORITY, an independent public authority of the Commonwealth of Massachusetts, (collectively, "the Defendants"), caused the Subject Accident by their negligence and, with respect to certain Defendants, by manufacturing and/or designing a defective product and breaching the implied warranty of merchantability.

2.     DREW KATZ and MELISSA SILVER are the children of LEWIS A. KATZ and have been appointed Co-Personal Representatives of his Estate.

3.     DREW KATZ and MELISSA SILVER, on behalf of themselves, the Estate of LEWIS A. KATZ, and all survivors and next of kin bring this action pursuant to Massachusetts'

Podhurst Orseck, P.A.                                        2

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

wrongful death statute, Mass. Gen. Laws ch. 229 §§ 2 and 6, and seek all available damages, including:

      a.  As a result of the death of LEWIS A. KATZ, DREW KATZ and MELISSA SILVER have suffered the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of LEWIS A. KATZ; and

      b.  The Estate of LEWIS A. KATZ is entitled to damages for the conscious suffering LEWIS A. KATZ endured as a result of the accident that killed him.

4.    DREW KATZ and MELISSA SILVER, on behalf of themselves, the Estate of LEWIS A. KATZ, and all survivors and next of kin bring this action pursuant to Florida's wrongful death statute, Fla. Stat. § 768.21, and seek all available damages, including:

      a.  As a result of the death of LEWIS A. KATZ, DREW KATZ and MELISSA SILVER have suffered the loss of support and services, parental companionship, instruction, and guidance, and mental pain and suffering from the date of LEWIS A. KATZ's death; and

      b.  As a result of LEWIS A. KATZ's death, the Estate of LEWIS A. KATZ has suffered the loss of his prospective net accumulations.

5.    DREW KATZ and MELISSA SILVER, on behalf of themselves, the Estate of LEWIS A. KATZ, and all survivors and next of kin bring this action pursuant to any other applicable wrongful death statute.

Podhurst Orseck, P.A.          3

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346      www.podhurst.com

## The Parties

6.    The Plaintiffs, DREW KATZ and MELISSA SILVER are the children of LEWIS A. KATZ, and have been appointed Co-Personal Representatives of his Estate.  At the time of his death, LEWIS A. KATZ was a resident of Florida.

7.    The Defendant, SK TRAVEL LLC (hereinafter "SK TRAVEL"), is and was, at all times material to this Complaint, a North Carolina Limited Liability Company with its principal place of business in Delaware.  At the time of the Subject Accident, SK TRAVEL owned the Subject Aircraft.

8.    The Defendant, SPINIELLO COMPANIES, INC. (hereinafter "SPINIELLO"), is and was, at all times material to this Complaint, a New Jersey Corporation with its principal place of business in New Jersey.   At the time of the Subject Accident, SPINIELLO employed MCDOWELL and DEVRIES (collectively, "the Pilots").

9.    The Defendant, ARIZIN VENTURES LLC (hereinafter "ARIZIN"), is and was, at all times material to this Complaint, a Delaware Limited Liability Company.  At the time of the Subject Accident, ARIZIN was dry leasing the Subject Aircraft from the Defendant, SK TRAVEL.  A dry lease is a leasing arrangement whereby an aircraft lessor—in this case, SK TRAVEL—provides an aircraft to an aircraft lessee—in this case, ARIZIN—without insurance, crew, ground staff, supporting equipment, or maintenance.

10.    The Defendant, CAROL MCDOWELL, and her Decedent, JAMES MCDOWELL, (hereinafter referred to as "MCDOWELL"), have at all material times been Delaware residents. The Decedent, JAMES MCDOWELL, was 1 of 2 pilots of the Subject Aircraft at the time of the Subject Accident.  At the time of the Subject Accident, MCDOWELL was employed by the Defendant, SPINIELLO.

Podhurst Orseck, P.A.                                    4

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

11. The Defendant, SHELLY DEVRIES, and her Decedent, BAUKE DEVRIES, (hereinafter "DEVRIES"), have at all material times been New Jersey residents. The Decedent, DEVRIES, was 1 of 2 pilots of the Subject Aircraft at the time of the Subject Accident. At the time of the Subject Accident, DEVRIES was employed by the Defendant, SPINIELLO.

12. The Defendant, GULFSTREAM AEROSPACE CORPORATION (hereinafter "GULFSTREAM GEORGIA"), is and was, at all times material to this Complaint, a Georgia Corporation with its principal place of business at 500 Gulfstream Road, Savannah, Georgia. GULFSTREAM GEORGIA is and was, at all material times, engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, and distributing aircrafts and their component parts, including the Subject Aircraft and its component parts.

13. The Defendant, GULFSTREAM AEROSPACE CORPORATION (hereinafter "GULFSTREAM DELAWARE"), is and was, at all times material, a Delaware Corporation with its principal place of business at 500 Gulfstream Road, Savannah, Georgia. GULFSTREAM DELAWARE is and at all material times was engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, and distributing aircrafts and their component parts.

14. Upon information and belief, GULFSTREAM GEORGIA and GULFSTREAM DELAWARE are either one and the same entity, are agents or instrumentalities of one another, or else are engaged in a joint venture together. For purposes of this Complaint, we will refer to both GULFSTREAM GEORGIA and GULFSTREAM DELAWARE together as GULFSTREAM. GULFSTREAM owns the type certificate (No. A12EA) for the Subject Aircraft.

Podhurst Orseck, P.A.                                      5

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

15.   The   Defendant,   GULFSTREAM   AEROSPACE   SERVICES   CORPORATION (hereinafter "GULFSTREAM SERVICES"), is and was, at all times material to this Complaint, a Delaware Corporation with its principal place of business in Dallas, Texas. GULFSTREAM SERVICES also has its offices at 500 Gulfstream Road, Savannah, Georgia, and is engaged in the business of servicing, inspecting, repairing, and maintaining aircrafts and their component parts. GULFSTREAM SERVICES is either a subsidiary, department, agency, instrumentality, alter-ego, or operating division of GULFSTREAM. GULFSTREAM SERVICES, which regularly does business as "Gulfstream Aerospace Corporation," is also engaged in a joint venture with GULFSTREAM.

16.   The   Defendant,   ROCKWELL   COLLINS,   INC.,   previously   ROCKWELL INTERNATIONAL (hereinafter "ROCKWELL COLLINS"), is and was, at all times material to this Complaint, a Delaware Corporation with its principal place of business in Cedar Rapids, Iowa. ROCKWELL COLLINS is and at all material times was engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, and distributing aircraft component parts, including the gust lock system and the Power Lever Interlock Mechanism ("Interlock Mechanism") of the Subject Aircraft.

17.   The   Defendant,   HONEYWELL   INTERNATIONAL,   INC.   (hereinafter "HONEYWELL"), is and was, at all times material to this Complaint, a Delaware Corporation with its principal place of business in New Jersey. HONEYWELL is and at all material times was engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, and distributing aircraft component parts, including the auto-throttle system of the Subject Aircraft.

Podhurst Orseck, P.A.                                    6

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

18.   The Defendant, the Massachusetts Port Authority (hereinafter "MASSPORT") is and was, at all times material to this Complaint, a "public employer" of the Commonwealth of Massachusetts engaged in the business of designing, constructing, owning, operating, repairing, inspecting, and maintaining the airport at Laurence G. Hanscom Field ("Hanscom Field") in Bedford, Massachusetts.

### Subject Matter Jurisdiction

19.   The Superior Court of the Commonwealth of Massachusetts has exclusive original jurisdiction over this civil action because "there is no reasonable likelihood that recovery by the plaintiff will be less than or equal to $25,000." Mass. Gen. Laws ch. 212, § 3.

### Personal Jurisdiction

20.   The Court may exercise personal jurisdiction over MASSPORT because MASSPORT is "domiciled in, organized under the laws of, or maintaining … its principal place of business in" Massachusetts. Mass. Gen. Laws ch. 223A § 2.

21.   The exercise of personal jurisdiction over MASSPORT comports with the Due Process Clause of the U.S. Constitution because MASSPORT is "at home" in Massachusetts.

22.   The Court may exercise personal jurisdiction over the remaining Defendants, pursuant to Mass. Gen. Laws ch. 223A § 3(c), inasmuch as each of the Defendants acted "directly or by an agent" to cause "tortious injury by an act or omission in this commonwealth."

23.   Similarly, the Court may exercise personal jurisdiction over Defendants GULFSTREAM, GULFSTREAM SERVICES, ROCKWELL COLLINS, and HONEYWELL, pursuant to Mass. Gen. Laws ch. 223A § 3(d), inasmuch as each of these Defendants caused "tortious injury in" Massachusetts "by an act or omission outside" Massachusetts and each "regularly does or solicits business, or engages in any other persistent course of conduct, or

Podhurst Orseck, P.A.                                            7

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346   |        www.podhurst.com

derives substantial revenue from goods used or consumed or services rendered," in Massachusetts.

24.    The exercise of personal jurisdiction over the Defendants comports with the Due Process Clause of the U.S. Constitution because the Defendants engaged in sufficient "minimum contacts" with the Commonwealth of Massachusetts such that the exercise of jurisdiction over them would be both fair and reasonable.

25.    Specifically, SK TRAVEL owned, controlled, operated, and possessed the Subject Aircraft, which crashed in Massachusetts, causing tortious injuries and death there.

26.    ARIZIN leased, controlled, operated, and possessed the Subject Aircraft, which crashed in Massachusetts, causing tortious injuries and death there.

27.    SPINIELLO employed the Pilots who, during and in the course and scope of their employment for SPINIELLO, flew the Subject Aircraft to Massachusetts, engaged in tortious conduct in Massachusetts, and caused tortious injuries and death in Massachusetts.

28.    The Pilots flew the Subject Aircraft to Massachusetts, engaged in tortious conduct in Massachusetts, and caused injuries and death in Massachusetts.

29.    GULFSTREAM's contacts with Massachusetts satisfy the "stream of commerce" test because (1) GULFSTREAM delivers its products into the stream of commerce with the expectation that they will either be purchased by consumers in Massachusetts or be brought by consumers to Massachusetts; (2) GULFSTREAM regularly advertises its products and services in Massachusetts; (3) GULFSTREAM regularly provides services and advice to its customers in Massachusetts; (4) GULFSTREAM regularly sells its products to customers in Massachusetts; (5) GULFSTREAM derives substantial revenues from its business in Massachusetts; (6) GULFSTREAM employs hundreds of individuals in Massachusetts; (7) GULFSTREAM receives

Podhurst Orseck, P.A.                                8

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

tax benefits from the Commonwealth of Massachusetts; (8) GULFSTREAM maintains a full-time facility in Massachusetts; (9) GULFSTREAM flies GULFSTREAM aircraft into Massachusetts for the purpose of facilitating its business in Massachusetts; and (10) GULFSTREAM's Massachusetts workers serviced, repaired, and inspected the Subject Aircraft prior to the Subject Accident.

30.  GULFSTREAM and GULFSTREAM SERVICES operate an enormous facility in Westfield, Massachusetts. GULFSTREAM employs over 225 people at this facility, which has grown to encompass over 210,000 square feet of Massachusetts land.

31.  Upon information and belief, the approved repair station certificate (LEGRO396G) for the Westfield facility is in GULFSTREAM's name.

32.  Upon information and belief, when, in 2011, GULFSTREAM announced plans to expand the Westfield service center's operations, GULFSTREAM invested over $20,000,000.00 into that expansion project.

33.  In addition, as a part of that expansion, GULFSTREAM negotiated for and obtained tax incentives from the Commonwealth of Massachusetts. These tax incentives saved GULFSTREAM more than $4,000,000.00 in tax payments it would otherwise have owed to the Commonwealth of Massachusetts.

34.  Moreover, at GULFSTREAM's request, the Commonwealth of Massachusetts provided taxpayer-based funding of more than $5,000,000.00 to upgrade certain perimeter roads at the Westfield airport so as to increase access to the Westfield facility. This state-sponsored funding also paid for improvements to the Westfield tarmac area as a way of giving GULFSTREAM and its Massachusetts customers a more suitable parking area.

Podhurst Orseck, P.A.                              9

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346          www.podhurst.com

35. Upon information and belief, in 2 recent job postings on April 4, 2016, and April 13, 2016, GULFSTREAM sought to hire Airworthiness Inspector(s) to work at the Westfield service center in Massachusetts.

36. Upon information and belief, GULFSTREAM spends more than $2,000,000.00 every single year purchasing supplies and materials for its Westfield operations from other Massachusetts-based companies and vendors.

37. Upon information and belief, GULFSTREAM generates more than $30,000,000.00 in annual revenues from its Massachusetts operations, which includes revenues from the Westfield service facility.

38. Although the lease for the Westfield facility is in the name of GULFSTREAM SERVICES, GULFSTREAM SERVICES, which openly does business under the name "Gulfstream Aerospace Corporation," is either a subsidiary, department, agency, instrumentality, alter-ego, or operating division of GULFSTREAM. At the very least, GULFSTREAM SERVICES is engaged in a joint venture with GULFSTREAM. In fact, GULFSTREAM SERVICES shares common officers, directors, employees, and shareholders with GULFSTREAM; shares revenues and costs with GULFSTREAM; and advertises its Westfield facility, on the Internet and elsewhere in Massachusetts, solely and exclusively under the GULFSTREAM trade name. Indeed, all Internet traffic for the Westfield facility is directed to GULFSTREAM's website, which makes clear that the Westfield facility belongs to, and is operated by, GULFSTREAM.

39. Moreover, the Subject Aircraft had, on at least one prior occasion, received field service maintenance and repairs from GULFSTREAM employees who worked at the Westfield facility. The payment for these repairs was made directly to GULFSTREAM.

Podhurst Orseck, P.A.                                      10

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346          www.podhurst.com

40.    Records from the National Business Aviation Association ("NBAA") reveal that at least ten (10) GULFSTREAM aircraft are owned and/or operated by Massachusetts citizens or entities. All 10 of these GULFSTREAM aircraft are based and kept in the Commonwealth of Massachusetts—a fact known to GULFSTREAM. Indeed, GULFSTREAM and GULFSTREAM SERVICES regularly provide service, inspection, maintenance, repair, customer support, and parts sales to the owners of these 10 aircraft. Moreover, GULFSTREAM regularly communicates with the owners of these 10 aircraft about, among other things, airworthiness information and regularly provides advice and support—and markets its products and services—to the owners of these aircraft.

41.    Notably, the Subject Aircraft flew to Bedford, Massachusetts, on the night of the Subject Accident so that LEWIS A. KATZ and his guests could attend a philanthropic fundraiser hosted by the historian, Doris Kearns Goodwin. As such, for purposes of any jurisdictional analysis, the Subject Aircraft's accident in Massachusetts was not simply fortuitous.

42.    Upon information and belief, the Subject Aircraft had made other previous trips to and from Massachusetts, and GULFSTREAM had access to information from the Subject Aircraft's computers that would have allowed GULFSTREAM to know that the Subject Aircraft had traveled to Massachusetts.

43.    Upon information and belief, GULFSTREAM employees routinely fly company-owned and operated aircraft into the Commonwealth of Massachusetts for the purpose of providing support, maintenance, and sales promotions to persons or entities based in Massachusetts.

44.    In short, GULFSTREAM's and GULFSTREAM SERVICES' substantial contacts with the Commonwealth of Massachusetts are extensive and of long standing: GULFSTREAM and GULFSTREAM SERVICES regularly and consistently avail themselves of the privilege of doing

Podhurst Orseck, P.A.                                      11

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

business in Massachusetts, of marketing their products and services to the residents of Massachusetts, of selling those products in Massachusetts, and of earning revenues from repairing and maintaining those products in Massachusetts; GULFSTREAM and GULFSTREAM SERVICES operate their business in Massachusetts on land they lease next to an airport in Massachusetts; they sought and obtained monies and tax incentives from the Government of Massachusetts for the expansion and improvement of their land in Massachusetts; they employ a large number of Massachusetts workers at their Massachusetts facilities; and they have for many years understood that the products they place in the stream of commerce end up in the Commonwealth of Massachusetts.

45.  In sum, GULFSTREAM should reasonably have anticipated the possibility of being haled into court in Massachusetts for deaths it caused in Massachusetts by its negligent design and manufacture of a product that it placed into the stream of commerce.

46.  ROCKWELL COLLINS is registered to do business in Massachusetts, has a Massachusetts office located at 256 Marginal Street, East Boston, Massachusetts 02128, and has a registered agent for service of process in Boston, Massachusetts.

47.  ROCKWELL COLLINS has sought and obtained a Foreign Corporation Certificate from the Commonwealth of Massachusetts for the purpose of conducting and transacting substantial business activities in Massachusetts.

48.  ROCKWELL COLLINS operates various business entities throughout the Commonwealth of Massachusetts and does substantial, systematic, and continuous business in Massachusetts by availing itself of business opportunities, advertising the availability of its parts and services, selling and shipping its parts to Massachusetts residents and entities, and then

Podhurst Orseck, P.A.                                      12

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346        www.podhurst.com

communicating with its Massachusetts customers about airworthiness, repairs, maintenance, and pricing information.

49.   ROCKWELL COLLINS knows that the products it places into the stream of commerce are routinely purchased and used in Massachusetts.

50.   In sum, ROCKWELL COLLINS should reasonably have anticipated the possibility of being haled into court in Massachusetts for deaths it caused in Massachusetts by its negligent design and manufacture of a product that it placed into the stream of commerce.

51.   HONEYWELL is registered to do business in the Commonwealth of Massachusetts, has a registered office address at 84 State Street, Boston, Massachusetts 02109.

52.   HONEYWELL has sought and obtained a Foreign Corporation Certificate from the Commonwealth of Massachusetts for the purpose of conducting and transacting substantial business activities in Massachusetts.

53.   HONEYWELL operates various business entities throughout the Commonwealth of Massachusetts and does substantial, systematic, and continuous business in Massachusetts by availing itself of business opportunities, advertising the availability of its parts and services, selling and shipping its parts to Massachusetts residents and entities in Massachusetts, and then communicating with its Massachusetts customers about, among other things, airworthiness, repairs, maintenance, and pricing information.

54.   HONEYWELL knows that the products it places into the stream of commerce are routinely purchased and used in Massachusetts.

55.   In sum, HONEYWELL should reasonably have anticipated the possibility of being haled into court in Massachusetts for deaths it caused in Massachusetts by its negligent design and manufacture of a product that it placed into the stream of commerce.

Podhurst Orseck, P.A.                                    13

25 West Flagler Street, Suite 800, Miami, Fl. 33130, Miami 305.358.2800 Fax 305.358.2382  •  Fort Lauderdale 954.463.4346        www.podhurst.com

### Venue

56.   Pursuant to Mass. Gen. Laws ch. 223 § 1, venue is proper in Suffolk County with respect to MASSPORT because MASSPORT "lives" or has its "usual place of business" in Suffolk County.

57.   Pursuant to Mass. Gen. Laws ch. 223 § 8, venue is proper in Suffolk County with respect to MASSPORT because MASSPORT is a corporation that may "sue or be sued" in Suffolk County.

58.   Pursuant to Mass. Gen. Laws ch. 223 § 1, venue is proper in Suffolk County with respect to the remaining Defendants because not one of them "lives in the commonwealth." As a result, "the action may be brought in any county."

### The Facts

### Introduction

59.   On May 31, 2014, the Subject Aircraft, manufactured by GULFSTREAM and piloted by MCDOWELL and DEVRIES, sped down the runway at Hanscom Field, failed to take off, continued past the runway safety area, lost its landing gear, collided with several lights and antennae, caught fire, and smashed through a security fence before crashing into a ravine.  The crash and fire killed all 7 people onboard, including MCDOWELL and DEVRIES and LEWIS A. KATZ.

60.   A subsequent investigation has revealed that the Pilots inexcusably failed to disengage the gust lock before takeoff.  The gust lock restricts the movement of the power levers, which are the main engine controls.  When the gust lock is engaged and working properly, the plane's main controls are locked, and the plane will be unable to take off.

Podhurst Orseck, P.A.                                    14

25 West Flagler Street, Suite 800, Miami, Fl. 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

61.   The subsequent investigation has also revealed a defect in the Subject Aircraft's Interlock Mechanism—which was designed, manufactured, sold, and delivered by ROCKWELL COLLINS and incorporated into the Subject Aircraft by GULFSTREAM.   The Interlock Mechanism is a series of levers and pulleys that, when the gust lock is in the locked position, interact with the 2 engine power levers so that they may be moved no more than 6°, thereby limiting the amount of power available to a pilot once the engines have started.  Quite simply, then, the Interlock Mechanism is designed to prevent a pilot from taking off with the gust lock in the locked position.

62.   The Subject Aircraft's Interlock Mechanism failed to prevent the Pilots from moving the power levers past 6°.  Indeed, even though the gust lock was in the locked position, the Pilots were able to move the power levers as far as 27°—almost, though not completely, to full throttle.

### The Sequence of Events and the Pilots' Negligence

63.   On May 31, 2014, the Subject Aircraft flew from Newcastle Airport in Wilmington, Delaware to Hanscom Field, where it landed at 15:44 after a 48-minute flight.

64.   The Pilots activated the gust lock by pulling the gust lock handle to its ON position.

65.   LEWIS A. KATZ and his guests left the aircraft to attend a philanthropic fundraiser at the home of the historian, Doris Kearns Goodwin.

66.   The crew remained on the Subject Aircraft, except for a short trip to the Fixed Base Operator ("FBO"), where they ordered pizza, which they brought back onto the Subject Aircraft.

67.   The Pilots filed their proposed flight plan, which included an 18:30 departure, at 15:59.

68.   At 19:53, the Pilots updated the flight plan with the control tower based on the passengers' revised arrival time of 20:45.

69.   LEWIS A. KATZ and his 3 guests returned to the Subject Aircraft at 21:28.

Podhurst Orseck, P.A.                                        15

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

70.   The right engine was started first, at 21:30, and the left engine started shortly thereafter.

71.   Critically, however, the Pilots failed to disengage the gust lock.

72.   At 21:32, the Subject Aircraft pulled away from its parked position and began taxiing to the start of Runway 11.

73.   For the eleven minutes after LEWIS A. KATZ and his guests embarked (between 21:28 and 21:39), the Cockpit Voice Recorder ("CVR") reveals not a single communication between the crew related to any pre-flight activity.

74.   The Pilots then failed to conduct a number of required and aviation industry-standard control checks that would have revealed that the gust lock was still engaged.  For example, Item 70 of the Gulfstream Airplane Flight Manual ("AFM") category "Before Engine Start," which is labeled "Gust Lock as Required," required the Pilots to disengage the gust lock.  But the Subject Aircraft's CVR and Flight Data Recorder ("FDR") reveal that the Pilots neither conducted—nor discussed conducting—this check.

75.   Similarly, the check at Item 4 of the AFM category "Starting Engines" is called "Gust Lock Off."  As its name suggests, this check requires the pilot to move the gust lock lever into the "OFF," or forward, position.  But, again, the Subject Aircraft's CVR and FDR reveal that the Pilots neither conducted—nor discussed conducting—this check.

76.   The Pilots also failed to perform the checks at Item 16 of the AFM category "After Engine Start, Normal Procedures," which comprises 3 separate checks.  The first involves pre-flight checks of the 3 primary flight controls: (1) the Elevator Check, which requires the pilot to move the elevator control (or "yoke")[1] from the full forward to the full aft position; (2) the

---

[1] The elevator control or "yoke" is the steering wheel of a fixed-wing aircraft, like an airplane.  By rotating the yoke, the pilot controls the ailerons.  By pulling the yoke back, the pilots control the elevator.  When the yoke is pulled back, the nose of the aircraft rises.  When the yoke is pushed forward, the nose is lowered.  When the yoke is turned left, the plane rolls to the left, and when the yoke is turned to the right, the plane rolls to the right.

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346          www.podhurst.com

rudder check, which requires the pilot to step on the right and left rudder pedals to their full positions; and (3) the aileron check, which requires the pilot to rotate the control wheel 90° to the right and 90° to the left. Each of these checks must be done "while observing a marshaller," that is, while a marshaller outside the plane observes that the checks are in fact done. Any one of these tests would have revealed that the gust lock was still engaged. The elevator, for instance, would not have pulled back freely; the rudder pedals would not have pressed down fully; and the control wheel would not have rotated as required. But the Subject Aircraft's CVR and FDR reveal that the Pilots neither conducted—nor discussed conducting—any of these checks.

77.    The second Item 16 check, the "Elevator Drop Check," requires the pilot to grab the control wheel, pull it back, and then release it. The purpose of this test is to ensure that the bungee spring in the elevator is unbroken. Again, had the Pilots complied with this mandatory test, they would have noticed that the wheel would not pull back at all, which would have been yet another reminder to disengage the gust lock. But the Subject Aircraft's CVR and FDR reveal that the Pilots neither conducted—nor discussed conducting—the Elevator Drop Check.

78.    The third and final Item 16 check is the "Rudder Torque Limiter Check." This check requires the pilot to step on the rudder pedals, which in turn move the rudders at the back of the plane. If the rudders are free and the torque limiter is working properly, the blue rudder limiter light would illuminate when the rudder pedals reached the full extent of their travel. Had they conducted this mandatory test, the Pilots would have realized that the rudder pedals could not be pushed down fully, which would have reminded them to disengage the gust lock. Again, however, the Subject Aircraft's CVR and FDR reveal that the Pilots never conducted—nor discussed conducting—this check.

Podhurst Orseck, P.A.                    17

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

79.   Using the aircraft's nose wheel steering ("NWS") tiller, the crew taxied the Subject Aircraft down taxiways Sierra, Tango, and Echo and then turned onto Runway 11. During the taxi, the gust lock system remained engaged with the gust lock handle in the ON position. At no time did the Pilots discuss takeoff speeds or brief one another about emergency procedures.

80.   The Pilots then overlooked a number of warning signs that should have caused them to abort the takeoff.   For example, shortly after Lineup, the blue rudder torque limiter light illuminated—an indication that there was suddenly an increase in hydraulic pressure at a time when such an increase would have been inappropriate.  Instead of aborting the takeoff, the CVR reveals that DEVRIES noted to MCDOWELL that the "rudder limit light is on."  MCDOWELL responded by asking DEVRIES if he was stepping on the rudder, and DEVRIES replied that he was not.  The Pilots then decided that they would proceed with the takeoff without addressing the underlying problem associated with the illumination of the rudder torque limiter light.  Significantly, neither Pilot commented further on the illumined rudder torque limiter light, and neither checked the rudder pedals for freedom of movement.  Had they done so, they would have recognized that the pedals were locked by the gust lock system.

81.   The Pilots then encountered another unexpected indication from the Subject Aircraft, which they likewise ignored.  The throttles were unable to reach the crew's high-power setting the Pilots typically employed before engaging the auto-throttle system.  For more than 5 seconds, the Interlock Mechanism impeded the advancement of the throttle.  Undeterred by the throttle restriction, and after achieving 41 knots of speed, the Pilots simultaneously engaged the auto-throttle system and bypassed the Interlock Mechanism.

82.   Over the next 3 or 4 seconds, the gust lock moved from the ON position to an intermediate position—neither completely engaged nor fully disengaged.

Podhurst Orseck, P.A.                                    18

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346   |   www.podhurst.com

83.    The Subject Aircraft continued to accelerate, passing 60 knots, where the Pilots missed yet another check that would have revealed the ongoing engagement of the gust lock.  Item 4 of the AFM category "Lineup" requires a "60 Knot Elevator Check," during which the pilot, at 60 knots, would confirm that the elevators are free and that the yoke has reached its neutral position. Again, the FDR and CVR reveal that the Pilots failed to conduct this simple check, which would have demonstrated that the gust lock was still engaged.  Notably, according to the FDR and CVR, they also failed to notice that the yoke was not in its neutral position—that, instead, it was in the trailing edge down position.  This is significant because the hydraulic pressure at 60 knots would have forced the yoke, if the gust locked had not been engaged, into the neutral position. That it was not in the neutral position, therefore, was conclusive proof that the gust lock was still engaged.

84.    The Subject Aircraft also never reached Minimum Engine Pressure Ratio ("Min EPR"). EPR is the ratio between pressure levels in front of the engine and pressure levels behind the engine.  In other words, EPR is a number that represents the amount of power that an airplane's engine is producing.  Typically, the airplane's Flight Management System ("FMS") will compute the airplane's required EPR after the pilot inputs a number of flight-specific factors.  Generally speaking, a pilot is free to use 1 of 3 EPRs in deciding how much thrust is required for takeoff: Min EPR, which involves full thrust; Flex EPR, which is a takeoff conducted with reduced thrust; or the pilot's own EPR, which the pilot can enter at his or her discretion.

85.    In addition to never reaching Min EPR, the Subject Aircraft also never "clamped" on a single EPR; instead, it momentarily exceeded Flex EPR and then continuously decreased below Flex EPR.  Despite this unmistakable evidence that something was wrong with the aircraft, the Pilots did not abort the takeoff as they should have.

Podhurst Orseck, P.A.                                          19

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382  •  Fort Lauderdale 954.463.4346      www.podhurst.com

86.   A few seconds later, at 119 knots, the CVR reveals, 1 of the Pilots called out "$V_1$," that is, "decision speed"—the speed above which the takeoff will continue in the event of an engine failure.

87.   Almost immediately thereafter, at 125 knots, 1 of the Pilots called out "Rotate," that is, "$V_R$" or "rotation speed"—the speed at which the pilot must pull back on the yoke, thereby triggering the elevators at the back of the plane to turn upward, thus pushing the tail down, lifting the nose up, and, if all goes well, allowing the plane to take off.   At $V_R$, DEVRIES in fact attempted to pull the yoke back and take off—a fact revealed by the FDR, which recorded that the yoke moved half of a degree, from approximately -13.8° to -13.2°.   This was the first time, according to the FDR, that the yoke was moved.   When DEVRIES recognized that the yoke would not budge more than half of a degree, he finally appears to have noticed that the gust lock was engaged.   Immediately after pulling on the yoke, DEVRIES yelled that the "lock is on" 7 times over a 12.7-second span.

88.   Despite the now-obvious engagement of the gust lock and the very real dangers this impediment presented, the Pilots still did not attempt to abort the takeoff: They did not press down on the brakes; they did not pull the power levers back to idle; and they did not activate the thrust reversers.

89.   Instead, MCDOWELL activated the Flight Power Shut-Off Valve ("FPSOV").   This emergency procedure is only appropriate in situations where the pilots have confirmed that the flight controls, including the yoke, are free, and it is only effective at disengaging a hydraulically-induced flight control problem, as it allows the crew to manually manipulate the flight controls without the assistance of the hydraulic system.   The FPSOV, however, is not a solution to the problem posed by an engaged gust lock system during takeoff.

Podhurst Orseck, P.A.                                      20

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346                www.podhurst.com

90. The Pilots did not attempt to engage the brakes until the plane had reached 139 knots—a full 11 seconds after $V_R$. But, because the Pilots failed to pull the power handles back to idle, the plane continued to accelerate for several critical seconds, until it reached 163 knots, at which point it finally began to slow down. At 158 knots, the Pilots, for the first time, pulled the power levers back to idle, which brought the plane down to 145 knots, which is when the Pilots pulled the reverse handles, thus activating the thrust reversers. By then, 15 critical seconds had elapsed since the Pilots first called out $V_R$.

91. By this point, the Subject Aircraft had sped off the runway at Hanscom Field and continued past the adjoining runway safety area, where it lost its landing gear, and collided with several Medium Intensity Approach Lighting System with Runway Alignment Indicator ("MALSR") lights. These MALSR lights, which were not frangible, ruptured the fuel cells, causing the Subject Aircraft to begin leaking fuel, as a result of which the Subject Aircraft caught fire.

92. After colliding with the MALSR lights and the concrete-encased antennae, the Subject Aircraft, now on fire, ran into a number of antennae and smashed through a fence before crashing into a ravine, through which a creek flowed, where the fuel spilling from the fuel tanks fed an outside fire that consumed the now-shattered plane and its 7 occupants.

93. After the crash, the Subject Aircraft's ground spoilers were found retracted and trailing.

94. The CVR has revealed that the Pilots did not maintain a sterile cockpit after they started the engines. That is, the Pilots discussed subjects other than the flight operations after they started the engines—a gross violation of aviation industry standards.

95. The CVR has also revealed that the Pilots failed to perform any of the checks listed in the AFM using the "challenge and response" method.

Podhurst Orseck, P.A.                    21

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

96. In fact, a subsequent investigation has revealed that the Pilots had failed to perform complete flight control checks before an astounding 98% of their previous 175 takeoffs in the Subject Aircraft.

### The Owners and Operators of the Subject Aircraft

97. At all times material to this Complaint, the Pilots were flying the Subject Aircraft during and in the course of their employment for SPINIELLO.

98. At all times material to this Complaint, SK TRAVEL was the owner of the Subject Aircraft.

99. At all times material to this complaint, SK TRAVEL dry leased the Subject Aircraft to ARIZIN.

100. At all times material to this Complaint, SK TRAVEL and ARIZIN entered into a contract, under the terms of which SK TRAVEL retained control and possession of the Subject Aircraft and was responsible for maintenance and repairs of the Subject Aircraft.

101. At all times material to this Complaint, SK TRAVEL and ARIZIN entered into a contract, under the terms of which ARIZIN was responsible, along with SK TRAVEL, for accidents resulting from its use and operation of the Subject Aircraft.

### The Defective Products

102. At no time did the Subject Aircraft provide a warning to the Pilots, either visually or aurally, that the appropriate EPR had not been achieved for takeoff.

103. At no time did the Subject Aircraft provide a warning to the Pilots, either visually or aurally, that the EPR was continuously decreasing below Flex EPR.

104. At no time did GULFSTREAM warn the Pilots not to use the FPSOV to unlock the gust lock during takeoff.

Podhurst Orseck, P.A.                    22

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

105. The Subject Aircraft did not contain a mechanism that, when the gust lock was engaged, limited the operation of the aircraft.

106. Upon information and belief, the vast majority of other aircraft manufacturers have installed mechanisms that either (1) automatically disengage the gust lock when the engines are started or the power levers are moved forward; (2) prevent the engine(s) from being started while the gust lock is engaged; (3) completely prohibit throttle lever advancement while the gust lock is engaged; or (4) force the control yoke all the way to the left when the gust lock is engaged, thereby preventing the pilots' ability to steer the aircraft and also providing a powerful visual cue to the crew that the gust lock is still engaged. These alternative designs are reasonable and were known and available to GULFSTREAM at the time it designed and manufactured the Subject Aircraft.

107. After the crash, the detent pin—which ROCKWELL COLLINS designed, manufactured, and installed into the Subject Aircraft's gust lock system, and which secures the gust lock handle in either the full ON or full OFF position—was found sheared. Subsequent tests revealed that the detent pin did not meet the standard for hardness set out by the American Society for Testing and Materials ("ASTM").

**GULFSTREAM's Misrepresentations to the Federal Aviation Authority ("FAA")**

108. At all times material to this Complaint, GULFSTREAM designed, manufactured, and sold the Subject Aircraft.

109. At all times material to this Complaint, GULFSTREAM owned the type certificate for the Subject Aircraft.

Podhurst Orseck, P.A.                    23

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346  |  www.podhurst.com

110. In 1987, prior to the Subject Accident, GULFSTREAM submitted its design drawings for the G-IV aircraft, as well as its gust lock system and Interlock Mechanism, to the FAA for certification.

111. Despite the complexity of the G-IV's gust lock system and Interlock Mechanism and the significant ways in which the gust lock system, the Interlock Mechanism, and the G-IV aircraft differed from earlier models, GULFSTREAM elected to conduct no pre-certification testing on either the gust lock system or the Interlock Mechanism system.

112. GULFSTREAM assured the FAA and the public during the G-IV certification process that the G-IV's gust lock system and Interlock Mechanism would limit the operation of the aircraft when the gust lock was engaged. Specifically, GULFSTREAM asserted that the Interlock Mechanism would prevent the power throttles from being moved past 6° when the gust lock was engaged.

113. This statement was false. Testing conducted after the Subject Accident has revealed that, even with the gust lock engaged, the G-IV's power levers can be moved between, on average, 18° and 24°. Indeed, testing conducted after the Subject Accident has revealed that the Subject Aircraft's power levers could be moved as far as 27°, even though the gust lock was engaged.

114. After the Subject Accident, GULFSTREAM admitted that, had testing been conducted on the G-IV's gust lock system and Interlock Mechanism prior to the certification process, this defect in the gust lock system and Interlock Mechanism would have been revealed.

115. GULFSTREAM also assured the FAA and the public that the red gust lock handle was so close to the power lever that, when the gust lock was engaged, the pilot-in-command's hand

Podhurst Orseck, P.A.

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

would necessarily touch or brush up against the gust lock handle in such a way as to impede the pilot-in-command from pushing the power lever when the gust lock was engaged.

116. This statement was also false. The G-IV's gust lock handle and power lever are far enough apart that a pilot-in-command pushing the power lever would never touch or brush up against the gust lock handle, even when the gust lock handle was in the ON position.

117. Based on GULFSTREAM's willful, wanton, reckless, and grossly negligent misrepresentations and omissions, the FAA certified GULFSTREAM's design for the G-IV, including its design of the Interlock Mechanism and the gust lock system.

118. Upon information and belief, this decision to forego necessary testing on the G-IV's gust lock system and Mechanical Interlock was done to save GULFSTREAM the sizeable time and expense associated with meticulous pre-certification testing.

### GULFSTREAM's and GULFSTREAM SERVICES' Maintenance, Inspections, and Repairs

119. On at least a yearly basis, the Subject Aircraft was repaired, inspected, and serviced by GULFSTREAM at its facility in Savannah, Georgia.

120. After each such inspection, GULFSTREAM certified that the Subject Aircraft, including its gust lock system, its Mechanical Interlock, its auto-throttle system, and its hydraulic assist system were current and airworthy.

121. In fact, less than 2 years before the Subject Accident, the Subject Aircraft, its gust lock system, and its Mechanical Interlock underwent a major overhaul and inspection at the GULFSTREAM facility in Savannah, Georgia. After this overhaul, GULFSTREAM declared the Subject Aircraft, its gust lock system, and Mechanical Interlock both current and airworthy.

Podhurst Orseck, P.A.                    25

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

## MASSPORT's Negligence

122. At all times material to this Complaint, MASSPORT was responsible for the design, construction, installation, maintenance, repair, and operation of the MALSR lights.

123. At all times material to this Complaint, MASSPORT had contracted with the U.S. Air Force to provide Fire and Rescue services in cases of emergencies at Hanscom Field.

124. The MALSR lights into which the Subject Aircraft collided, and which caused the Subject Aircraft to catch fire, were not frangible.

125. Several weeks after the Subject Accident, MASSPORT replaced all of the non-frangible MALSR lights at Hanscom Field with frangible ones.

126. The antennae into which the Subject Aircraft collided, and which caused the Subject Aircraft to catch fire, were likewise not frangible.

127. On the night of the Subject Accident, Hanscom Field's fire and rescue services did not begin to fight the fire with an extinguishing agent until more than 3 minutes had elapsed from the initial alarm.

128. At 23 minutes and 7 seconds after the alarm, 1 of the fire and rescue service vehicles ran out of fire-fighting foam. The fire was still raging.

129. At 28 minutes and 18 seconds after the alarm, fire and rescue services stopped applying water to the fire, despite the fact that the fire was still raging.

130. At 30 minutes and 7 seconds after the alarm, 1 of the fire and rescue service vehicles ran out of water. The fire was still raging.

131. On the night of the Subject Accident, Hanscom Field's fire and rescue services did not open the Subject Aircraft's main cabin door until 2 hours and 11 minutes after the alarm.

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

132. Several of the bodies of the Subject Aircraft's occupants were found out of their seats and in the vicinity of the main cabin door suggesting that the impact of the Subject Accident did not kill them.

COUNT 1

**CLAIM OF WRONGFUL DEATH PREDICATED ON COMMON LAW DANGEROUS INSTRUMENTALITY LIABILITY, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST SK TRAVEL**

133. The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

134. At all times material to this Complaint, SK TRAVEL was the owner of the Subject Aircraft, a dangerous instrumentality under the law.

135. At all times material to this complaint, SK TRAVEL was in possession of the Subject Aircraft.

136. At all times material to this complaint, SK TRAVEL was in control of the Subject Aircraft.

137. Accordingly, SK TRAVEL is vicariously and legally liable for the damages resulting from the ownership and operation of the Subject Aircraft.

138. The crash of the Subject Aircraft directly and proximately resulted in the death of LEWIS A. KATZ.

139. As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, the common laws of Florida and Massachusetts, and any other applicable law, they are entitled to damages for:

    a.  Pain and suffering of LEWIS A. KATZ prior to his death;

Podhurst Orseck, P.A.              27

25 West Flagler Street, Suite 800, Miami, Fl. 33130, Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346     www.podhurst.com

b.  Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

c.  Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

d.  Loss of support in money and in kind;

e.  Lost net accumulations;

f.  Lost value of life;

g.  Funeral expenses; and/or

h.  Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against SK TRAVEL for compensatory damages, costs, and such other relief this Court deems appropriate.  The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 2
### CLAIM OF WRONGFUL DEATH PREDICATED ON VICARIOUS LIABILITY PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST SK TRAVEL

140.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

141.  Massachusetts law provides that "No person shall *operate an aircraft* negligently so as to endanger the life or property of another." 702 Mass. Code Regs. 4.02.

Podhurst Orseck, P.A.                    28

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346  |  www.podhurst.com

142. Under Massachusetts law, "operation of aircraft" or "operate aircraft," means "the use, navigation or piloting of aircraft in the air space over this commonwealth or upon any airport within this commonwealth. Any person who causes or authorizes the operation of aircraft, whether with or without the right of legal control, in the capacity of owner, lessee or otherwise, of the aircraft, shall be deemed to be engaged in the operation of aircraft." Mass. Gen. Laws ch. 90 § 35(j).

143. At all times material to this Complaint, SK TRAVEL was the owner of the Subject Aircraft.

144. At all times material to this complaint, SK TRAVEL was in possession of the Subject Aircraft.

145. At all times material to this complaint, SK TRAVEL was in control of the Subject Aircraft.

146. Accordingly, under Massachusetts law, SK TRAVEL is vicariously and legally liable for the damages resulting from the ownership and operation of the Subject Aircraft.

147. The crash of the Subject Aircraft directly and proximately resulted in the death of LEWIS A. KATZ.

148. As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, the common laws of Florida and Massachusetts, and any other applicable law, they are entitled to damages for:

    a.  Pain and suffering of LEWIS A. KATZ prior to his death;

    b.  Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

Podhurst Orseck, P.A.       29

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346    www.podhurst.com

c.  Lost society, companionship, guidance, and services of LEWIS A.

KATZ to his survivors, beneficiaries, and heirs;

d.  Loss of support in money and in kind;

e.  Lost net accumulations;

f.  Lost value of life;

g.  Funeral expenses; and/or

h.  Any and all other damages to which the survivors, beneficiaries,

and/or the Estate of LEWIS A. KATZ may be entitled to recover under

applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of

themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased,

demand judgment against SK TRAVEL for compensatory damages, costs, and such other relief

this Court deems appropriate.  The Plaintiffs further demand a trial by jury of all issues triable as

of right by a jury.

### COUNT 3
### CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE, PURSUANT TO
### MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21,
### AGAINST SK TRAVEL

149.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if

fully set forth herein.

150.  At all times material to this Complaint, SK TRAVEL was the owner of the Subject

Aircraft.

151.  At all times material to this Complaint, SK TRAVEL owed LEWIS A. KATZ a duty to

keep the aircraft in good operating condition and completely airworthy during the lease term by

Podhurst Orseck, P.A.                    30

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382  •  Fort Lauderdale 954.463.4346        www.podhurst.com

performing the service and maintenance recommended in the Gulfstream Factory Maintenance Program.

152. At all times material to this Complaint, SK TRAVEL owed LEWIS A. KATZ a duty to repair or replace any failed parts of the Subject Aircraft with a serviceable unit of comparable quality to the failed unit.

153. SK TRAVEL breached the duty of care it owed to LEWIS A. KATZ in a number of ways, including, but not limited to, the following:

    a. Failing to ensure that the detent pin on the Subject Aircraft was functioning properly;

    b. Failing to replace the substandard detent pin with a functioning detent pin; and

    c. Failing to ensure that the gust lock system was working properly.

    d. Failing to ensure that the Interlock Mechanism was working properly.

154. At all times material to this Complaint, SK TRAVEL failed to exercise the requisite degree of care in maintaining and repairing the Subject Aircraft, which negligently violated operative safety procedures and/or the applicable standard of care, with disregard for the serious consequences of their negligence.

155. SK TRAVEL's breach of operative safety procedures and/or the applicable standard of care directly and proximately resulted in the Subject Accident and the death of LEWIS A. KATZ.

156. As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2 and Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

Podhurst Orseck, P.A.      31

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346    www.podhurst.com

a.  Pain and suffering of LEWIS A. KATZ prior to his death;

b.  Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

c.  Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

d.  Loss of support in money and in kind;

e.  Lost net accumulations;

f.  Lost value of life;

g.  Funeral expenses; and/or

h.  Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against SK TRAVEL for compensatory damages, costs, and such other relief this Court deems appropriate.  The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 4
## CLAIM OF CONSCIOUS SUFFERING,
## PURSUANT TO MASS. GEN. LAWS CH. 229 § 6,
## AGAINST SK TRAVEL

157.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

158.  Massachusetts law provides that "No person shall *operate an aircraft* negligently so as to endanger the life or property of another." 702 Mass. Code Regs. 4.02.

Podhurst Orseck, P.A.                                    32

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

159. Under Massachusetts law, "operation of aircraft" or "operate aircraft," means "the use, navigation or piloting of aircraft in the air space over this commonwealth or upon any airport within this commonwealth. Any person who causes or authorizes the operation of aircraft, whether with or without the right of legal control, in the capacity of owner, lessee or otherwise, of the aircraft, shall be deemed to be engaged in the operation of aircraft." Mass. Gen. Laws ch. 90 § 35(j).

160. At all times material to this Complaint, SK TRAVEL was the owner of the Subject Aircraft.

161. At all times material to this complaint, SK TRAVEL was in possession of the Subject Aircraft.

162. At all times material to this complaint, SK TRAVEL was in control of the Subject Aircraft.

163. In addition, the Subject Aircraft was a dangerous instrumentality under the law.

164. Accordingly, under Massachusetts law, SK TRAVEL is vicariously and legally liable for the damages resulting from the ownership and operation of the Subject Aircraft.

165. The crash of the Subject Aircraft directly and proximately resulted in the conscious suffering and death of LEWIS A. KATZ.

166. As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they are entitled to damages for conscious suffering and any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

Podhurst Orseck, P.A.                    33

25 West Flagler Street, Suite 800, Miami, FL 33130; Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346          www.podhurst.com

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against SK TRAVEL for conscious suffering damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 5
## CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE AND VICARIOUS LIABILITY, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST SPINIELLO

167. The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

168. At all times material to this Complaint, SPINIELLO employed MCDOWELL and DEVRIES, the Pilots of the Subject Aircraft.

169. Accordingly, SPINIELLO is vicariously and legally liable for the negligence of the Pilots conducted during, and within the scope of, their employment with SPINIELLO.

170. At all times material to this Complaint, the Pilots owed LEWIS A. KATZ a duty to operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death.

171. The Pilots breached the duty of care they owed to LEWIS A. KATZ in a number of ways, including, but not limited to, the following:

    a. Failing to properly disengage the gust lock;

    b. Failing to conduct the check at Item 70 of the AFM category "Before Engine Start," which is labeled "Gust Lock as Required";

    c. Failing to conduct the check at Item 4 of the AFM category "Starting Engines," labeled "Gust Lock Off";

Podhurst Orseck, P.A.       34

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346    www.podhurst.com

d.  Failing to conduct the checks at Item 16 of the AFM category "After Engine Start, Normal Procedures";

e.  Failing to abort the takeoff after the blue rudder limiter light had illuminated;

f.  Failing to check the rudder pedals after the blue rudder limiter light illuminated;

g.  Failing to conduct the check at Item 4 of the AFM category "Lineup," called the "60 Knot Elevator Check";

h.  Failing to abort the takeoff immediately after recognizing that the elevator did not move more than half of a degree, from -13.8° to -13.2°;

i.  Failing to abort the takeoff when the Subject Aircraft did not reach Min EPR;

j.  Failing to abort the takeoff when the Subject Aircraft failed to "clamp" on a single EPR;

k.  Failing to abort the takeoff after noticing that the Subject Aircraft's EPR began decreasing continuously below Flex EPR;

l.  Failing to abort the takeoff when they recognized that the "lock is on";

m.  Activating the FPSOV in an attempt to disengage the gust lock during the takeoff;

n.  Failing to engage the brakes until the plane had already reached 139 knots;

Podhurst Orseck, P.A.                                 35

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

o. Failing to pull the power handles back to idle at or before their application of the brakes;

p. Failing to activate the thrust reversers when they applied the brakes;

q. Failing to maintain a sterile cockpit after starting the engines; and

r. Failing to perform any of the checks listed in the AFM using the "challenge and response" method.

172. At all times material to this Complaint, the Pilots failed to exercise the requisite degree of care in ensuring the safety of the Subject Aircraft and operated the Subject Aircraft in a hazardous manner, which negligently violated operative safety procedures and/or the applicable standard of care, with disregard for the serious consequences of their negligence.

173. The Pilots' negligence occurred during, and within the scope of, their employment for SPINIELLO.   Accordingly, SPINIELLO is vicariously and legally liable for the Pilots' negligence under Mass. Gen. Laws ch. 229 § 2, which states: "A person shall be liable for the negligence or the willful, wanton or reckless act of his agents or servants while engaged in his business to the same extent and subject to the same limits as he would be liable under this section for his own act."

174. The Pilots' breach of operative safety procedures and/or the applicable standard of care directly and proximately resulted in the Subject Accident and the death of LEWIS A. KATZ.

175. As a direct and proximate result of the Pilots' negligence, LEWIS A. KATZ experienced conscious suffering and endured severe injuries, which resulted in his death.

176. As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged.   Therefore,

Podhurst Orseck, P.A.                              36

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com

pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they

are entitled to damages for:

     a.  Pain and suffering of LEWIS A. KATZ prior to his death;

     b.  Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and

        heirs;

     c.  Lost society, companionship, guidance, and services of LEWIS A.

        KATZ to his survivors, beneficiaries, and heirs;

     d.  Loss of support in money and in kind;

     e.  Lost net accumulations;

     f.  Lost value of life;

     g.  Funeral expenses; and/or

     h.  Any and all other damages to which the survivors, beneficiaries,

        and/or the Estate of LEWIS A. KATZ may be entitled to recover under

        applicable law.

    WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of

themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased,

demand judgment against SPINIELLO for compensatory damages, costs, and such other relief

this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as

of right by a jury.

COUNT 6
CLAIM OF CONSCIOUS SUFFERING,
PURSUANT TO MASS. GEN. LAWS CH. 229 § 6,
AGAINST SPINIELLO

    177.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if

fully set forth herein.

Podhurst Orseck, P.A.         37

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346 | www.podhurst.com

178. At all times material to this Complaint, SPINIELLO employed MCDOWELL and DEVRIES, the Pilots of the Subject Aircraft.

179. Accordingly, SPINIELLO is vicariously and legally liable for the negligence of the Pilots conducted during, and within the scope of, their employment.

180. At all times material to this Complaint, the Pilots owed LEWIS A. KATZ a duty to operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death.

181. The Pilots breached the duty of care they owed to LEWIS A. KATZ in a number of ways, including, but not limited to, the following:

    a.  Failing to properly disengage the gust lock;

    b.  Failing to conduct the check at Item 70 of the AFM category "Before Engine Start," which is labeled "Gust Lock as Required";

    c.  Failing to conduct the check at Item 4 of the AFM category "Starting Engines," labeled "Gust Lock Off";

    d.  Failing to conduct the checks at Item 16 of the AFM category "After Engine Start, Normal Procedures";

    e.  Failing to abort the takeoff after the blue rudder limiter light had illuminated;

    f.  Failing to check the rudder pedals after the blue rudder limiter light illuminated;

    g.  Failing to conduct the check at Item 4 of the AFM category "Lineup," called the "60 Knot Elevator Check";

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346    www.podhurst.com

h. Failing to abort the takeoff immediately after recognizing that the elevator did not move more than half of a degree, from -13.8° to -13.2°;

i. Failing to abort the takeoff when the Subject Aircraft did not reach Min EPR;

j. Failing to abort the takeoff when the Subject Aircraft failed to "clamp" on a single EPR;

k. Failing to abort the takeoff after noticing that the Subject Aircraft's EPR began decreasing continuously below Flex EPR;

l. Failing to abort the takeoff when they recognized that the "lock is on";

m. Activating the FPSOV in an attempt to disengage the gust lock during the takeoff;

n. Failing to engage the brakes until the plane had already reached 139 knots;

o. Failing to pull the power handles back to idle at or before their application of the brakes;

p. Failing to activate the thrust reversers when they applied the brakes;

q. Failing to maintain a sterile cockpit after starting the engines; and

r. Failing to perform any of the checks listed in the AFM using the "challenge and response" method.

182. At all times material to this Complaint, the Pilots failed to exercise the requisite degree of care in ensuring the safety of the Subject Aircraft and operated the Subject Aircraft in a

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346          www.podhurst.com

hazardous manner, which negligently violated operative safety procedures and/or the applicable standard of care, with disregard for the serious consequences of their negligence.

183. The Pilots' negligence occurred during, and within the scope of, their employment for SPINIELLO. Accordingly, SPINIELLO is vicariously and legally liable for the Pilots' negligence under Mass. Gen. Laws ch. 229 § 2, which states: "A person shall be liable for the negligence or the willful, wanton or reckless act of his agents or servants while engaged in his business to the same extent and subject to the same limits as he would be liable under this section for his own act."

184. The Pilots' breach of operative safety procedures and/or the applicable standard of care directly and proximately resulted in the Subject Accident and the death of LEWIS A. KATZ.

185. As a direct and proximate result of the Pilots' negligence, LEWIS A. KATZ experienced conscious suffering and endured severe injuries, which resulted in his death.

186. As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they are entitled to damages for conscious suffering and any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against SPINIELLO for conscious suffering damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

Podhurst Orseck, P.A.                                    40

25 West Flagler Street, Suite 800, Miami, FL 33130, Miami 305.358.2800  Fax 305.358.2382  •  Fort Lauderdale 954.463.4346          www.podhurst.com