**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Drew Katz and Melissa Silver, individually and as
the Co-Personal Representatives of the Estate of
LEWIS A. KATZ, deceased,

       Plaintiffs,

v.

SPINIELLO COMPANIES, a New Jersey
Corporation; SK TRAVEL LLC, a North Carolina
Limited Liability Company; ARIZIN VENTURES
LLC, a Delaware Limited Liability Company;
CAROL MCDOWELL, in her capacity as Personal
Representative of the ESTATE OF JAMES
MCDOWELL, deceased, a resident of Delaware;
SHELLY DEVRIES, in her capacity as Personal
Representative of the ESTATE OF BAUKE
DEVRIES, deceased, a resident of New Jersey
GULFSTREAM AEROSPACE CORPORATION,
a Georgia Corporation; GULFSTREAM
AEROSPACE CORPORATION, a Delaware
Corporation; GULFSTREAM AEROSPACE
SERVICES CORPORATION, d/b/a Gulfstream
Aerospace Corporation, a Delaware Corporation;
ROCKWELL COLLINS, INC., an Iowa
Corporation; HONEYWELL INTERNATIONAL,
INC., a Delaware Corporation; and the
MASSACHUSETTS PORT AUTHORITY, an
independent public authority of the Commonwealth
of Massachusetts,

       Defendants,

SK TRAVEL, LLC; SPINIELLO COMPANIES;
and ARIZIN VENTURES, LLC,

       Third-Party Plaintiffs,

v.

UNITED STATES OF AMERICA,

       Third-Party Defendant.

_____/

**Civil Action No.: 16-cv-11380-DJC**

## CORRECTED SECOND AMENDED COMPLAINT AND
## DEMAND FOR TRIAL BY JURY
### (Leave to file granted on August 8, 2017)

### General Allegations

1.    This is a civil action for the wrongful death of LEWIS A. KATZ, who was killed on May 31, 2014, when the Gulfstream G-IV airplane, Serial Number N121JM ("the Subject Aircraft"), in which he was a passenger crashed and burned at Laurence G. Hanscom Field in Bedford, Massachusetts ("the Subject Accident"). He was 72 years old. As this Complaint shows, the Defendants, SPINIELLO COMPANIES, a New Jersey Corporation; SK TRAVEL LLC, a North Carolina Limited Liability Company; ARIZIN VENTURES LLC, a Delaware Limited Liability Company; CAROL MCDOWELL, in her capacity as Personal Representative of the ESTATE OF JAMES MCDOWELL, deceased, a resident of Delaware; SHELLY DEVRIES, in her capacity as Personal Representative of the ESTATE OF BAUKE DEVRIES, deceased, a resident of New Jersey; GULFSTREAM AEROSPACE CORPORATION, a Georgia Corporation; GULFSTREAM AEROSPACE CORPORATION, a Delaware Corporation; GULFSTREAM AEROSPACE SERVICES CORPORATION, d/b/a Gulfstream Aerospace Corporation, a Delaware Corporation; ROCKWELL COLLINS, INC., an Iowa Corporation; HONEYWELL INTERNATIONAL, INC., a Delaware Corporation; and the MASSACHUSETTS PORT AUTHORITY, an independent public authority of the Commonwealth of Massachusetts, (collectively, "the Defendants"), caused the Subject Accident by their negligence and, with respect to certain Defendants, by manufacturing and/or designing a defective product and breaching the implied warranty of merchantability.

2.    DREW KATZ and MELISSA SILVER are the children of LEWIS A. KATZ and have been appointed Co-Personal Representatives of his Estate.

3.    DREW KATZ and MELISSA SILVER, on behalf of themselves, the Estate of LEWIS A. KATZ, and all survivors and next of kin bring this action pursuant to Massachusetts' wrongful death statute, Mass. Gen. Laws ch. 229 §§ 2 and 6, and seek all available damages, including:

> a. As a result of the death of LEWIS A. KATZ, DREW KATZ and MELISSA SILVER have suffered the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of LEWIS A. KATZ; and
>
> b. The Estate of LEWIS A. KATZ is entitled to damages for the conscious suffering LEWIS A. KATZ endured as a result of the accident that killed him.

4.    DREW KATZ and MELISSA SILVER, on behalf of themselves, the Estate of LEWIS A. KATZ, and all survivors and next of kin bring this action pursuant to Florida's wrongful death statute, Fla. Stat. § 768.21, and seek all available damages, including:

> a. As a result of the death of LEWIS A. KATZ, DREW KATZ and MELISSA SILVER have suffered the loss of support and services, parental companionship, instruction, and guidance, and mental pain and suffering from the date of LEWIS A. KATZ's death; and
>
> b. As a result of LEWIS A. KATZ's death, the Estate of LEWIS A. KATZ has suffered the loss of his prospective net accumulations.

5.    DREW KATZ and MELISSA SILVER, on behalf of themselves, the Estate of LEWIS A. KATZ, and all survivors and next of kin bring this action pursuant to any other applicable wrongful death statute.

## The Parties

6.    The Plaintiffs, DREW KATZ and MELISSA SILVER are the children of LEWIS A. KATZ, and have been appointed Co-Personal Representatives of his Estate. At the time of his death, LEWIS A. KATZ was a resident of Florida.

7.    The Defendant, SK TRAVEL LLC (hereinafter "SK TRAVEL"), is and was, at all times material to this Complaint, a North Carolina Limited Liability Company with its principal place of business in Delaware. At the time of the Subject Accident, SK TRAVEL owned the Subject Aircraft.

8.    The Defendant, SPINIELLO COMPANIES, INC. (hereinafter "SPINIELLO"), is and was, at all times material to this Complaint, a New Jersey Corporation with its principal place of business in New Jersey. At the time of the Subject Accident, SPINIELLO employed MCDOWELL and DEVRIES (collectively, "the Pilots").

9.    The Defendant, ARIZIN VENTURES LLC (hereinafter "ARIZIN"), is and was, at all times material to this Complaint, a Delaware Limited Liability Company. At the time of the Subject Accident, ARIZIN was dry leasing the Subject Aircraft from the Defendant, SK TRAVEL. A dry lease is a leasing arrangement whereby an aircraft lessor—in this case, SK TRAVEL—provides an aircraft to an aircraft lessee—in this case, ARIZIN—without insurance, crew, ground staff, supporting equipment, or maintenance.

10.    The Defendant, CAROL MCDOWELL, and her Decedent, JAMES MCDOWELL, (hereinafter referred to as "MCDOWELL"), have at all material times been Delaware residents. The Decedent, JAMES MCDOWELL, was 1 of 2 pilots of the Subject Aircraft at the time of the Subject Accident. At the time of the Subject Accident, MCDOWELL was employed by the Defendant, SPINIELLO.

11.    The Defendant, SHELLY DEVRIES, and her Decedent, BAUKE DEVRIES, (hereinafter "DEVRIES"), have at all material times been New Jersey residents. The Decedent, DEVRIES, was 1 of 2 pilots of the Subject Aircraft at the time of the Subject Accident. At the time of the Subject Accident, DEVRIES was employed by the Defendant, SPINIELLO.

12.    The Defendant, GULFSTREAM AEROSPACE CORPORATION (hereinafter "GULFSTREAM GEORGIA"), is and was, at all times material to this Complaint, a Georgia Corporation with its principal place of business at 500 Gulfstream Road, Savannah, Georgia. GULFSTREAM GEORGIA is and was, at all material times, engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, and distributing aircrafts and their component parts, including the Subject Aircraft and its component parts.

13.    The Defendant, GULFSTREAM AEROSPACE CORPORATION (hereinafter "GULFSTREAM DELAWARE"), is and was, at all times material, a Delaware Corporation with its principal place of business at 500 Gulfstream Road, Savannah, Georgia. GULFSTREAM DELAWARE is and at all material times was engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, and distributing aircrafts and their component parts.

14.    Upon information and belief, GULFSTREAM GEORGIA and GULFSTREAM DELAWARE are either one and the same entity, are agents or instrumentalities of one another, or else are engaged in a joint venture together. For purposes of this Complaint, we will refer to both GULFSTREAM GEORGIA and GULFSTREAM DELAWARE together as GULFSTREAM. GULFSTREAM owns the type certificate (No. A12EA) for the Subject Aircraft.

15.     The   Defendant,   GULFSTREAM   AEROSPACE   SERVICES   CORPORATION (hereinafter "GULFSTREAM SERVICES"), is and was, at all times material to this Complaint, a Delaware Corporation with its principal place of business in Dallas, Texas. GULFSTREAM SERVICES also has its offices at 500 Gulfstream Road, Savannah, Georgia, and is engaged in the business of servicing, inspecting, repairing, and maintaining aircrafts and their component parts. GULFSTREAM SERVICES is either a subsidiary, department, agency, instrumentality, alter-ego, or operating division of GULFSTREAM. GULFSTREAM SERVICES, which regularly does business as "Gulfstream Aerospace Corporation," is also engaged in a joint venture with GULFSTREAM.

16.     The   Defendant,   ROCKWELL   COLLINS,   INC.,   previously   ROCKWELL INTERNATIONAL (hereinafter "ROCKWELL COLLINS"), is and was, at all times material to this Complaint, a Delaware Corporation with its principal place of business in Cedar Rapids, Iowa. ROCKWELL COLLINS is and at all material times was engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, and distributing aircraft component parts, including the gust lock system and the Power Lever Interlock Mechanism ("Interlock Mechanism") of the Subject Aircraft.

17.     The   Defendant,   HONEYWELL   INTERNATIONAL,   INC.   (hereinafter "HONEYWELL"), is and was, at all times material to this Complaint, a Delaware Corporation with its principal place of business in New Jersey. HONEYWELL is and at all material times was engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, and distributing aircraft component parts, including the auto-throttle system of the Subject Aircraft.

18.    The Defendant, the Massachusetts Port Authority (hereinafter "MASSPORT") is and was, at all times material to this Complaint, a "public employer" of the Commonwealth of Massachusetts engaged in the business of designing, constructing, owning, operating, repairing, inspecting, and maintaining the airport at Laurence G. Hanscom Field ("Hanscom Field") in Bedford, Massachusetts.

## Subject Matter Jurisdiction

19.    The Superior Court of the Commonwealth of Massachusetts has exclusive original jurisdiction over this civil action because "there is no reasonable likelihood that recovery by the plaintiff will be less than or equal to $25,000." Mass. Gen. Laws ch. 212, § 3.

## Personal Jurisdiction

20.    The Court may exercise personal jurisdiction over MASSPORT because MASSPORT is "domiciled in, organized under the laws of, or maintaining ... its principal place of business in" Massachusetts. Mass. Gen. Laws ch. 223A § 2.

21.    The exercise of personal jurisdiction over MASSPORT comports with the Due Process Clause of the U.S. Constitution because MASSPORT is "at home" in Massachusetts.

22.    The Court may exercise personal jurisdiction over the remaining Defendants, pursuant to Mass. Gen. Laws ch. 223A § 3(c), inasmuch as each of the Defendants acted "directly or by an agent" to cause "tortious injury by an act or omission in this commonwealth."

23.    Similarly, the Court may exercise personal jurisdiction over Defendants GULFSTREAM, GULFSTREAM SERVICES, ROCKWELL COLLINS, and HONEYWELL, pursuant to Mass. Gen. Laws ch. 223A § 3(d), inasmuch as each of these Defendants caused "tortious injury in" Massachusetts "by an act or omission outside" Massachusetts and each "regularly does or solicits business, or engages in any other persistent course of conduct, or

derives substantial revenue from goods used or consumed or services rendered," in Massachusetts.

24.  The exercise of personal jurisdiction over the Defendants comports with the Due Process Clause of the U.S. Constitution because the Defendants engaged in sufficient "minimum contacts" with the Commonwealth of Massachusetts such that the exercise of jurisdiction over them would be both fair and reasonable.

25.  Specifically, SK TRAVEL owned, controlled, operated, and possessed the Subject Aircraft, which crashed in Massachusetts, causing tortious injuries and death there.

26.  ARIZIN leased, controlled, operated, and possessed the Subject Aircraft, which crashed in Massachusetts, causing tortious injuries and death there.

27.  SPINIELLO employed the Pilots who, during and in the course and scope of their employment for SPINIELLO, flew the Subject Aircraft to Massachusetts, engaged in tortious conduct in Massachusetts, and caused tortious injuries and death in Massachusetts.

28.  The Pilots flew the Subject Aircraft to Massachusetts, engaged in tortious conduct in Massachusetts, and caused injuries and death in Massachusetts.

29.  GULFSTREAM's contacts with Massachusetts satisfy the "stream of commerce" test because (1) GULFSTREAM delivers its products into the stream of commerce with the expectation that they will either be purchased by consumers in Massachusetts or be brought by consumers to Massachusetts; (2) GULFSTREAM regularly advertises its products and services in Massachusetts; (3) GULFSTREAM regularly provides services and advice to its customers in Massachusetts; (4) GULFSTREAM regularly sells its products to customers in Massachusetts; (5) GULFSTREAM derives substantial revenues from its business in Massachusetts; (6) GULFSTREAM employs hundreds of individuals in Massachusetts; (7) GULFSTREAM

receives tax benefits from the Commonwealth of Massachusetts; (8) GULFSTREAM maintains a full-time facility in Massachusetts; (9) GULFSTREAM flies GULFSTREAM aircraft into Massachusetts for the purpose of facilitating its business in Massachusetts; and (10) GULFSTREAM's Massachusetts workers serviced, repaired, and inspected the Subject Aircraft prior to the Subject Accident.

30.     GULFSTREAM and GULFSTREAM SERVICES operate an enormous facility in Westfield, Massachusetts. GULFSTREAM employs over 225 people at this facility, which has grown to encompass over 210,000 square feet of Massachusetts land.

31.     Upon information and belief, the approved repair station certificate (LEGRO396G) for the Westfield facility is in GULFSTREAM's name.

32.     Upon information and belief, when, in 2011, GULFSTREAM announced plans to expand the Westfield service center's operations, GULFSTREAM invested over $20,000,000.00 into that expansion project.

33.     In addition, as a part of that expansion, GULFSTREAM negotiated for and obtained tax incentives from the Commonwealth of Massachusetts. These tax incentives saved GULFSTREAM more than $4,000,000.00 in tax payments it would otherwise have owed to the Commonwealth of Massachusetts.

35.     Moreover, at GULFSTREAM's request, the Commonwealth of Massachusetts provided taxpayer-based funding of more than $5,000,000.00 to upgrade certain perimeter roads at the Westfield airport so as to increase access to the Westfield facility. This state-sponsored funding also paid for improvements to the Westfield tarmac area as a way of giving GULFSTREAM and its Massachusetts customers a more suitable parking area.

36.     Upon information and belief, in 2 recent job postings on April 4, 2016, and April 13, 2016, GULFSTREAM sought to hire Airworthiness Inspector(s) to work at the Westfield service center in Massachusetts.

37.     Upon information and belief, GULFSTREAM spends more than $2,000,000.00 every single year purchasing supplies and materials for its Westfield operations from other Massachusetts-based companies and vendors.

38.     Upon information and belief, GULFSTREAM generates more than $30,000,000.00 in annual revenues from its Massachusetts operations, which includes revenues from the Westfield service facility.

39.     Although the lease for the Westfield facility is in the name of GULFSTREAM SERVICES, GULFSTREAM SERVICES, which openly does business under the name "Gulfstream Aerospace Corporation," is either a subsidiary, department, agency, instrumentality, alter-ego, or operating division of GULFSTREAM. At the very least, GULFSTREAM SERVICES is engaged in a joint venture with GULFSTREAM. In fact, GULFSTREAM SERVICES shares common officers, directors, employees, and shareholders with GULFSTREAM; shares revenues and costs with GULFSTREAM; and advertises its Westfield facility, on the Internet and elsewhere in Massachusetts, solely and exclusively under the GULFSTREAM trade name. Indeed, all Internet traffic for the Westfield facility is directed to GULFSTREAM's website, which makes clear that the Westfield facility belongs to, and is operated by, GULFSTREAM.

39.     Moreover, the Subject Aircraft had, on at least one prior occasion, received field service maintenance and repairs from GULFSTREAM employees who worked at the Westfield facility. The payment for these repairs was made directly to GULFSTREAM.

40.    Records from the National Business Aviation Association ("NBAA") reveal that at least ten (10) GULFSTREAM aircraft are owned and/or operated by Massachusetts citizens or entities. All 10 of these GULFSTREAM aircraft are based and kept in the Commonwealth of Massachusetts—a fact known to GULFSTREAM. Indeed, GULFSTREAM and GULFSTREAM SERVICES regularly provide service, inspection, maintenance, repair, customer support, and parts sales to the owners of these 10 aircraft. Moreover, GULFSTREAM regularly communicates with the owners of these 10 aircraft about, among other things, airworthiness information and regularly provides advice and support—and markets its products and services— to the owners of these aircraft.

41.    Notably, the Subject Aircraft flew to Bedford, Massachusetts, on the night of the Subject Accident so that LEWIS A. KATZ and his guests could attend a philanthropic fundraiser hosted by the historian, Doris Kearns Goodwin. As such, for purposes of any jurisdictional analysis, the Subject Aircraft's accident in Massachusetts was not simply fortuitous.

42.    Upon information and belief, the Subject Aircraft had made other previous trips to and from Massachusetts, and GULFSTREAM had access to information from the Subject Aircraft's computers that would have allowed GULFSTREAM to know that the Subject Aircraft had traveled to Massachusetts.

43.    Upon information and belief, GULFSTREAM employees routinely fly company-owned and operated aircraft into the Commonwealth of Massachusetts for the purpose of providing support, maintenance, and sales promotions to persons or entities based in Massachusetts.

44.    In short, GULFSTREAM's and GULFSTREAM SERVICES' substantial contacts with the Commonwealth of Massachusetts are extensive and of long standing: GULFSTREAM and

GULFSTREAM SERVICES regularly and consistently avail themselves of the privilege of doing business in Massachusetts, of marketing their products and services to the residents of Massachusetts, of selling those products in Massachusetts, and of earning revenues from repairing and maintaining those products in Massachusetts; GULFSTREAM and GULFSTREAM SERVICES operate their business in Massachusetts on land they lease next to an airport in Massachusetts; they sought and obtained monies and tax incentives from the Government of Massachusetts for the expansion and improvement of their land in Massachusetts; they employ a large number of Massachusetts workers at their Massachusetts facilities; and they have for many years understood that the products they place in the stream of commerce end up in the Commonwealth of Massachusetts.

45.    In sum, GULFSTREAM should reasonably have anticipated the possibility of being haled into court in Massachusetts for deaths it caused in Massachusetts by its negligent design and manufacture of a product that it placed into the stream of commerce.

46.    ROCKWELL COLLINS is registered to do business in Massachusetts, has a Massachusetts office located at 256 Marginal Street, East Boston, Massachusetts 02128, and has a registered agent for service of process in Boston, Massachusetts.

47.    ROCKWELL COLLINS has sought and obtained a Foreign Corporation Certificate from the Commonwealth of Massachusetts for the purpose of conducting and transacting substantial business activities in Massachusetts.

48.    ROCKWELL COLLINS operates various business entities throughout the Commonwealth of Massachusetts and does substantial, systematic, and continuous business in Massachusetts by availing itself of business opportunities, advertising the availability of its parts and services, selling and shipping its parts to Massachusetts residents and entities, and then

communicating with its Massachusetts customers about airworthiness, repairs, maintenance, and pricing information.

49.    ROCKWELL COLLINS knows that the products it places into the stream of commerce are routinely purchased and used in Massachusetts.

50.    In sum, ROCKWELL COLLINS should reasonably have anticipated the possibility of being haled into court in Massachusetts for deaths it caused in Massachusetts by its negligent design and manufacture of a product that it placed into the stream of commerce.

51.    HONEYWELL is registered to do business in the Commonwealth of Massachusetts, has a registered office address at 84 State Street, Boston, Massachusetts 02109.

52.    HONEYWELL has sought and obtained a Foreign Corporation Certificate from the Commonwealth of Massachusetts for the purpose of conducting and transacting substantial business activities in Massachusetts.

53.    HONEYWELL operates various business entities throughout the Commonwealth of Massachusetts and does substantial, systematic, and continuous business in Massachusetts by availing itself of business opportunities, advertising the availability of its parts and services, selling and shipping its parts to Massachusetts residents and entities in Massachusetts, and then communicating with its Massachusetts customers about, among other things, airworthiness, repairs, maintenance, and pricing information.

54.    HONEYWELL knows that the products it places into the stream of commerce are routinely purchased and used in Massachusetts.

55.    In sum, HONEYWELL should reasonably have anticipated the possibility of being haled into court in Massachusetts for deaths it caused in Massachusetts by its negligent design and manufacture of a product that it placed into the stream of commerce.

## Venue

56.    Pursuant to Mass. Gen. Laws ch. 223 § 1, venue is proper in Suffolk County with respect to MASSPORT because MASSPORT "lives" or has its "usual place of business" in Suffolk County.

57.    Pursuant to Mass. Gen. Laws ch. 223 § 8, venue is proper in Suffolk County with respect to MASSPORT because MASSPORT is a corporation that may "sue or be sued" in Suffolk County.

58.    Pursuant to Mass. Gen. Laws ch. 223 § 1, venue is proper in Suffolk County with respect to the remaining Defendants because not one of them "lives in the commonwealth." As a result, "the action may be brought in any county."

## The Facts

### Introduction

59.    On May 31, 2014, the Subject Aircraft, manufactured by GULFSTREAM and piloted by MCDOWELL and DEVRIES, sped down the runway at Hanscom Field, failed to take off, continued past the runway safety area, lost its landing gear, collided with several lights and antennae, caught fire, and smashed through a security fence before crashing into a ravine. The crash and fire killed all 7 people onboard, including MCDOWELL and DEVRIES and LEWIS A. KATZ.

60.    A subsequent investigation has revealed that the Pilots inexcusably failed to disengage the gust lock before takeoff. The gust lock restricts the movement of the power levers, which are the main engine controls. When the gust lock is engaged and working properly, the plane's main controls are locked, and the plane will be unable to take off.

61.     The subsequent investigation has also revealed a defect in the Subject Aircraft's Interlock Mechanism—which was designed, manufactured, sold, and delivered by ROCKWELL COLLINS and incorporated into the Subject Aircraft by GULFSTREAM. The Interlock Mechanism is a series of levers and pulleys that, when the gust lock is in the locked position, interact with the 2 engine power levers so that they may be moved no more than 6°, thereby limiting the amount of power available to a pilot once the engines have started. Quite simply, then, the Interlock Mechanism is designed to prevent a pilot from taking off with the gust lock in the locked position.

62.     The Subject Aircraft's Interlock Mechanism failed to prevent the Pilots from moving the power levers past 6°. Indeed, even though the gust lock was in the locked position, the Pilots were able to move the power levers as far as 27°—almost, though not completely, to full throttle.

<strong>The Sequence of Events and the Pilots' Negligence</strong>

63.     On May 31, 2014, the Subject Aircraft flew from Newcastle Airport in Wilmington, Delaware to Hanscom Field, where it landed at 15:44 after a 48-minute flight.

64.     The Pilots activated the gust lock by pulling the gust lock handle to its ON position.

65.     LEWIS A. KATZ and his guests left the aircraft to attend a philanthropic fundraiser at the home of the historian, Doris Kearns Goodwin.

66.     The crew remained on the Subject Aircraft, except for a short trip to the Fixed Base Operator ("FBO"), where they ordered pizza, which they brought back onto the Subject Aircraft.

68.     The Pilots filed their proposed flight plan, which included an 18:30 departure, at 15:59. At 19:53, the Pilots updated the flight plan with the control tower based on the passengers' revised arrival time of 20:45.

69.     LEWIS A. KATZ and his 3 guests returned to the Subject Aircraft at 21:28.

70.     The right engine was started first, at 21:30, and the left engine started shortly thereafter.

71.     Critically, however, the Pilots failed to disengage the gust lock.

72.     At 21:32, the Subject Aircraft pulled away from its parked position and began taxiing to the start of Runway 11.

73.     For the eleven minutes after LEWIS A. KATZ and his guests embarked (between 21:28 and 21:39), the Cockpit Voice Recorder ("CVR") reveals not a single communication between the crew related to any pre-flight activity.

74.     The Pilots then failed to conduct a number of required and aviation industry-standard control checks that would have revealed that the gust lock was still engaged. For example, Item 70 of the Gulfstream Airplane Flight Manual ("AFM") category "Before Engine Start," which is labeled "Gust Lock as Required," required the Pilots to disengage the gust lock. But the Subject Aircraft's CVR and Flight Data Recorder ("FDR") reveal that the Pilots neither conducted—nor discussed conducting—this check.

75.     Similarly, the check at Item 4 of the AFM category "Starting Engines" is called "Gust Lock Off." As its name suggests, this check requires the pilot to move the gust lock lever into the "OFF," or forward, position. But, again, the Subject Aircraft's CVR and FDR reveal that the Pilots neither conducted—nor discussed conducting—this check.

76.     The Pilots also failed to perform the checks at Item 16 of the AFM category "After Engine Start, Normal Procedures," which comprises 3 separate checks. The first involves pre-flight checks of the 3 primary flight controls: (1) the Elevator Check, which requires the pilot to move the elevator control (or "yoke")[1] from the full forward to the full aft position; (2) the

---

[1] The elevator control or "yoke" is the steering wheel of a fixed-wing aircraft, like an airplane. By rotating the yoke, the pilot controls the ailerons. By pulling the yoke back, the pilots control the elevator. When the yoke is pulled back, the nose of the aircraft rises. When the yoke is pushed forward, the nose is lowered. When the yoke is turned left, the plane rolls to the left, and when the yoke is turned to the right, the plane rolls to the right.

rudder check, which requires the pilot to step on the right and left rudder pedals to their full positions; and (3) the aileron check, which requires the pilot to rotate the control wheel 90° to the right and 90° to the left. Each of these checks must be done "while observing a marshaller," that is, while a marshaller outside the plane observes that the checks are in fact done. Any one of these tests would have revealed that the gust lock was still engaged. The elevator, for instance, would not have pulled back freely; the rudder pedals would not have pressed down fully; and the control wheel would not have rotated as required. But the Subject Aircraft's CVR and FDR reveal that the Pilots neither conducted—nor discussed conducting—any of these checks.

77.    The second Item 16 check, the "Elevator Drop Check," requires the pilot to grab the control wheel, pull it back, and then release it. The purpose of this test is to ensure that the bungee spring in the elevator is unbroken. Again, had the Pilots complied with this mandatory test, they would have noticed that the wheel would not pull back at all, which would have been yet another reminder to disengage the gust lock. But the Subject Aircraft's CVR and FDR reveal that the Pilots neither conducted—nor discussed conducting—the Elevator Drop Check.

78.    The third and final Item 16 check is the "Rudder Torque Limiter Check." This check requires the pilot to step on the rudder pedals, which in turn move the rudders at the back of the plane. If the rudders are free and the torque limiter is working properly, the blue rudder limiter light would illuminate when the rudder pedals reached the full extent of their travel. Had they conducted this mandatory test, the Pilots would have realized that the rudder pedals could not be pushed down fully, which would have reminded them to disengage the gust lock. Again, however, the Subject Aircraft's CVR and FDR reveal that the Pilots never conducted—nor discussed conducting—this check.

79.    Using the aircraft's nose wheel steering ("NWS") tiller, the crew taxied the Subject Aircraft down taxiways Sierra, Tango, and Echo and then turned onto Runway 11. During the taxi, the gust lock system remained engaged with the gust lock handle in the ON position. At no time did the Pilots discuss takeoff speeds or brief one another about emergency procedures.

80.    The Pilots then overlooked a number of warning signs that should have caused them to abort the takeoff. For example, shortly after Lineup, the blue rudder torque limiter light illuminated—an indication that there was suddenly an increase in hydraulic pressure at a time when such an increase would have been inappropriate. Instead of aborting the takeoff, the CVR reveals that DEVRIES noted to MCDOWELL that the "rudder limit light is on." MCDOWELL responded by asking DEVRIES if he was stepping on the rudder, and DEVRIES replied that he was not. The Pilots then decided that they would proceed with the takeoff without addressing the underlying problem associated with the illumination of the rudder torque limiter light. Significantly, neither Pilot commented further on the illumined rudder torque limiter light, and neither checked the rudder pedals for freedom of movement. Had they done so, they would have recognized that the pedals were locked by the gust lock system.

81.    The Pilots then encountered another unexpected indication from the Subject Aircraft, which they likewise ignored. The throttles were unable to reach the crew's high-power setting the Pilots typically employed before engaging the auto-throttle system. For more than 5 seconds, the Interlock Mechanism impeded the advancement of the throttle. Undeterred by the throttle restriction, and after achieving 41 knots of speed, the Pilots simultaneously engaged the auto-throttle system and bypassed the Interlock Mechanism.

82.    Over the next 3 or 4 seconds, the gust lock moved from the ON position to an intermediate position—neither completely engaged nor fully disengaged.

83.     The Subject Aircraft continued to accelerate, passing 60 knots, where the Pilots missed yet another check that would have revealed the ongoing engagement of the gust lock. Item 4 of the AFM category "Lineup" requires a "60 Knot Elevator Check," during which the pilot, at 60 knots, would confirm that the elevators are free and that the yoke has reached its neutral position. Again, the FDR and CVR reveal that the Pilots failed to conduct this simple check, which would have demonstrated that the gust lock was still engaged. Notably, according to the FDR and CVR, they also failed to notice that the yoke was not in its neutral position—that, instead, it was in the trailing edge down position. This is significant because the hydraulic pressure at 60 knots would have forced the yoke, if the gust locked had not been engaged, into the neutral position. That it was not in the neutral position, therefore, was conclusive proof that the gust lock was still engaged.

84.     The Subject Aircraft also never reached Minimum Engine Pressure Ratio ("Min EPR"). EPR is the ratio between pressure levels in front of the engine and pressure levels behind the engine. In other words, EPR is a number that represents the amount of power that an airplane's engine is producing. Typically, the airplane's Flight Management System ("FMS") will compute the airplane's required EPR after the pilot inputs a number of flight-specific factors. Generally speaking, a pilot is free to use 1 of 3 EPRs in deciding how much thrust is required for takeoff: Min EPR, which involves full thrust; Flex EPR, which is a takeoff conducted with reduced thrust; or the pilot's own EPR, which the pilot can enter at his or her discretion.

85.     In addition to never reaching Min EPR, the Subject Aircraft also never "clamped" on a single EPR; instead, it momentarily exceeded Flex EPR and then continuously decreased below

Flex EPR. Despite this unmistakable evidence that something was wrong with the aircraft, the Pilots did not abort the takeoff as they should have.

86.    A few seconds later, at 119 knots, the CVR reveals, 1 of the Pilots called out "V$_1$," that is, "decision speed"—the speed above which the takeoff will continue in the event of an engine failure.

87.    Almost immediately thereafter, at 125 knots, 1 of the Pilots called out "Rotate," that is, "V$_R$" or "rotation speed"—the speed at which the pilot must pull back on the yoke, thereby triggering the elevators at the back of the plane to turn upward, thus pushing the tail down, lifting the nose up, and, if all goes well, allowing the plane to take off. At V$_R$, DEVRIES in fact attempted to pull the yoke back and take off—a fact revealed by the FDR, which recorded that the yoke moved half of a degree, from approximately -13.8° to -13.2°. This was the first time, according to the FDR, that the yoke was moved. When DEVRIES recognized that the yoke would not budge more than half of a degree, he finally appears to have noticed that the gust lock was engaged. Immediately after pulling on the yoke, DEVRIES yelled that the "lock is on" 7 times over a 12.7-second span.

88.    Despite the now-obvious engagement of the gust lock and the very real dangers this impediment presented, the Pilots still did not attempt to abort the takeoff: They did not press down on the brakes; they did not pull the power levers back to idle; and they did not activate the thrust reversers.

89.    Instead, MCDOWELL activated the Flight Power Shut-Off Valve ("FPSOV"). This emergency procedure is only appropriate in situations where the pilots have confirmed that the flight controls, including the yoke, are free, and it is only effective at disengaging a hydraulically-induced flight control problem, as it allows the crew to manually manipulate the flight controls without the assistance of the hydraulic system. The FPSOV, however, is not a solution to the problem posed by an engaged gust lock system during takeoff.

90.  The Pilots did not attempt to engage the brakes until the plane had reached 139 knots—a full 11 seconds after $V_R$. But, because the Pilots failed to pull the power handles back to idle, the plane continued to accelerate for several critical seconds, until it reached 163 knots, at which point it finally began to slow down. At 158 knots, the Pilots, for the first time, pulled the power levers back to idle, which brought the plane down to 145 knots, which is when the Pilots pulled the reverse handles, thus activating the thrust reversers. By then, 15 critical seconds had elapsed since the Pilots first called out $V_R$.

91.  By this point, the Subject Aircraft had sped off the runway at Hanscom Field and continued past the adjoining runway safety area, where it lost its landing gear, and collided with several Medium Intensity Approach Lighting System with Runway Alignment Indicator ("MALSR") lights. These MALSR lights, which were not frangible, ruptured the fuel cells, causing the Subject Aircraft to begin leaking fuel, as a result of which the Subject Aircraft caught fire.

92.  After colliding with the MALSR lights and the concrete-encased antennae, the Subject Aircraft, now on fire, ran into a number of antennae and smashed through a fence before crashing into a ravine, through which a creek flowed, where the fuel spilling from the fuel tanks fed an outside fire that consumed the now-shattered plane and its 7 occupants.

93.  After the crash, the Subject Aircraft's ground spoilers were found retracted and trailing.

94.  The CVR has revealed that the Pilots did not maintain a sterile cockpit after they started the engines. That is, the Pilots discussed subjects other than the flight operations after they started the engines—a gross violation of aviation industry standards.

95.  The CVR has also revealed that the Pilots failed to perform any of the checks listed in the AFM using the "challenge and response" method.

96.     In fact, a subsequent investigation has revealed that the Pilots had failed to perform complete flight control checks before an astounding 98% of their previous 175 takeoffs in the Subject Aircraft.

### The Owners and Operators of the Subject Aircraft

97.     At all times material to this Complaint, the Pilots were flying the Subject Aircraft during and in the course of their employment for SPINIELLO. In the alternative, however, that it is determined that the Pilots were not employees of SPINIELLO at the time of the Subject Accident, then they were the employees of SK TRAVEL and/or ARIZIN, acting in the course and scope of their employment.

98.     At all times material to this Complaint, SK TRAVEL was the owner of the Subject Aircraft.

99.     At all times material to this complaint, SK TRAVEL dry leased the Subject Aircraft to ARIZIN.

100.    At all times material to this Complaint, SK TRAVEL and ARIZIN entered into a contract, under the terms of which SK TRAVEL retained control and possession of the Subject Aircraft and was responsible for maintenance and repairs of the Subject Aircraft.

101.    At all times material to this Complaint, SK TRAVEL and ARIZIN entered into a contract, under the terms of which ARIZIN was responsible, along with SK TRAVEL, for accidents resulting from its use and operation of the Subject Aircraft.

### The Defective Products

102.    At no time did the Subject Aircraft provide a warning to the Pilots, either visually or aurally, that the appropriate EPR had not been achieved for takeoff.

103.   At no time did the Subject Aircraft provide a warning to the Pilots, either visually or aurally, that the EPR was continuously decreasing below Flex EPR.

104.   At no time did GULFSTREAM warn the Pilots not to use the FPSOV to unlock the gust lock during takeoff.

105.   The Subject Aircraft did not contain a mechanism that, when the gust lock was engaged, limited the operation of the aircraft.

106.   Upon information and belief, the vast majority of other aircraft manufacturers have installed mechanisms that either (1) automatically disengage the gust lock when the engines are started or the power levers are moved forward; (2) prevent the engine(s) from being started while the gust lock is engaged; (3) completely prohibit throttle lever advancement while the gust lock is engaged; or (4) force the control yoke all the way to the left when the gust lock is engaged, thereby preventing the pilots' ability to steer the aircraft and also providing a powerful visual cue to the crew that the gust lock is still engaged. These alternative designs are reasonable and were known and available to GULFSTREAM at the time it designed and manufactured the Subject Aircraft.

107.  After the crash, the detent pin—which ROCKWELL COLLINS designed, manufactured, and installed into the Subject Aircraft's gust lock system, and which secures the gust lock handle in either the full ON or full OFF position—was found sheared. Subsequent tests revealed that the detent pin did not meet the standard for hardness set out by the American Society for Testing and Materials ("ASTM").

**GULFSTREAM's Misrepresentations to the Federal Aviation Authority ("FAA")**

108.   At all times material to this Complaint, GULFSTREAM designed, manufactured, and sold the Subject Aircraft.

109.   At all times material to this Complaint, GULFSTREAM owned the type certificate for the Subject Aircraft.

110.   In 1987, prior to the Subject Accident, GULFSTREAM submitted its design drawings for the G-IV aircraft, as well as its gust lock system and Interlock Mechanism, to the FAA for certification.

111.   Despite the complexity of the G-IV's gust lock system and Interlock Mechanism and the significant ways in which the gust lock system, the Interlock Mechanism, and the G-IV aircraft differed from earlier models, GULFSTREAM elected to conduct no pre-certification testing on either the gust lock system or the Interlock Mechanism system.

112.   GULFSTREAM assured the FAA and the public during the G-IV certification process that the G-IV's gust lock system and Interlock Mechanism would limit the operation of the aircraft when the gust lock was engaged. Specifically, GULFSTREAM asserted that the Interlock Mechanism would prevent the power throttles from being moved past 6° when the gust lock was engaged.

113.   This statement was false. Testing conducted after the Subject Accident has revealed that, even with the gust lock engaged, the G-IV's power levers can be moved between, on average, 18° and 24°. Indeed, testing conducted after the Subject Accident has revealed that the Subject Aircraft's power levers could be moved as far as 27°, even though the gust lock was engaged.

114.   After the Subject Accident, GULFSTREAM admitted that, had testing been conducted on the G-IV's gust lock system and Interlock Mechanism prior to the certification process, this defect in the gust lock system and Interlock Mechanism would have been revealed.

115.   GULFSTREAM also assured the FAA and the public that the red gust lock handle was so close to the power lever that, when the gust lock was engaged, the pilot-in-command's hand would necessarily touch or brush up against the gust lock handle in such a way as to impede the pilot-in-command from pushing the power lever when the gust lock was engaged.

116.   This statement was also false. The G-IV's gust lock handle and power lever are far enough apart that a pilot-in-command pushing the power lever would never touch or brush up against the gust lock handle, even when the gust lock handle was in the ON position.

117.   Based on GULFSTREAM's willful, wanton, reckless, and grossly negligent misrepresentations and omissions, the FAA certified GULFSTREAM's design for the G-IV, including its design of the Interlock Mechanism and the gust lock system.

118.   Upon information and belief, this decision to forego necessary testing on the G-IV's gust lock system and Mechanical Interlock was done to save GULFSTREAM the sizeable time and expense associated with meticulous pre-certification testing.

### GULFSTREAM's and GULFSTREAM SERVICES'
### Maintenance, Inspections, and Repairs

119.   On at least a yearly basis, the Subject Aircraft was repaired, inspected, and serviced by GULFSTREAM at its facility in Savannah, Georgia.

120.   After each such inspection, GULFSTREAM certified that the Subject Aircraft, including its gust lock system, its Mechanical Interlock, its auto-throttle system, and its hydraulic assist system were current and airworthy.

121.   In fact, less than 2 years before the Subject Accident, the Subject Aircraft, its gust lock system, and its Mechanical Interlock underwent a major overhaul and inspection at the GULFSTREAM facility in Savannah, Georgia. After this overhaul, GULFSTREAM declared the Subject Aircraft, its gust lock system, and Mechanical Interlock both current and airworthy.

**MASSPORT's Negligence**

122.  At all times material to this Complaint, MASSPORT was responsible for the design, construction, installation, maintenance, repair, and operation of the MALSR lights.

123.  At all times material to this Complaint, MASSPORT had contracted with the U.S. Air Force to provide Fire and Rescue services in cases of emergencies at Hanscom Field.

124.  The MALSR lights into which the Subject Aircraft collided, and which caused the Subject Aircraft to catch fire, were not frangible.

125.  Several weeks after the Subject Accident, MASSPORT replaced all of the non-frangible MALSR lights at Hanscom Field with frangible ones.

126.  The antennae into which the Subject Aircraft collided, and which caused the Subject Aircraft to catch fire, were likewise not frangible.

127.  On the night of the Subject Accident, Hanscom Field's fire and rescue services did not begin to fight the fire with an extinguishing agent until more than 3 minutes had elapsed from the initial alarm.

128.  At 23 minutes and 7 seconds after the alarm, 1 of the fire and rescue service vehicles ran out of fire-fighting foam. The fire was still raging.

129.  At 28 minutes and 18 seconds after the alarm, fire and rescue services stopped applying water to the fire, despite the fact that the fire was still raging.

130.  At 30 minutes and 7 seconds after the alarm, 1 of the fire and rescue service vehicles ran out of water. The fire was still raging.

131.  On the night of the Subject Accident, Hanscom Field's fire and rescue services did not open the Subject Aircraft's main cabin door until 2 hours and 11 minutes after the alarm.

132.   Several of the bodies of the Subject Aircraft's occupants were found out of their seats and in the vicinity of the main cabin door suggesting that the impact of the Subject Accident did not kill them.

**COUNT 1**
**CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE AND**
**VICARIOUS LIABILITY, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2**
**AND FLA. STAT. § 768.21, AGAINST SPINIELLO**

133.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

134.   At all times material to this Complaint, SPINIELLO employed MCDOWELL and DEVRIES, the Pilots of the Subject Aircraft.

135.   Accordingly, SPINIELLO is vicariously and legally liable for the negligence of the Pilots conducted during, and within the scope of, their employment with SPINIELLO.

136.   At all times material to this Complaint, the Pilots owed LEWIS A. KATZ a duty to operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death.

137.   The Pilots breached the duty of care they owed to LEWIS A. KATZ in a number of ways, including, but not limited to, the following:

   a.   Failing to properly disengage the gust lock;

   b.   Failing to conduct the check at Item 70 of the AFM category "Before Engine Start," which is labeled "Gust Lock as Required";

   c.   Failing to conduct the check at Item 4 of the AFM category "Starting Engines," labeled "Gust Lock Off";

   d.   Failing to conduct the checks at Item 16 of the AFM category "After Engine Start, Normal Procedures";

e.  Failing to abort the takeoff after the blue rudder limiter light had illuminated;

f.  Failing to check the rudder pedals after the blue rudder limiter light illuminated;

g.  Failing to conduct the check at Item 4 of the AFM category "Lineup," called the "60 Knot Elevator Check";

h.  Failing to abort the takeoff immediately after recognizing that the elevator did not move more than half of a degree, from -13.8° to - 13.2°;

i.  Failing to abort the takeoff when the Subject Aircraft did not reach Min EPR;

j.  Failing to abort the takeoff when the Subject Aircraft failed to "clamp" on a single EPR;

k.  Failing to abort the takeoff after noticing that the Subject Aircraft's EPR began decreasing continuously below Flex EPR;

l.  Failing to abort the takeoff when they recognized that the "lock is on";

m.  Activating the FPSOV in an attempt to disengage the gust lock during the takeoff;

n.  Failing to engage the brakes until the plane had already reached 139 knots;

o.  Failing to pull the power handles back to idle at or before their application of the brakes;

p.  Failing to activate the thrust reversers when they applied the brakes;

q.  Failing to maintain a sterile cockpit after starting the engines; and

r.  Failing to perform any of the checks listed in the AFM using the "challenge and response" method.

138.   At all times material to this Complaint, the Pilots failed to exercise the requisite degree of care in ensuring the safety of the Subject Aircraft and operated the Subject Aircraft in a hazardous manner, which negligently violated operative safety procedures and/or the applicable standard of care, with disregard for the serious consequences of their negligence.

139.   The Pilots' negligence occurred during, and within the scope of, their employment for SPINIELLO. Accordingly, SPINIELLO is vicariously and legally liable for the Pilots' negligence under Mass. Gen. Laws ch. 229 § 2, which states: "A person shall be liable for the negligence or the willful, wanton or reckless act of his agents or servants while engaged in his business to the same extent and subject to the same limits as he would be liable under this section for his own act."

140.   The Pilots' breach of operative safety procedures and/or the applicable standard of care directly and proximately resulted in the Subject Accident and the death of LEWIS A. KATZ.

141.   As a direct and proximate result of the Pilots' negligence, LEWIS A. KATZ experienced conscious suffering and endured severe injuries, which resulted in his death.

142.   As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

a.  Pain and suffering of LEWIS A. KATZ prior to his death;

b.  Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

c.  Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

d.  Loss of support in money and in kind;

e.  Lost net accumulations;

f.  Lost value of life;

g.  Funeral expenses; and/or

h.  Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against SPINIELLO for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 2
## CLAIM OF CONSCIOUS SUFFERING,
## PURSUANT TO MASS. GEN. LAWS CH. 229 § 6,
## AGAINST SPINIELLO

143.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

144.  At all times material to this Complaint, SPINIELLO employed MCDOWELL and DEVRIES, the Pilots of the Subject Aircraft.

145.  Accordingly, SPINIELLO is vicariously and legally liable for the negligence of the Pilots conducted during, and within the scope of, their employment.

146.   At all times material to this Complaint, the Pilots owed LEWIS A. KATZ a duty to operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death.

147.   The Pilots breached the duty of care they owed to LEWIS A. KATZ in a number of ways, including, but not limited to, the following:

a.   Failing to properly disengage the gust lock;

b.   Failing to conduct the check at Item 70 of the AFM category "Before Engine Start," which is labeled "Gust Lock as Required";

c.   Failing to conduct the check at Item 4 of the AFM category "Starting Engines," labeled "Gust Lock Off";

d.   Failing to conduct the checks at Item 16 of the AFM category "After Engine Start, Normal Procedures";

e.   Failing to abort the takeoff after the blue rudder limiter light had illuminated.

f.   Failing to check the rudder pedals after the blue rudder limiter light illuminated;

g.   Failing to conduct the check at Item 4 of the AFM category "Lineup," called the "60 Knot Elevator Check";

h.   Failing to abort the takeoff immediately after recognizing that the elevator did not move more than half of a degree, from -13.8° to - 13.2°;

i.   Failing to abort the takeoff when the Subject Aircraft did not reach Min EPR;

j.   Failing to abort the takeoff when the Subject Aircraft failed to "clamp" on a single EPR;

k.   Failing to abort the takeoff after noticing that the Subject Aircraft's EPR began decreasing continuously below Flex EPR;

l.   Failing to abort the takeoff when they recognized that the "lock is on";

m.   Activating the FPSOV in an attempt to disengage the gust lock during the takeoff;

n.   Failing to engage the brakes until the plane had already reached 139 knots;

o.   Failing to pull the power handles back to idle at or before their application of the brakes;

p.   Failing to activate the thrust reversers when they applied the brakes;

q.   Failing to maintain a sterile cockpit after starting the engines; and

r.   Failing to perform any of the checks listed in the AFM using the "challenge and response" method.

148.   At all times material to this Complaint, the Pilots failed to exercise the requisite degree of care in ensuring the safety of the Subject Aircraft and operated the Subject Aircraft in a hazardous manner, which negligently violated operative safety procedures and/or the applicable standard of care, with disregard for the serious consequences of their negligence.

149.   The Pilots' negligence occurred during, and within the scope of, their employment for SPINIELLO. Accordingly, SPINIELLO is vicariously and legally liable for the Pilots' negligence under Mass. Gen. Laws ch. 229 § 2, which states: "A person shall be liable for the negligence or the willful, wanton or reckless act of his agents or servants while engaged in his

business to the same extent and subject to the same limits as he would be liable under this section for his own act."

150.   The Pilots' breach of operative safety procedures and/or the applicable standard of care directly and proximately resulted in the Subject Accident and the death of LEWIS A. KATZ.

151.   As a direct and proximate result of the Pilots' negligence, LEWIS A. KATZ experienced conscious suffering and endured severe injuries, which resulted in his death.

152.   As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they are entitled to damages for conscious suffering and any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against SPINIELLO for conscious suffering damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 3
## CLAIM FOR PUNITIVE DAMAGES, PURSUANT TO MASS. GEN LAWS CH. 229 § 2, AGAINST SPINIELLO

153.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

154.   At all times material to this Complaint, SPINIELLO employed MCDOWELL and DEVRIES, the Pilots of the Subject Aircraft.

155.  Accordingly, SPINIELLO is vicariously and legally liable for the negligence of the Pilots conducted during, and within the scope of, their employment.

156.  At all times material to this Complaint, the Pilots owed LEWIS A. KATZ a duty to operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death.

157.  The Pilots breached the duty of care they owed to LEWIS A. KATZ.

158.  As a direct and proximate result of the Pilots' wanton, reckless, and grossly negligent conduct, LEWIS A. KATZ experienced conscious suffering and endured severe injuries, which resulted in his death.

159.  The Pilots' actions in causing the Subject Accident and the resulting death of LEWIS A. KATZ constituted wanton, reckless, and grossly negligent conduct that warrants the imposition of punitive damages under Mass. Gen. Laws ch. 229 § 2.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against SPINIELLO for punitive damages in an amount that is fair and just under the law and such other relief as this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT 4**
**CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE AND**
**VICARIOUS LIABILITY, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2**
**AND FLA. STAT. § 768.21, AGAINST SK TRAVEL**

160.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

161.  Based upon information and belief, the Plaintiffs are of the position that the Pilots were employees of SPINIELLO—and only SPINIELLO—at the time of the Subject Accident. In the

alternative, however, that it is determined that SPINIELLO did not employ the Pilots at the time of the Subject Accident, then SK TRAVEL employed the Pilots.

162.  In that alternative, SK TRAVEL is vicariously and legally liable for the negligence of the Pilots conducted during, and within the scope of, their employment with SK TRAVEL.

163.  At all times material to this Complaint, the Pilots owed LEWIS A. KATZ a duty to operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death.

164.  The Pilots breached the duty of care they owed to LEWIS A. KATZ in a number of ways, including, but not limited to, the following:

   a.  Failing to properly disengage the gust lock;

   b.  Failing to conduct the check at Item 70 of the AFM category "Before Engine Start," which is labeled "Gust Lock as Required";

   c.  Failing to conduct the check at Item 4 of the AFM category "Starting Engines," labeled "Gust Lock Off";

   d.  Failing to conduct the checks at Item 16 of the AFM category "After Engine Start, Normal Procedures";

   e.  Failing to abort the takeoff after the blue rudder limiter light had illuminated;

   f.  Failing to check the rudder pedals after the blue rudder limiter light illuminated;

   g.  Failing to conduct the check at Item 4 of the AFM category "Lineup," called the "60 Knot Elevator Check";

h. Failing to abort the takeoff immediately after recognizing that the elevator did not move more than half of a degree, from -13.8° to - 13.2°;

i. Failing to abort the takeoff when the Subject Aircraft did not reach Min EPR;

j. Failing to abort the takeoff when the Subject Aircraft failed to "clamp" on a single EPR;

k. Failing to abort the takeoff after noticing that the Subject Aircraft's EPR began decreasing continuously below Flex EPR;

l. Failing to abort the takeoff when they recognized that the "lock is on"; ee. Activating the FPSOV in an attempt to disengage the gust lock during the takeoff;

m. Failing to engage the brakes until the plane had already reached 139 knots;

n. Failing to pull the power handles back to idle at or before their application of the brakes;

o. Failing to activate the thrust reversers when they applied the brakes.

p. Failing to maintain a sterile cockpit after starting the engines; and

q. Failing to perform any of the checks listed in the AFM using the "challenge and response" method.

165. At all times material to this Complaint, the Pilots failed to exercise the requisite degree of care in ensuring the safety of the Subject Aircraft and operated the Subject Aircraft in a hazardous manner, which negligently violated operative safety procedures and/or the applicable standard of care, with disregard for the serious consequences of their negligence.

166.  In the alternative that the Court finds the Pilots were not employees of SPINIELLO, then the Pilots' negligence occurred during, and within the scope of, their employment for SK TRAVEL. Accordingly, in that alternative, SK TRAVEL is vicariously and legally liable for the Pilots' negligence under Mass. Gen. Laws ch. 229 § 2, which states: "A person shall be liable for the negligence or the willful, wanton or reckless act of his agents or servants while engaged in his business to the same extent and subject to the same limits as he would be liable under this section for his own act."

167.  The Pilots' breach of operative safety procedures and/or the applicable standard of care directly and proximately resulted in the Subject Accident and the death of LEWIS A. KATZ.

168.  As a direct and proximate result of the Pilots' negligence, LEWIS A. KATZ experienced conscious suffering and endured severe injuries, which resulted in his death.

169. As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

  a.  Pain and suffering of LEWIS A. KATZ prior to his death;

  b.  Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

  c.  Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

  d.  Loss of support in money and in kind;

  e.  Lost net accumulations;

  f.  Lost value of life;

g.  Funeral expenses; and/or

h.  Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against SK TRAVEL for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 5
## CLAIM OF WRONGFUL DEATH PREDICATED ON COMMON LAW DANGEROUS INSTRUMENTALITY LIABILITY, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST SK TRAVEL

170.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

171.  At all times material to this Complaint, SK TRAVEL was the owner of the Subject Aircraft, a dangerous instrumentality under the law.

172.  At all times material to this complaint, SK TRAVEL was in possession of the Subject Aircraft.

173.  At all times material to this complaint, SK TRAVEL was in control of the Subject Aircraft.

174.  Accordingly, SK TRAVEL is vicariously and legally liable for the damages resulting from the ownership and operation of the Subject Aircraft.

175.  The crash of the Subject Aircraft directly and proximately resulted in the death of LEWIS A. KATZ.

176. As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, the common laws of Florida and Massachusetts, and any other applicable law, they are entitled to damages for:

    a.  Pain and suffering of LEWIS A. KATZ prior to his death;

    b.  Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

    c.  Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

    d.  Loss of support in money and in kind;

    e.  Lost net accumulations;

    f.  Lost value of life;

    g.  Funeral expenses; and/or

    h.  Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against SK TRAVEL for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT 6**
**CLAIM OF WRONGFUL DEATH PREDICATED ON VICARIOUS LIABILITY**
**PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21,**
**AGAINST SK TRAVEL**

177.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

178.   At all times material to this Complaint, SK TRAVEL was the owner of the Subject Aircraft.

179.   At all times material to this complaint, SK TRAVEL was in possession of the Subject Aircraft.

180.   At all times material to this complaint, SK TRAVEL was in control of the Subject Aircraft.

181.   Accordingly, SK TRAVEL is vicariously and legally liable for the damages resulting from the ownership and operation of the Subject Aircraft.

182.   The crash of the Subject Aircraft directly and proximately resulted in the death of LEWIS A. KATZ.

183.   As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, the common laws of Florida and Massachusetts, and any other applicable law, they are entitled to damages for:

      a.   Pain and suffering of LEWIS A. KATZ prior to his death;

      b.   Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

      c.   Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

    d.   Loss of support in money and in kind;

    e.   Lost net accumulations;

    f.   Lost value of life;

    g.   Funeral expenses; and/or

    h.   Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against SK TRAVEL for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

### COUNT 7
### CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST SK TRAVEL

184.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

185.   At all times material to this Complaint, SK TRAVEL was the owner of the Subject Aircraft.

186.   At all times material to this Complaint, SK TRAVEL owed LEWIS A. KATZ a duty to keep the aircraft in good operating condition and completely airworthy during the lease term by performing the service and maintenance recommended in the Gulfstream Factory Maintenance Program.

187.   At all times material to this Complaint, SK TRAVEL owed LEWIS A. KATZ a duty to repair or replace any failed parts of the Subject Aircraft with a serviceable unit of comparable quality to the failed unit.

188.   SK TRAVEL breached the duty of care it owed to LEWIS A. KATZ in a number of ways, including, but not limited to, the following:

     a.   Failing to ensure that the detent pin on the Subject Aircraft was functioning properly;

     b.   Failing to replace the substandard detent pin with a functioning detent pin; and

     c.   Failing to ensure that the gust lock system was working properly.

     d.   Failing to ensure that the Interlock Mechanism was working properly.

189.   At all times material to this Complaint, SK TRAVEL failed to exercise the requisite degree of care in maintaining and repairing the Subject Aircraft, which negligently violated operative safety procedures and/or the applicable standard of care, with disregard for the serious consequences of their negligence.

190.   SK TRAVEL's breach of operative safety procedures and/or the applicable standard of care directly and proximately resulted in the Subject Accident and the death of LEWIS A. KATZ.

191.   As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2 and Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

     a.   Pain and suffering of LEWIS A. KATZ prior to his death;

   b.   Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

   c.   Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

   d.   Loss of support in money and in kind;

   e.   Lost net accumulations;

   f.   Lost value of life;

   g.   Funeral expenses; and/or

   h.   Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against SK TRAVEL for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 8
## CLAIM OF CONSCIOUS SUFFERING,
## PURSUANT TO MASS. GEN. LAWS CH. 229 § 6,
## AGAINST SK TRAVEL

192.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

193.   At all times material to this Complaint, SK TRAVEL was the owner of the Subject Aircraft.

194.  At all times material to this complaint, SK TRAVEL was in possession of the Subject Aircraft.

195.  At all times material to this complaint, SK TRAVEL was in control of the Subject Aircraft.

196.  Accordingly, SK TRAVEL is vicariously liable for the Subject Accident.

197.  In addition, the Subject Aircraft was a dangerous instrumentality under the law.

198.  Accordingly, SK TRAVEL is also vicariously and legally liable for the damages resulting from the ownership and operation of the Subject Aircraft.

199.  Based upon information and belief, the Plaintiffs are of the position that the Pilots were employees of SPINIELLO—and only SPINIELLO—at the time of the Subject Accident. In the alternative, however, that it is determined that SPINIELLO did not employ the Pilots at the time of the Subject Accident, then SK TRAVEL is also vicariously liable for having employed the Pilots, whose negligence in the course and scope of their employment caused the Subject Accident.

200.  The crash of the Subject Aircraft directly and proximately resulted in the conscious suffering and death of LEWIS A. KATZ.

201.  As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they are entitled to damages for conscious suffering and any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against SK TRAVEL for conscious suffering damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 9
## CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE AND VICARIOUS LIABILITY, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST ARIZIN

202.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

203.  Based upon information and belief, the Plaintiffs are of the position that the Pilots were employees of SPINIELLO—and only SPINIELLO—at the time of the Subject Accident. In the alternative, however, that it is determined that SPINIELLO or SK TRAVEL did not employ the Pilots at the time of the Subject Accident, then ARIZIN employed the Pilots.

204.  In that alternative, ARIZIN is vicariously and legally liable for the negligence of the Pilots conducted during, and within the scope of, their employment with ARIZIN.

205.  At all times material to this Complaint, the Pilots owed LEWIS A. KATZ a duty to operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death.

206.  The Pilots breached the duty of care they owed to LEWIS A. KATZ in a number of ways, including, but not limited to, the following:

a.  Failing to properly disengage the gust lock;

b.  Failing to conduct the check at Item 70 of the AFM category "Before Engine Start," which is labeled "Gust Lock as Required";

c.  Failing to conduct the check at Item 4 of the AFM category "Starting Engines," labeled "Gust Lock Off";

d.  Failing to conduct the checks at Item 16 of the AFM category "After Engine Start, Normal Procedures";

e.  Failing to abort the takeoff after the blue rudder limiter light had illuminated;

f.  Failing to check the rudder pedals after the blue rudder limiter light illuminated;

g.  Failing to conduct the check at Item 4 of the AFM category "Lineup," called the "60 Knot Elevator Check".

h.  Failing to abort the takeoff immediately after recognizing that the elevator did not move more than half of a degree, from -13.8° to - 13.2°;

i.  Failing to abort the takeoff when the Subject Aircraft did not reach Min EPR;

j.  Failing to abort the takeoff when the Subject Aircraft failed to "clamp" on a single EPR;

k.  Failing to abort the takeoff after noticing that the Subject Aircraft's EPR began decreasing continuously below Flex EPR;

l.  Failing to abort the takeoff when they recognized that the "lock is on";

m.  Activating the FPSOV in an attempt to disengage the gust lock during the takeoff;

n.  Failing to engage the brakes until the plane had already reached 139 knots;

o.   Failing to pull the power handles back to idle at or before their application

of the brakes;

p.   Failing to activate the thrust reversers when they applied the brakes;

q.   Failing to maintain a sterile cockpit after starting the engines;

and

r.   Failing to perform any of the checks listed in the AFM using

the "challenge and response" method.

207.   At all times material to this Complaint, the Pilots failed to exercise the requisite degree of care in ensuring the safety of the Subject Aircraft and operated the Subject Aircraft in a hazardous manner, which negligently violated operative safety procedures and/or the applicable standard of care, with disregard for the serious consequences of their negligence.

208.   In the alternative that the Court finds the Pilots were not employees of SPINIELLO or SK TRAVEL, then the Pilots' negligence occurred during, and within the scope of, their employment for ARIZIN. Accordingly, in that alternative, ARIZIN is vicariously and legally liable for the Pilots' negligence under Mass. Gen. Laws ch. 229 § 2, which states: "A person shall be liable for the negligence or the willful, wanton or reckless act of his agents or servants while engaged in his business to the same extent and subject to the same limits as he would be liable under this section for his own act."

209.   The Pilots' breach of operative safety procedures and/or the applicable standard of care directly and proximately resulted in the Subject Accident and the death of LEWIS A. KATZ.

210.   As a direct and proximate result of the Pilots' negligence, LEWIS A. KATZ experienced conscious suffering and endured severe injuries, which resulted in his death.

211. As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

    a.   Pain and suffering of LEWIS A. KATZ prior to his death;

    b.   Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

    c.   Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

    d.   Loss of support in money and in kind;

    e.   Lost net accumulations;

    f.   Lost value of life;

    g.   Funeral expenses; and/or

    h.   Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against ARIZIN for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 10
## CLAIM OF WRONGFUL DEATH PREDICATED ON COMMON LAW DANGEROUS INSTRUMENTALITY LIABILITY,

## **PURSUANT TO MASS. GEN. LAWS CH. 229 § 2,**
## **AGAINST ARIZIN**

212.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

213.   At all times material to this Complaint, ARIZIN dry leased the Subject Aircraft, a dangerous instrumentality under the law, from SK TRAVEL.

214.   At all times material to this Complaint, ARIZIN was the operator of the Subject Aircraft.

215.   At all times material to this Complaint, ARIZIN was in possession of the Subject Aircraft.

216.   At all times material to this Complaint, ARIZIN was in control of the Subject Aircraft.

217.   At all times material to this Complaint, ARIZIN was responsible for the operational control of the Subject Aircraft.

218.   The flight that resulted in the Subject Accident was coordinated through, and organized by, ARIZIN, its agents, and employees.

219.   Accordingly, ARIZIN is vicariously and legally liable for the damages resulting from the operation of the Subject Aircraft, a dangerous instrumentality under the law.

220.   The crash of the Subject Aircraft directly and proximately resulted in the death of LEWIS A. KATZ.

221.   As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, the common laws of Florida and Massachusetts, and any other applicable law, they are entitled to damages for:

a.   Pain and suffering of LEWIS A. KATZ prior to his death;

b. Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

c. Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

d. Loss of support in money and in kind;

e. Lost net accumulations;

f. Lost value of life;

g. Funeral expenses; and/or

h. Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against ARIZIN for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT 11**
**CLAIM OF WRONGFUL DEATH PREDICATED ON VICARIOUS LIABILITY PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST ARIZIN**

222. The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

223. At all times material to this Complaint, ARIZIN was the lessee of the Subject Aircraft.

224. At all times material to this complaint, ARIZIN was in possession of the Subject Aircraft.

225.   At all times material to this complaint, ARIZIN was in control of the Subject Aircraft.

226.   Accordingly, ARIZIN is vicariously and legally liable for the damages resulting from the lease and operation of the Subject Aircraft.

227.   The crash of the Subject Aircraft directly and proximately resulted in the death of LEWIS A. KATZ.

228.   As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, the common laws of Florida and Massachusetts, and any other applicable law, they are entitled to damages for:

    a.   Pain and suffering of LEWIS A. KATZ prior to his death;

    b.   Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

    c.   Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

    d.   Loss of support in money and in kind;

    e.   Lost net accumulations;

    f.   Lost value of life;

    g.   Funeral expenses; and/or

    h.   Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased,

demand judgment against SK TRAVEL for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT 12**
**CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST ARIZIN**

229. The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

230. At all times material to this Complaint, ARIZIN dry leased the Subject Aircraft from SK TRAVEL.

231. At all times material to this Complaint, ARIZIN was the operator of the Subject Aircraft.

232. At all times material to this Complaint, ARIZIN was in possession of the Subject Aircraft.

233. At all times material to this Complaint, ARIZIN was in control of the Subject Aircraft.

234. At all times material to this Complaint, ARIZIN was responsible for the operational control of the Subject Aircraft.

235. The flight that resulted in the Subject Accident was coordinated through, and organized by, ARIZIN, its agents, and employees.

236. At all times material to this Complaint, ARIZIN owed LEWIS A. KATZ a duty to, among other things:

    a.  Operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death; and

     b.   Exercise reasonable diligence and care in selecting the pilots to whom it entrusted the operation of the Subject Aircraft.

237. ARIZIN breached these duties by, among other things:

     a.   Failing to operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death; and

     b.   Entrusting the operation of the Subject Aircraft to 2 pilots who had failed to perform complete flight control checks before 98% of their previous 175 takeoffs in the Subject Aircraft.

238. ARIZIN's breach of these duties directly and proximately resulted in the Subject Accident and the death of LEWIS A. KATZ.

239. As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

     a.   Pain and suffering of LEWIS A. KATZ prior to his death;

     b.   Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

     c.   Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

     d.   Loss of support in money and in kind;

     e.   Lost net accumulations;

     f.   Lost value of life;

g.  Funeral expenses; and/or

h.  Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against ARIZIN for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 13
## CLAIM OF CONSCIOUS SUFFERING AS A RESULT OF NEGLIGENCE, PURSUANT TO MASS. GEN. LAWS CH. 229 § 6, AGAINST ARIZIN

240.    The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

241.    At all times material to this Complaint, ARIZIN dry leased the Subject Aircraft from SK TRAVEL.

242.    At all times material to this Complaint, ARIZIN was the operator of the Subject Aircraft.

243.    At all times material to this Complaint, ARIZIN was in possession of the Subject Aircraft.

244.    At all times material to this Complaint, ARIZIN was in control of the Subject Aircraft.

245.    At all times material to this Complaint, ARIZIN was responsible for the operational control of the Subject Aircraft.

54

246.    The flight that resulted in the Subject Accident was coordinated through, and organized by, ARIZIN, its agents, and employees.

247.    At all times material to this Complaint, ARIZIN owed LEWIS A. KATZ a duty to, among other things:

      a.  Operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death; and

      b.  Exercise reasonable diligence and care in selecting the pilots to whom it entrusted the operation of the Subject Aircraft.

248. ARIZIN breached these duties by, among other things:

      a.  Failing to operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death; and

      b.  Entrusting the operation of the Subject Aircraft to 2 pilots who had failed to perform complete flight control checks before 98% of their previous 175 takeoffs in the Subject Aircraft.

249. ARIZIN's breach of these duties directly and proximately resulted in the Subject Accident and the death of LEWIS A. KATZ.

250. ARIZIN is also vicariously and legally liable for the crash of the Subject Aircraft because the Subject Aircraft was a dangerous instrumentality under the law.

251. ARIZIN is also vicariously and legally liable for the crash of the Subject Aircraft because, as the lessee of the Subject Aircraft, it is deemed to have been operating the Subject Aircraft under Massachusetts law.

252. Based upon information and belief, the Plaintiffs are of the position that the Pilots were employees of SPINIELLO—and only SPINIELLO—at the time of the Subject Accident. In the alternative, however, that it is determined that SPINIELLO and SK TRAVEL did not employ the Pilots at the time of the Subject Accident, then ARIZIN is also vicariously liable for having employed the Pilots, whose negligence in the course and scope of their employment caused the Subject Accident.

253.  Massachusetts law provides that "No person shall *operate an aircraft* negligently so as to endanger the life or property of another." 702 Mass. Code Regs. 4.02.

254.  Under Massachusetts law, "operation of aircraft" or "operate aircraft," means "the use, navigation or piloting of aircraft in the air space over this commonwealth or upon any airport within this commonwealth. Any person who causes or authorizes the operation of aircraft, whether with or without the right of legal control, in the capacity of owner, lessee or otherwise, of the aircraft, shall be deemed to be engaged in the operation of aircraft." Mass. Gen. Laws ch. 90 § 35(j).

255.  The crash of the Subject Aircraft directly and proximately resulted in the conscious suffering and death of LEWIS A. KATZ.

256.  As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they are entitled to damages for conscious suffering and any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against ARIZIN for conscious suffering damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT 14**
**CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE,**
**PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST**
**THE ESTATES OF JAMES MCDOWELL AND BAUKE DEVRIES**

257.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

258.   MCDOWELL and DEVRIES (the "Pilots") were the pilots of the Subject Aircraft at the time of the Subject Accident.

259.   At all times material to this Complaint, the Pilots owed LEWIS A. KATZ a duty to operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death.

260.   The Pilots breached the duty of care they owed to LEWIS A. KATZ in a number of ways, including, but not limited to, the following:

    a.   Failing to properly disengage the gust lock;

    b.   Failing to conduct the check at Item 70 of the AFM category "Before Engine Start," which is labeled "Gust Lock as Required";

    c.   Failing to conduct the check at Item 4 of the AFM category "Starting Engines," labeled "Gust Lock Off";

    d.   Failing to conduct the checks at Item 16 of the AFM category "After Engine Start, Normal Procedures";

e.   Failing to abort the takeoff after the blue rudder limiter light had illuminated;

f.   Failing to check the rudder pedals when the blue rudder limiter light illuminated;

g.   Failing to conduct the check at Item 4 of the AFM category "Lineup," called the "60 Knot Elevator Check";

h.   Failing to abort the takeoff immediately after recognizing that the elevator did not move more than half a degree, from -13.8° to -13.2°;

i.   Failing to abort the takeoff when the Subject Aircraft did not reach Min EPR;

j.   Failing to abort the takeoff when the Subject Aircraft failed to "clamp" on a single EPR;

k.   Failing to abort the takeoff after noticing that the Subject Aircraft's EPR began decreasing continuously below Flex EPR;

l.   Failing to abort the takeoff when they realized that the "lock is on";

m.  Activating the FPSOV in an attempt to disengage the gust lock during the takeoff;

n.   Failing to engage the brakes until the plane had already reached 139 knots;

o.   Failing to pull the power handles back to idle at or before their application of the brakes;

p.   Failing to activate the thrust reversers when they applied the brakes;

q.   Failing to maintain a sterile cockpit after starting the engines; and

r.  Failing to perform any of the checks listed in the AFM using the "challenge and response" method.

261. At all times material to this Complaint, the Pilots failed to exercise the requisite degree of care in ensuring the safety of the Subject Aircraft and operated the Subject Aircraft in a hazardous manner, which negligently violated operative safety procedures and/or the applicable standard of care, with disregard for the serious consequences of their negligence.

262.  The Pilots' breach of operative safety procedures and/or the applicable standard of care directly and proximately resulted in the Subject Accident and the death of LEWIS A. KATZ.

263.  As a direct and proximate result of the Pilots' negligence, LEWIS A. KATZ experienced conscious suffering and endured severe injuries, which resulted in his death.

264.  As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

a.  Pain and suffering of LEWIS A. KATZ prior to his death;

b.  Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

c.  Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

d.  Loss of support in money and in kind;

e.  Lost net accumulations;

f.  Lost value of life;

g.  Funeral expenses; and/or

h.   Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against CAROL MCDOWELL, in her capacity as Personal Representative of the ESTATE OF JAMES MCDOWELL, deceased, and SHELLY DEVRIES, in her capacity as Personal Representative of the ESTATE OF BAUKE DEVRIES, deceased, for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

### COUNT 15
### CLAIM OF CONSCIOUS SUFFERING AS A RESULT OF NEGLIGENCE, PURSUANT TO MASS. GEN. LAWS CH. 229 § 6, AGAINST THE ESTATES OF JAMES MCDOWELL AND BAUKE DEVRIES

265.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

266.   MCDOWELL and DEVRIES (the "pilots") were the pilots of the Subject Aircraft at the time of the Subject Accident.

267.   At all times material to this Complaint, the Pilots owed LEWIS A. KATZ a duty to operate the Subject Aircraft, both on the ground and in the air, with reasonable care, and to exercise the highest degree of care to prevent injury or death.

268.   The Pilots breached the duty of care they owed to LEWIS A. KATZ in a number of ways, including, but not limited to, the following:

a.   Failing to properly disengage the gust lock;

b.  Failing to conduct the check at Item 70 of the AFM category "Before Engine Start," which is labeled "Gust Lock as Required";

c.  Failing to conduct the check at Item 4 of the AFM category "Starting Engines," labeled "Gust Lock Off";

d.  Failing to conduct the checks at Item 16 of the AFM category "After Engine Start, Normal Procedures";

e.  Failing to abort the takeoff after the blue rudder limiter light had illuminated;

f.  Failing to check the rudder pedals when the blue rudder limiter light illuminated;

g.  Failing to conduct the check at Item 4 of the AFM category "Lineup," called the "60 Knot Elevator Check";

h.  Failing to abort the takeoff immediately after recognizing that the elevator did not move more than half a degree, from -13.8° to -13.2°;

i.  Failing to abort the takeoff when the Subject Aircraft did not reach Min EPR;

j.  Failing to abort the takeoff when the Subject Aircraft failed to "clamp" on a single EPR;

k.  Failing to abort the takeoff after noticing that the Subject Aircraft's EPR began decreasing continuously below Flex EPR;

l.  Failing to abort the takeoff when they realized that the "lock is on";

m.  Activating the FPSOV in an attempt to disengage the gust lock during the takeoff;

n.  Failing to engage the brakes until the plane had already reached 139 knots;

o.  Failing to pull the power handles back to idle at or before their application of the brakes;

p.  Failing to activate the thrust reversers when they applied the brakes;

q.  Failing to maintain a sterile cockpit after starting the engines; and

r.  Failing to perform any of the checks listed in the AFM using the "challenge and response" method.

269.  At all times material to this Complaint, the Pilots failed to exercise the requisite degree of care in ensuring the safety of the Subject Aircraft and operated the Subject Aircraft in a hazardous manner, which negligently violated operative safety procedures and/or the applicable standard of care, with disregard for the serious consequences of their negligence.

270.  The Pilots' breach of operative safety procedures and/or the applicable standard of care directly and proximately resulted in the Subject Accident and the death of LEWIS A. KATZ.

271.  As a direct and proximate result of the Pilots' negligence, LEWIS A. KATZ experienced conscious suffering and endured severe injuries, which resulted in his death.

272.  As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they are entitled to damages for conscious suffering damages; and/or any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against CAROL MCDOWELL, in her capacity as Personal Representative of the ESTATE OF JAMES MCDOWELL, deceased, and SHELLY DEVRIES, in her capacity as Personal Representative of the ESTATE OF BAUKE DEVRIES, deceased, for conscious suffering damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 16
## CLAIM OF WRONGFUL DEATH PREDICATED ON THE BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST GULFSTREAM

273.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

274.   GULFSTREAM owns the type certificate (No. A12EA) for the Subject Aircraft.

275.   GULFSTREAM designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the Subject Aircraft, together with its component parts, knowing that the equipment that it designed, manufactured, and sold would be used by the aviation community for flight operations.

276.   Prior to the Subject Accident, GULFSTREAM expressly and/or impliedly warranted that the Subject Aircraft and its component parts and systems were airworthy, of merchantable quality, and fit and safe for the purposes for which they were manufactured, designed, assembled, inspected, tested, sold, serviced, repaired, maintained, overhauled, intended, and used.

277.  Prior to the Subject Accident, GULFSTREAM expressly and/or impliedly warranted that the Subject Aircraft and its component parts and systems were free from all defects, including manufacturing defects, design defects, and failure to warn defects.

278.  Prior to the Subject Accident, GULFSTREAM knew that these warranties would be—and, in fact, were—relied upon.

279. GULFSTREAM breached these warranties, however, because the Subject Aircraft, together with its component parts and systems, including its gust lock system, its Interlock Mechanism, its auto-throttle system, and its hydraulic assist system, was unfit for its intended use, and was in an unreasonably dangerous and defective condition at the time of its delivery and/or sale. In fact, the Subject Aircraft and its component parts and systems contained a variety of design defects, manufacturing defects, and inadequate and unreasonably dangerous instructions and warnings, and GULFSTREAM failed to give the FAA, the public, LEWIS A. KATZ, and the Pilots adequate warnings about the nature and extent of those dangers. Specifically:

    a.  The detent pin did not meet the standard for hardness set out by the American Society for Testing and Materials ("ASTM"). As a result, the detent pin sheared, which prevented the gust lock handle from locking into either the full "ON" or the full "OFF" position. The sheared detent pin permitted the throttle levers to be pushed forward far beyond 6°, even though the Subject Aircraft's controls were locked;

    b.  The gust lock system was designed without a fail-safe mechanism. That is, the gust lock system was not designed so as to have a second detent pin that could substitute for the first in case of malfunction, such as

shearing. This form of fail-safe mechanism is common in aircrafts of this kind;

c. GULFSTREAM failed to conduct a Failure Mode and Effects Analysis ("FMEA") on the detent pin, which would have revealed the absence of a fail-safe mechanism;

d. GULFSTREAM designed and manufactured the Subject Aircraft such that the engines could be started, even though the gust lock was engaged and the controls locked;

e. The Subject Aircraft was designed and manufactured in such a way that the Interlock Mechanism failed to prevent the throttles from moving past 6° when the gust lock was engaged;

f. The Interlock Mechanism was designed without a fail-safe mechanism. That is, the Interlock Mechanism was not designed so as to have a second mechanism that would prevent the throttles from moving past 6° in the event that the Interlock Mechanism failed;

g. GULFSTREAM's design and manufacture of the Subject Aircraft failed to abide by the requirements of applicable regulations in that the gust lock did not automatically disengage when the pilot operated the primary flight controls in a normal manner, and did not limit the operation of the airplane so that the pilot received unmistakable warning that the gust lock was engaged at the start of takeoff;

h. The Subject Aircraft was designed and manufactured without an auto-lock for the controls, which would have automatically unlocked the

controls once the hydraulic pressure was turned on;GULFSTREAM failed to design and manufacture a system that would warn the Pilots that the gust lock was engaged and that the controls were locked;

i.  GULFSTREAM failed to warn the Pilots about the potential consequences of the illumination of the torque rudder limiter light;

j.  GULFSTREAM failed to warn the Pilots that they should have aborted the flight when the torque rudder limiter light was illuminated;

k.  GULFSTREAM failed to warn the Pilots that the illuminated rudder limiter light could mean that the gust lock was engaged;

l.  GULFSTREAM failed to warn the Pilots never to activate the FPSOV in an effort to disengage the gust lock;

m.  GULFSTREAM failed to warn the Pilots of the potential consequences of activating the FPSOV to disengage the gust lock during takeoff;

n.  GULFSTREAM failed to design and manufacture a system that would warn the Pilots that their EPR was lower than necessary for takeoff;

o.  GULFSTREAM failed to design and manufacture a system that would warn the Pilots when the auto-throttle and the designated EPR were in disagreement;

p.  GULFSTREAM failed to design and manufacture a system that would prevent activation of the auto-throttle when the gust lock was engaged; and

q.  GULFSTREAM failed to design and manufacture the Subject Aircraft's hydraulic assist system so as to allow the gust lock to be easily disengaged after the engines are started.

r.  In 1987, prior to the Subject Accident, GULFSTREAM submitted its design drawings for the G-IV aircraft, as well as its gust lock system and Interlock Mechanism, to the FAA for certification.

s.  Despite the complexity of the G-IV's gust lock system and Interlock Mechanism and the significant ways in which the gust lock system, the Interlock Mechanism, and the G-IV aircraft differed from earlier models, GULFSTREAM elected to conduct no pre-certification testing on either system.

t.  GULFSTREAM assured the FAA and the public during the G-IV certification process that the G-IV's gust lock system and Interlock Mechanism would limit the operation of the aircraft when the gust lock was engaged. Specifically, GULFSTREAM asserted that the Interlock Mechanism would prevent the power throttles from being moved past 6° when the gust lock was engaged. This statement was false. Testing conducted after the Subject Accident has revealed that, even with the gust lock engaged, the G-IV's power levers can be moved between, on average, 18° and 24°. Indeed, testing conducted after the Subject Accident has revealed that the Subject Aircraft's power levers could be moved as far as 27°, even though the gust lock was engaged.

u.  After the Subject Accident, GULFSTREAM admitted that, had testing been conducted on the G-IV aircraft prior to the certification process, this defect in the gust lock system and Interlock Mechanism would have been revealed.

v.  GULFSTREAM also assured the FAA and the public that the red gust lock handle was so close to the power lever that, when the gust lock was engaged, the pilot-in-command's hand would necessarily touch or brush up against the gust lock handle in such a way as to impede the pilot-in-command from pushing the power lever when the gust lock was engaged. This statement was also false. The G-IV's gust lock handle and power lever are far enough apart that a pilot-in-command pushing the power lever would never touch or brush up against the gust lock handle, even when the gust lock handle was in the ON position.

280.  Upon information and belief, GULFSTREAM's decision to forego necessary testing on the G-IV's gust lock system and Mechanical Interlock was done to save GULFSTREAM the sizeable time and expense associated with meticulous pre-certification testing.

281.  GULFSTREAM's misrepresentations and omissions—and GULFSTREAM's decision to forego necessary safety testing in order to save time and money—manifests a willful, reckless, or wanton disregard for life or property.

282. Based on GULFSTREAM's willful, wanton, reckless, and grossly negligent misrepresentations and omissions, the FAA certified GULFSTREAM's design of the G-IV, including its design of the Interlock Mechanism and the gust lock system. As a result of this

certification, GULFSTREAM was able to manufacture the Subject Aircraft and sell it into the stream of commerce.

283.   Upon information and belief, the vast majority of other aircraft manufacturers have installed mechanisms that either (1) automatically disengage the gust lock when the engines are started or the power levers are moved forward; (2) prevent the engine(s) from being started while the gust lock is engaged; (3) completely prohibit throttle lever advancement while the gust lock is engaged; or (4) force the control yoke all the way to the left when the gust lock is engaged, thereby preventing the pilots' ability to steer the aircraft and simultaneously providing a powerful visual cue to the crew that the gust lock is still engaged. These alternative designs are reasonable and were known and available to GULFSTREAM at the time it designed and manufactured the Subject Aircraft.

284.   At all times material to this Complaint, the Subject Aircraft was sold and/or delivered by GULFSTREAM without being altered by some other party, without substantial change in the condition in which it was sold and/or delivered by GULFSTREAM, and was being used as intended by, and/or in a manner that was reasonably foreseeable to, GULFSTREAM.

285.   The manufacturing, design, and failure to warn defects described in sub-paragraphs a-w of this Count directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. GULFSTREAM is therefore liable for the death of LEWIS A. KATZ.

286.   As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

   a.   Pain and suffering of LEWIS A. KATZ prior to his death;

     b.   Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

     c.   Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

     d.   Loss of support in money and in kind;

     e.   Lost net accumulations;

     f.   Lost value of life;

     g.   Funeral expenses; and/or

     h.   Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against GULFSTREAM for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 17
## CLAIM OF CONSCIOUS SUFFERING AS A RESULT OF THE BREACH OF THE WARRANTY OF MERCHANTABILITY, PURSUANT TO MASS. GEN. LAWS CH. 229 § 6, AGAINST GULFSTREAM

287.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

288.  GULFSTREAM owns the type certificate (No. A12EA) for the Subject Aircraft.

289.  GULFSTREAM designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the Subject Aircraft, together with its component parts, knowing that the equipment that it designed, manufactured, and sold would be used by the aviation community for flight operations.

290.  Prior to the Subject Accident, GULFSTREAM expressly and/or impliedly warranted that the Subject Aircraft and its component parts and systems were airworthy, of merchantable quality, and fit and safe for the purposes for which they were manufactured, designed, assembled, inspected, tested, sold, serviced, repaired, maintained, overhauled, intended, and used.

291.  Prior to the Subject Accident, GULFSTREAM expressly and/or impliedly warranted that the Subject Aircraft and its component parts and systems were free from all defects, including manufacturing defects, design defects, and failure to warn defects.

292.  Prior to the Subject Accident, GULFSTREAM knew that these warranties would be—and, in fact, were—relied upon.

293.  GULFSTREAM breached these warranties, however, because the Subject Aircraft, together with its component parts and systems, including its gust lock system, its Interlock Mechanism, its auto-throttle system, and its hydraulic assist system, was unfit for its intended use, and was in an unreasonably dangerous and defective condition at the time of its delivery and/or sale. In fact, the Subject Aircraft and its component parts and systems contained a variety of design defects, manufacturing defects, and inadequate and unreasonably dangerous instructions and warnings, and GULFSTREAM failed to give the FAA, the public, LEWIS A. KATZ, or the Pilots adequate warnings about the nature and extent of those dangers. Specifically:

a. The detent pin did not meet the standard for hardness set out by the American Society for Testing and Materials ("ASTM"). As a result, the detent pin sheared, which prevented the gust lock handle from locking into either the full "ON" or the full "OFF" position. The sheared detent pin permitted the throttle levers to be pushed forward far beyond 6°, even though the Subject Aircraft's controls were locked;

b. The gust lock system was designed without a fail-safe mechanism. That is, the gust lock system was not designed so as to have a second detent pin that could substitute for the first in case of malfunction, such as shearing. This form of fail-safe mechanism is common in aircrafts of this kind;

c. GULFSTREAM failed to conduct a Failure Mode and Effects Analysis ("FMEA") on the detent pin, which would have revealed the absence of a fail-safe mechanism;

d. GULFSTREAM designed and manufactured the Subject Aircraft such that the engines could be started, even though the gust lock was engaged and the controls locked;

e. The Subject Aircraft was designed and manufactured in such a way that the Interlock Mechanism failed to prevent the throttles from moving past 6° when the gust lock was engaged;

f. The Interlock Mechanism was designed without a fail-safe mechanism. That is, the Interlock Mechanism was not designed so as to have a second mechanism that would prevent the throttles from moving past 6° in the event that the Interlock Mechanism failed;

g.  GULFSTREAM's design and manufacture of the Subject Aircraft failed to abide by the requirements of applicable regulations in that the gust lock did not automatically disengage when the pilot operated the primary flight controls in a normal manner, and did not limit the operation of the airplane so that the pilot received unmistakable warning that the gust lock was engaged at the start of takeoff;

h.  The Subject Aircraft was designed and manufactured without an auto-lock for the controls, which would have automatically unlocked the controls once the hydraulic pressure was turned on;

i.  GULFSTREAM failed to design and manufacture a system that would warn the Pilots that the gust lock was engaged and that the controls were locked;

j.  GULFSTREAM failed to warn the Pilots about the potential consequences of the illumination of the torque rudder limiter light;

k.  GULFSTREAM failed to warn the Pilots that they should have aborted the flight when the torque rudder limiter light was illuminated;

l.  GULFSTREAM failed to warn the Pilots that the illuminated rudder limiter light could mean that the gust lock was engaged;

m.  GULFSTREAM failed to warn the Pilots never to activate the FPSOV in an effort to disengage the gust lock;

n.  GULFSTREAM failed to warn the Pilots of the potential consequences of activating the FPSOV to disengage the gust lock during takeoff;

o.   GULFSTREAM failed to design and manufacture a system that would warn the Pilots that their EPR was lower than necessary for takeoff;

p.   GULFSTREAM failed to design and manufacture a system that would warn the Pilots when the auto-throttle and the designated EPR were in disagreement;

q.   GULFSTREAM failed to design and manufacture a system that would prevent activation of the auto-throttle when the gust lock was engaged; and

r.   GULFSTREAM failed to design and manufacture the Subject Aircraft's hydraulic assist system so as to allow the gust lock to be easily disengaged after the engines are started.

s.   In 1987, prior to the Subject Accident, GULFSTREAM submitted its design drawings for the G-IV aircraft, as well as its gust lock system and Interlock Mechanism, to the FAA for certification.

t.   Despite the complexity of the G-IV's gust lock system and Interlock Mechanism and the significant ways in which the gust lock system, the Interlock Mechanism, and the G-IV aircraft differed from earlier models, GULFSTREAM elected to conduct no pre-certification testing on either system.

u.   GULFSTREAM assured the FAA and the public during the G-IV certification process that the G-IV's gust lock system and Interlock Mechanism would limit the operation of the aircraft when the gust lock was engaged. Specifically, GULFSTREAM asserted that the Interlock

Mechanism would prevent the power throttles from being moved past 6° when the gust lock was engaged. This statement was false. Testing conducted after the Subject Accident has revealed that, even with the gust lock engaged, the G-IV's power levers can be moved between, on average, 18° and 24°. Indeed, testing conducted after the Subject Accident has revealed that the Subject Aircraft's power levers could be moved as far as 27°, even though the gust lock was engaged.

v. After the Subject Accident, GULFSTREAM admitted that, had testing been conducted on the G-IV aircraft prior to the certification process, this defect in the gust lock system and Interlock Mechanism would have been revealed.

w. GULFSTREAM also assured the FAA and the public that the red gust lock handle was so close to the power lever that, when the gust lock was engaged, the pilot-in-command's hand would necessarily touch or brush up against the gust lock handle in such a way as to impede the pilot-in-command from pushing the power lever when the gust lock was engaged. This statement was also false. The G-IV's gust lock handle and power lever are far enough apart that a pilot-in-command pushing the power lever would never touch or brush up against the gust lock handle, even when the gust lock handle was in the ON position.

294. Upon information and belief, GULFSTREAM's decision to forego necessary testing on the G-IV's gust lock system and Mechanical Interlock was done to save GULFSTREAM the sizeable time and expense associated with meticulous pre-certification testing.

75

295.  GULFSTREAM's misrepresentations and omissions—and GULFSTREAM's decision to forego necessary safety testing in order to save time and money—manifests a willful, reckless, or wanton disregard for life or property.

296. Based on GULFSTREAM's willful, wanton, reckless, and grossly negligent misrepresentations and omissions, the FAA certified GULFSTREAM's design for the G-IV, including its design of the Interlock Mechanism and the gust lock system. As a result of this certification, GULFSTREAM was able to manufacture the Subject Aircraft and sell it into the stream of commerce.

297.  Upon information and belief, the vast majority of other aircraft manufacturers have installed mechanisms that either (1) automatically disengage the gust lock when the engines are started or the power levers are moved forward; (2) prevent the engine(s) from being started while the gust lock is engaged; (3) completely prohibit throttle lever advancement while the gust lock is engaged; or (4) force the control yoke all the way to the left when the gust lock is engaged, thereby preventing the pilots' ability to steer the aircraft and simultaneously providing a powerful visual cue to the crew that the gust lock is still engaged. These alternative designs are reasonable and were known and available to GULFSTREAM at the time it designed and manufactured the Subject Aircraft.

298.  At all times material to this Complaint, the Subject Aircraft was sold and/or delivered by GULFSTREAM without being altered by some other party, without substantial change in the condition in which it was sold and/or delivered by GULFSTREAM, and was being used as intended by, and/or in a manner that was reasonably foreseeable to, GULFSTREAM.

299.  The manufacturing, design, and failure to warn defects described in sub-paragraphs a-w of this Count directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. GULFSTREAM is therefore liable for the death of LEWIS A. KATZ.

300.  As a result of the manufacturing, design, and failure to warn defects described in sub-paragraphs a-w of this Count, LEWIS A. KATZ experienced conscious suffering and endured severe injuries, which resulted in his death.

301.  As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they are entitled to damages for conscious suffering and any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against GULFSTREAM for conscious suffering damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

### COUNT 18
### CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE, PURSUANT TO MASS. GEN LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST GULFSTREAM

302.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

303.  GULFSTREAM owns the type certificate (No. A12EA) for the Subject Aircraft.

304.  GULFSTREAM designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the Subject Aircraft, together with its

component parts, knowing that the equipment that it designed, manufactured, and sold would be used by the aviation community for flight operations.

305.  At all times material to this Complaint, GULFSTREAM was engaged in the sale of aircrafts and their component parts, which involved placing aircrafts, including the Subject Aircraft, into the stream of commerce, with full knowledge and intent that its aircrafts and their component parts would be used and flown by purchasers, users, and operators without the opportunity for inspection or testing.

306.  At all times material to this Complaint, GULFSTREAM knew, or in the exercise of reasonable care should have known, that the failure of any of its aircraft or their component parts, including the Subject Aircraft, would create an unreasonable risk of harm or death to persons onboard the aircraft.

307.  At all times material to this Complaint, GULFSTREAM owed a duty to use reasonable care, and to exercise the highest degree of care, in planning, designing, certifying, manufacturing, assembling, installing, overhauling, modifying, repairing, testing, inspecting, marketing, and distributing its aircraft, including the Subject Aircraft, and its component parts.

308.  This duty of care extended to those persons, including LEWIS A. KATZ, who would put the Subject Aircraft to its intended use.

309.  GULFSTREAM was under a further, continuing, and ongoing duty to, among other things:

> a.  Design, manufacture, integrate, assemble, modify, install, and overhaul the Subject Aircraft, including its component parts, so that the Subject Aircraft could be safely operated;

b.  Test and inspect the Subject Aircraft, including its component parts, for dangerous conditions that existed and were likely to exist in the Subject Aircraft;

c.  Modify, service, and repair dangerous conditions that were known by, or which should have been known to, GULFSTREAM in the exercise of reasonable care; and

d.  Warn and advise pilots, passengers, owners, operators, and others, including LEWIS A. KATZ, of such dangerous conditions concerning and relating to GULFSTREAM's design, assembly, manufacture, testing, and inspection of the Subject Aircraft and its component parts that were known by, or which should have been known to, GULFSTREAM.

310.  GULFSTREAM knew or should have known that its failure to properly and safely design, manufacture, assemble, install, modify, test, and inspect the Subject Aircraft, including its component parts, would create an unreasonable risk of harm to persons, like LEWIS A. KATZ, onboard the Subject Aircraft.

311.  At all times material to this Complaint, GULFSTREAM breached the aforementioned duties, and negligently and carelessly failed to discharge the aforementioned duties, by, among other things:

a.  Failing to design, manufacture, integrate, assemble, install, overhaul, and modify the Subject Aircraft, including its component parts, so that the Subject Aircraft could be safely operated;

b.  Failing to test and inspect the Subject Aircraft for dangerous conditions that existed and were likely to exist in the Subject Aircraft;

c. Failing to modify, service, and repair dangerous conditions that were known by, or which should have been known to, GULFSTREAM in the exercise of reasonable care;

d. Failing to timely warn and advise pilots, passengers, owners, operators, and others, including LEWIS A. KATZ, of such dangerous conditions concerning and relating to GULFSTREAM's design, assembly, manufacture, testing, and inspection of the Subject Aircraft and its component parts that were known by, or which should have been known to, GULFSTREAM;

e. The detent pin did not meet the standard for hardness set out by the American Society for Testing and Materials ("ASTM"). As a result, the detent pin sheared, which prevented the gust lock handle from locking into either the full "ON" or the full "OFF" position. The sheared detent pin permitted the throttle levers to be pushed forward far beyond 6°, even though the Subject Aircraft's controls were locked;

f. The gust lock system was designed without a fail-safe mechanism. That is, the gust lock system was not designed so as to have a second detent pin that could substitute for the first in case of malfunction, such as shearing. This form of fail-safe mechanism is common in aircrafts of this kind;

g. GULFSTREAM failed to conduct a Failure Mode and Effects Analysis ("FMEA") on the detent pin, which would have revealed the absence of a fail-safe mechanism;

h.   GULFSTREAM designed and manufactured the Subject Aircraft such that the engines could be started, even though the gust lock was engaged and the controls locked;

i.   The Subject Aircraft was designed and manufactured in such a way that the Interlock Mechanism failed to prevent the throttles from moving past 6° when the gust lock was engaged;

j.   The Interlock Mechanism was designed without a fail-safe mechanism. That is, the Interlock Mechanism was not designed so as to have a second mechanism that would prevent the throttles from moving past 6° in the event that the Interlock Mechanism failed;

k.   GULFSTREAM's design and manufacture of the Subject Aircraft failed to abide by the requirements of applicable regulations in that the gust lock did not automatically disengage when the pilot operated the primary flight controls in a normal manner, and did not limit the operation of the airplane so that the pilot received unmistakable warning that the gust lock was engaged at the start of takeoff;

l.   The Subject Aircraft was designed and manufactured without an auto-lock for the controls, which would have automatically unlocked the controls once the hydraulic pressure was turned on;

m.   GULFSTREAM failed to design and manufacture a system that would warn the Pilots that the gust lock was engaged and that the controls were locked;

n.  GULFSTREAM failed to warn the Pilots about the potential consequences of the illumination of the torque rudder limiter light;

o.  GULFSTREAM failed to warn the Pilots that they should have aborted the flight when the torque rudder limiter light was illuminated;

p.  GULFSTREAM failed to warn the Pilots that the illuminated rudder limiter light could mean that the gust lock was engaged;

q.  GULFSTREAM failed to warn the Pilots never to activate the FPSOV in an effort to disengage the gust lock;

r.  GULFSTREAM failed to warn the Pilots of the potential consequences of activating the FPSOV to disengage the gust lock during takeoff;

s.  GULFSTREAM failed to design and manufacture a system that would warn the Pilots that their EPR was lower than necessary for takeoff;

t.  GULFSTREAM failed to design and manufacture a system that would warn the Pilots when the auto-throttle and the designated EPR were in disagreement;

u.  GULFSTREAM failed to design and manufacture a system that would prevent activation of the auto-throttle when the gust lock was engaged; and

v.  GULFSTREAM failed to design and manufacture the Subject Aircraft's hydraulic assist system so as to allow the gust lock to be easily disengaged after the engines are started.

w.  In 1987, prior to the Subject Accident, GULFSTREAM submitted its design drawings for the G-IV aircraft, as well as its gust lock system and Interlock Mechanism, to the FAA for certification.

x.  Despite the complexity of the G-IV's gust lock system and Interlock Mechanism and the significant ways in which the gust lock system, the Interlock Mechanism, and the G-IV aircraft differed from earlier models, GULFSTREAM elected to conduct no pre-certification testing on either system.

y.  GULFSTREAM assured the FAA and the public during the G-IV certification process that the G-IV's gust lock system and Interlock Mechanism would limit the operation of the aircraft when the gust lock was engaged. Specifically, GULFSTREAM asserted that the Interlock Mechanism would prevent the power throttles from being moved past 6° when the gust lock was engaged. This statement was false. Testing conducted after the Subject Accident has revealed that, even with the gust lock engaged, the G-IV's power levers can be moved between, on average, 18° and 24°. Indeed, testing conducted after the Subject Accident has revealed that the Subject Aircraft's power levers could be moved as far as 27°, even though the gust lock was engaged.

z.  After the Subject Accident, GULFSTREAM admitted that, had testing been conducted on the G-IV aircraft's gust lock system and Interlock Mechanism prior to the certification process, this defect in the gust lock system and Interlock Mechanism would have been revealed.

aa. GULFSTREAM also assured the FAA and the public that the red gust lock handle was so close to the power lever that, when the gust lock was engaged, the pilot-in-command's hand would necessarily touch or brush up against the gust lock handle in such a way as to impede the pilot-in-command from pushing the power lever when the gust lock was engaged. This statement was also false. The G-IV's gust lock handle and power lever are far enough apart that a pilot-in-command pushing the power lever would never touch or brush up against the gust lock handle, even when the gust lock handle was in the ON position. At all times material to this Complaint, the Subject Aircraft was sold and/or delivered by GULFSTREAM without being altered by some other party, without substantial change in the condition in which it was sold and/or delivered by GULFSTREAM, and was being used as intended by, and/or in a manner that was reasonably foreseeable to, GULFSTREAM.

312. Upon information and belief, the vast majority of other aircraft manufacturers have installed mechanisms that either (1) automatically disengage the gust lock when the engines are started or the power levers are moved forward; (2) prevent the engine(s) from being started while the gust lock is engaged; (3) completely prohibit throttle lever advancement while the gust lock is engaged; or (4) force the control yoke all the way to the left when the gust lock is engaged, thereby preventing the pilots' ability to steer the aircraft and simultaneously providing a powerful visual cue to the crew that the gust lock is still engaged. These alternative designs are reasonable and were known and available to GULFSTREAM at the time it designed and manufactured the Subject Aircraft.

313.   Upon information and belief, GULFSTREAM's decision to forego necessary testing on the G-IV's gust lock system and Mechanical Interlock was done to save GULFSTREAM the sizeable time and expense associated with meticulous pre-certification testing.

314.   GULFSTREAM's misrepresentations and omissions—and GULFSTREAM's decision to forego necessary safety testing in order to save time and money—manifests a willful, reckless, or wanton disregard for life or property.

315.   The manufacturing, design, and failure to warn defects described in sub-paragraphs a-aa of this Count directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. GULFSTREAM is therefore liable in negligence for the death of LEWIS A. KATZ.

316.   As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

a.   Pain and suffering of LEWIS A. KATZ prior to his death;

b.   Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

c.   Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

d.   Loss of support in money and in kind;

e.   Lost net accumulations;

f.   Lost value of life;

g.   Funeral expenses; and/or

h.  Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against GULFSTREAM for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 19
## CLAIM OF CONSCIOUS SUFFERING AS A RESULT OF NEGLIGENCE, PURSUANT TO MASS. GEN LAWS CH. 229 § 6, AGAINST GULFSTREAM

317.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

318.  GULFSTREAM owns the type certificate (No. A12EA) for the Subject Aircraft.

319.  GULFSTREAM designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the Subject Aircraft, together with its component parts, knowing that the equipment that it designed, manufactured, and sold would be used by the aviation community for flight operations.

320.  At all times material to this Complaint, GULFSTREAM was engaged in the sale of aircrafts and their component parts, which involved placing aircrafts, including the Subject Aircraft, into the stream of commerce, with full knowledge and intent that its aircrafts and their component parts would be used and flown by purchasers, users, and operators without the opportunity for inspection or testing.

321.  At all times material to this Complaint, GULFSTREAM knew, or in the exercise of reasonable care should have known, that the failure of any of its aircraft or their component parts, including the Subject Aircraft, would create an unreasonable risk of harm or death to persons onboard the aircraft.

322.  At all times material to this Complaint, GULFSTREAM owed a duty to use reasonable care, and to exercise the highest degree of care, in planning, designing, certifying, manufacturing, assembling, installing, overhauling, modifying, repairing, testing, inspecting, marketing, and distributing its aircraft, including the Subject Aircraft, and its component parts.

323.  This duty of care extended to those persons, including LEWIS A. KATZ, who would put the Subject Aircraft to its intended use.

324.  GULFSTREAM was under a further, continuing, and ongoing duty to, among other things:

a.  Design, manufacture, integrate, assemble, modify, install, and overhaul the Subject Aircraft, including its component parts, so that the Subject Aircraft could be safely operated;

b.  Test and inspect the Subject Aircraft, including its component parts, for dangerous conditions that existed and were likely to exist in the Subject Aircraft;

c.  Modify, service, and repair dangerous conditions that were known by, or which should have been known to, GULFSTREAM in the exercise of reasonable care; and

d.  Warn and advise pilots, passengers, owners, operators, and others, including LEWIS A. KATZ, of such dangerous conditions concerning and

relating to GULFSTREAM's design, assembly, manufacture, testing, and inspection of the Subject Aircraft and its component parts that were known by, or which should have been known to, GULFSTREAM.

325.  GULFSTREAM knew or should have known that its failure to properly and safely design, manufacture, assemble, install, modify, test, and inspect the Subject Aircraft, including its component parts, would create an unreasonable risk of harm to persons, like LEWIS A. KATZ, onboard the Subject Aircraft.

326.  At all times material to this Complaint, GULFSTREAM breached the aforementioned duties, and negligently and carelessly failed to discharge the aforementioned duties, by, among other things:

    a.  Failing to design, manufacture, integrate, assemble, install, overhaul, and modify the Subject Aircraft, including its component parts, so that the Subject Aircraft could be safely operated;

    b.  Failing to test and inspect the Subject Aircraft for dangerous conditions that existed and were likely to exist in the Subject Aircraft;

    c.  Failing to modify, service, and repair dangerous conditions that were known by, or which should have been known to, GULFSTREAM in the exercise of reasonable care;

    d.  Failing to timely warn and advise pilots, passengers, owners, operators, and others, including LEWIS A. KATZ, of such dangerous conditions concerning and relating to GULFSTREAM's design, assembly, manufacture, testing, and inspection of the Subject Aircraft and its

component parts that were known by, or which should have been known to, GULFSTREAM;

e.  The detent pin did not meet the standard for hardness set out by the American Society for Testing and Materials ("ASTM"). As a result, the detent pin sheared, which prevented the gust lock handle from locking into either the full "ON" or the full "OFF" position. The sheared detent pin permitted the throttle levers to be pushed forward far beyond 6°, even though the Subject Aircraft's controls were locked;

f.  The gust lock system was designed without a fail-safe mechanism. That is, the gust lock system was not designed so as to have a second detent pin that could substitute for the first in case of malfunction, such as shearing. This form of fail-safe mechanism is common in aircrafts of this kind;

g.  GULFSTREAM failed to conduct a Failure Mode and Effects Analysis ("FMEA") on the detent pin, which would have revealed the absence of a fail-safe mechanism;

h.  GULFSTREAM designed and manufactured the Subject Aircraft such that the engines could be started, even though the gust lock was engaged and the controls locked;

i.  The Subject Aircraft was designed and manufactured in such a way that the Interlock Mechanism failed to prevent the throttles from moving past 6° when the gust lock was engaged;

j.  The Interlock Mechanism was designed without a fail-safe mechanism. That is, the Interlock Mechanism was not designed so as to have a second

mechanism that would prevent the throttles from moving past 6° in the event that the Interlock Mechanism failed;

k.  GULFSTREAM's design and manufacture of the Subject Aircraft failed to abide by the requirements of applicable regulations in that the gust lock did not automatically disengage when the pilot operated the primary flight controls in a normal manner, and did not limit the operation of the airplane so that the pilot received unmistakable warning that the gust lock was engaged at the start of takeoff;

l.  The Subject Aircraft was designed and manufactured without an auto-lock for the controls, which would have automatically unlocked the controls once the hydraulic pressure was turned on;

m.  GULFSTREAM failed to design and manufacture a system that would warn the Pilots that the gust lock was engaged and that the controls were locked;

n.  GULFSTREAM failed to warn the Pilots about the potential consequences of the illumination of the torque rudder limiter light;

o.  GULFSTREAM failed to warn the Pilots that they should have aborted the flight when the torque rudder limiter light was illuminated;

p.  GULFSTREAM failed to warn the Pilots that the illuminated rudder limiter light could mean that the gust lock was engaged;

q.  GULFSTREAM failed to warn the Pilots never to activate the FPSOV in an effort to disengage the gust lock;

r.  GULFSTREAM failed to warn the Pilots of the potential consequences of activating the FPSOV to disengage the gust lock during takeoff;

s.  GULFSTREAM failed to design and manufacture a system that would warn the pilots that their EPR was lower than necessary for takeoff;

t.  GULFSTREAM failed to design and manufacture a system that would warn the Pilots when the auto-throttle and the designated EPR were in disagreement;

u.  GULFSTREAM failed to design and manufacture a system that would prevent activation of the auto-throttle when the gust lock was engaged; and

v.  GULFSTREAM failed to design and manufacture the Subject Aircraft's hydraulic assist system so as to allow the gust lock to be easily disengaged after the engines are started.

w.  In 1987, prior to the Subject Accident, GULFSTREAM submitted its design drawings for the G-IV aircraft, as well as its gust lock system and Interlock Mechanism, to the FAA for certification.

x.  Despite the complexity of the G-IV's gust lock system and Interlock Mechanism and the significant ways in which the gust lock system, the Interlock Mechanism, and the G-IV aircraft differed from earlier models, GULFSTREAM elected to conduct no pre-certification testing on either system.

y.  GULFSTREAM assured the FAA and the public during the G-IV certification process that the G-IV's gust lock system and Interlock

Mechanism would limit the operation of the aircraft when the gust lock was engaged. Specifically, GULFSTREAM asserted that the Interlock Mechanism would prevent the power throttles from being moved past 6° when the gust lock was engaged. This statement was false. Testing conducted after the Subject Accident has revealed that, even with the gust lock engaged, the G-IV's power levers can be moved between, on average, 18° and 24°. Indeed, testing conducted after the Subject Accident has revealed that the Subject Aircraft's power levers could be moved as far as 27°, even though the gust lock was engaged.

z.  After the Subject Accident, GULFSTREAM admitted that, had testing been conducted on the G-IV aircraft prior to the certification process, this defect in the gust lock system and Interlock Mechanism would have been revealed.

aa. GULFSTREAM also assured the FAA and the public that the red gust lock handle was so close to the power lever that, when the gust lock was engaged, the pilot-in-command's hand would necessarily touch or brush up against the gust lock handle in such a way as to impede the pilot-in-command from pushing the power lever when the gust lock was engaged. This statement was also false. The G-IV's gust lock handle and power lever are far enough apart that a pilot-in-command pushing the power lever would never touch or brush up against the gust lock handle, even when the gust lock handle was in the ON position.

327.   Upon information and belief, the vast majority of other aircraft manufacturers have installed mechanisms that either (1) automatically disengage the gust lock when the engines are started or the power levers are moved forward; (2) prevent the engine(s) from being started while the gust lock is engaged; (3) completely prohibit throttle lever advancement while the gust lock is engaged; or (4) force the control yoke all the way to the left when the gust lock is engaged, thereby preventing the pilots' ability to steer the aircraft and simultaneously providing a powerful visual cue to the crew that the gust lock is still engaged. These alternative designs are reasonable and were known and available to GULFSTREAM at the time it designed and manufactured the Subject Aircraft.

328.   Upon information and belief, GULFSTREAM's decision to forego necessary testing on the G-IV's gust lock system and Mechanical Interlock was done to save GULFSTREAM the sizeable time and expense associated with meticulous pre-certification testing.

329.   GULFSTREAM's misrepresentations and omissions—and GULFSTREAM's decision to forego necessary safety testing in order to save time and money—manifests a willful, reckless, or wanton disregard for life or property.

330.   At all times material to this Complaint, the Subject Aircraft was sold and/or delivered by GULFSTREAM without being altered by some other party, without substantial change in the condition in which it was sold and/or delivered by GULFSTREAM, and was being used as intended by, and/or in a manner that was reasonably foreseeable to, GULFSTREAM.

331.   The manufacturing, design, and failure to warn defects described in sub-paragraphs a-aa of this Count directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. GULFSTREAM is therefore liable in negligence for the death of LEWIS A. KATZ.

332.   As a result of the manufacturing, design, and failure to warn defects described in sub-paragraphs a-aa of this Count, LEWIS A. KATZ experienced conscious suffering and endured severe injuries, which resulted in his death.

333.   As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they are entitled to damages for conscious suffering and any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against GULFSTREAM for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 20
## CLAIM FOR PUNITIVE DAMAGES,
## PURSUANT TO MASS. GEN LAWS CH. 229 § 2,
## AGAINST GULFSTREAM

334.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

335.   GULFSTREAM owns the type certificate (No. A12EA) for the Subject Aircraft.

336.   GULFSTREAM's actions as described in Counts 14-17 of this Complaint constituted wanton, reckless, and grossly negligent conduct that warrants the imposition of punitive damages under Mass. Gen. Laws ch. 229 § 2.

337.   Specifically, GULFSTREAM engaged in the following willful, wanton, reckless, and grossly negligent conduct:

a.  In 1987, prior to the Subject Accident, GULFSTREAM submitted its
    design drawings for the G-IV aircraft, as well as its gust lock system and
    Interlock Mechanism, to the FAA for certification.

b.  Despite the complexity of the G-IV's gust lock system and Interlock
    Mechanism and the significant ways in which the gust lock system, the
    Interlock Mechanism, and the G-IV aircraft differed from earlier models,
    GULFSTREAM elected to conduct no pre-certification testing on either
    system.

c.  GULFSTREAM assured the FAA and the public during the G-IV
    certification process that the G-IV's gust lock system and Interlock
    Mechanism would limit the operation of the aircraft when the gust lock
    was engaged. Specifically, GULFSTREAM asserted that the Interlock
    Mechanism would prevent the power throttles from being moved past 6°
    when the gust lock was engaged. This statement was false. Testing
    conducted after the Subject Accident has revealed that, even with the gust
    lock engaged, the G-IV's power levers can be moved between, on average,
    18° and 24°. Indeed, testing conducted after the Subject Accident has
    revealed that the Subject Aircraft's power levers could be moved as far as
    27°, even though the gust lock was engaged.

d.  After the Subject Accident, GULFSTREAM admitted that, had testing
    been conducted on the G-IV aircraft prior to the certification process, this
    defect in the gust lock system and Interlock Mechanism would have been
    revealed.

e.  GULFSTREAM also assured the FAA and the public that the red gust lock handle was so close to the power lever that, when the gust lock was engaged, the pilot-in-command's hand would necessarily touch or brush up against the gust lock handle in such a way as to impede the pilot-in-command from pushing the power lever when the gust lock was engaged. This statement was also false. The G-IV's gust lock handle and power lever are far enough apart that a pilot-in-command pushing the power lever would never touch or brush up against the gust lock handle, even when the gust lock handle was in the ON position.

f.  Upon information and belief, this decision to forego necessary testing on the G-IV's gust lock system and Mechanical Interlock was done to save GULFSTREAM the sizeable time and expense associated with meticulous pre-certification testing.

g.  Upon information and belief, the vast majority of other aircraft manufacturers have installed mechanisms that either (1) automatically disengage the gust lock when the engines are started or the power levers are moved forward; (2) prevent the engine(s) from being started while the gust lock is engaged; (3) completely prohibit throttle lever advancement while the gust lock is engaged; or (4) force the control yoke all the way to the left when the gust lock is engaged, thereby preventing the pilots' ability to steer the aircraft and simultaneously providing a powerful visual cue to the crew that the gust lock is still engaged. These alternative

designs are reasonable and were known and available to GULFSTREAM

at the time it designed and manufactured the Subject Aircraft.

338.   Upon information and belief, GULFSTREAM's decision to forego necessary testing on

the G-IV's gust lock system and Mechanical Interlock was done to save GULFSTREAM the

sizeable time and expense associated with meticulous pre-certification testing.

339.   GULFSTREAM's misrepresentations and omissions—and GULFSTREAM's decision

to forego necessary safety testing in order to save time and money—manifests a willful, reckless,

or wanton disregard for life or property.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of

themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased,

demand judgment against GULFSTREAM for punitive damages in an amount that is fair and

just under the law and such other relief as this Court deems appropriate. The Plaintiffs further

demand a trial by jury of all issues triable as of right by a jury.

## COUNT 21
## CLAIM OF UNFAIR AND DECEPTIVE TRADE PRACTICES,
## PURSUANT TO MASS. GEN LAWS CH. 93A § 2,
## AGAINST GULFSTREAM

340.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if

fully set forth herein.

341.   GULFSTREAM owns the type certificate (No. A12EA) for the Subject Aircraft.

342.   At all times material to this Complaint, GULFSTREAM was engaged in trade and

commerce throughout the United States, including within the Commonwealth of Massachusetts.

343.   GULFSTREAM designed, assembled, manufactured, integrated, installed, modified,

inspected, tested, repaired, marketed, sold, and distributed the Subject Aircraft, together with its

component parts, knowing that the equipment that it designed, manufactured, and sold would be used by the aviation community for flight operations.

344.  Prior to the Subject Accident, GULFSTREAM expressly and/or impliedly warranted that the Subject Aircraft and its component parts and systems were airworthy, of merchantable quality, and fit and safe for the purposes for which they were manufactured, designed, assembled, inspected, tested, sold, serviced, repaired, maintained, overhauled, intended, and used.

345.  Prior to the Subject Accident, GULFSTREAM expressly and/or impliedly warranted that the Subject Aircraft and its component parts and systems were free from all defects, including manufacturing defects, design defects, and failure to warn defects.

346.  Prior to the Subject Accident, GULFSTREAM knew that these warranties would be— and, in fact, were—relied upon by individuals, like LEWIS A. KATZ, who would be flying on its aircrafts.

347.  GULFSTREAM breached these warranties, insofar as the Subject Aircraft, together with its component parts and systems, including its gust lock system, its Interlock Mechanism, its auto-throttle system, and its hydraulic assist system, was unfit for its intended use, and was in an unreasonably dangerous and defective condition at the time of its delivery and/or sale. In fact, the Subject Aircraft and its component parts and systems contained a variety of design defects, manufacturing defects, and inadequate and unreasonably dangerous instructions and warnings, and GULFSTREAM failed to give adequate warnings about the nature and extent of those dangers. Specifically:

      a.  The detent pin did not meet the standard for hardness set out by the American Society for Testing and Materials ("ASTM"). As a result, the

detent pin sheared, which prevented the gust lock handle from locking into either the full "ON" or the full "OFF" position. The sheared detent pin permitted the throttle levers to be pushed forward far beyond 6°, even though the Subject Aircraft's controls were locked;

b.  The gust lock system was designed without a fail-safe mechanism. That is, the gust lock system was not designed so as to have a second detent pin that could substitute for the first in case of malfunction, such as shearing. This form of fail-safe mechanism is common in aircrafts of this kind;

c.  GULFSTREAM failed to conduct a Failure Mode and Effects Analysis ("FMEA") on the detent pin, which would have revealed the absence of a fail-safe mechanism;

d.  GULFSTREAM designed and manufactured the Subject Aircraft such that the engines could be started, even though the gust lock was engaged and the controls locked;

e.  The Subject Aircraft was designed and manufactured in such a way that the Interlock Mechanism failed to prevent the throttles from moving past 6° when the gust lock was engaged;

f.  The Interlock Mechanism was designed without a fail-safe mechanism. That is, the Interlock Mechanism was not designed so as to have a second mechanism that would prevent the throttles from moving past 6° in the event that the Interlock Mechanism failed;

g.  GULFSTREAM's design and manufacture of the Subject Aircraft failed to abide by the requirements of applicable regulations in that the gust lock

99

did not automatically disengage when the pilot operated the primary flight controls in a normal manner, and did not limit the operation of the airplane so that the pilot received unmistakable warning that the gust lock was engaged at the start of takeoff;

h.  The Subject Aircraft was designed and manufactured without an auto-lock for the controls, which would have automatically unlocked the controls once the hydraulic pressure was turned on;

i.  GULFSTREAM failed to design and manufacture a system that would warn the Pilots that the gust lock was engaged and that the controls were locked;

j.  GULFSTREAM failed to warn the Pilots about the potential consequences of the illumination of the torque rudder limiter light;

k.  GULFSTREAM failed to warn the Pilots that they should have aborted the flight when the torque rudder limiter light was illuminated;

l.  GULFSTREAM failed to warn the Pilots that the illuminated rudder limiter light could mean that the gust lock was engaged;

m.  GULFSTREAM failed to warn the Pilots never to activate the FPSOV in an effort to disengage the gust lock;

n.  GULFSTREAM failed to warn the Pilots of the potential consequences of activating the FPSOV to disengage the gust lock during takeoff;

o.  GULFSTREAM failed to design and manufacture a system that would warn the Pilots that their EPR was lower than necessary for takeoff;

p.  GULFSTREAM failed to design and manufacture a system that would warn the Pilots when the auto-throttle and the designated EPR were in disagreement;

q.  GULFSTREAM failed to design and manufacture a system that would prevent activation of the auto-throttle when the gust lock was engaged;

r.  GULFSTREAM failed to design and manufacture the Subject Aircraft's hydraulic assist system so as to allow the gust lock to be easily disengaged after the engines are started.

s.  In 1987, prior to the Subject Accident, GULFSTREAM submitted its design drawings for the G-IV aircraft, as well as its gust lock system and Interlock Mechanism, to the FAA for certification.

t.  Despite the complexity of the G-IV's gust lock system and Interlock Mechanism and the significant ways in which the gust lock system, the Interlock Mechanism, and the G-IV aircraft differed from earlier models, GULFSTREAM elected to conduct no pre-certification testing on either system.

u.  GULFSTREAM assured the FAA and the public during the G-IV certification process that the G-IV's gust lock system and Interlock Mechanism would limit the operation of the aircraft when the gust lock was engaged. Specifically, GULFSTREAM asserted that the Interlock Mechanism would prevent the power throttles from being moved past 6° when the gust lock was engaged. This statement was false. Testing conducted after the Subject Accident has revealed that, even with the gust

lock engaged, the G-IV's power levers can be moved between, on average, 18° and 24°. Indeed, testing conducted after the Subject Accident has revealed that the Subject Aircraft's power levers could be moved as far as 27°, even though the gust lock was engaged.

v.   After the Subject Accident, GULFSTREAM admitted that, had testing been conducted on the G-IV aircraft prior to the certification process, this defect in the gust lock system and Interlock Mechanism would have been revealed.

w.   GULFSTREAM also assured the FAA and the public that the red gust lock handle was so close to the power lever that, when the gust lock was engaged, the pilot-in-command's hand would necessarily touch or brush up against the gust lock handle in such a way as to impede the pilot-in-command from pushing the power lever when the gust lock was engaged. This statement was also false. The G-IV's gust lock handle and power lever are far enough apart that a pilot-in-command pushing the power lever would never touch or brush up against thegust lock handle, even when the gust lock handle was in the ON position.

348.   Upon information and belief, GULFSTREAM's decision to forego necessary testing on the G-IV's gust lock system and Mechanical Interlock was done to save GULFSTREAM the sizeable time and expense associated with meticulous pre-certification testing.

349.   GULFSTREAM's misrepresentations and omissions—and GULFSTREAM's decision to forego necessary safety testing in order to save time and money—manifests a willful, reckless, or wanton disregard for life or property.

350. Under Massachusetts law, any breach of an express or implied warranty of merchantability constitutes a violation of the Mass. Gen. Laws Ch. 93A § 2.

351. GULFSTREAM, in furtherance of its trade and commerce, knew that failing to disclose the defects set forth in sub-paragraphs a-w of this Count would place the individuals who fly on its aircraft, including LEWIS A. KATZ, at risk of injury or death.

352. GULFSTREAM's breach of the implied warranty of merchantability, as described in sub-paragraphs a-w of this Count, was knowing and/or willful.

353. As a direct and proximate result of GULFSTREAM's "unfair or deceptive acts or practices in the conduct of any trade or commerce," as described in this Count, LEWIS A. KATZ suffered injuries prior to his death, endured conscious suffering before death, and died.

354. On April 8, 2016, in accordance with the provisions of Mass. Gen. Laws ch. 93A § 9(3), the Plaintiffs, through counsel, sent a demand letter to GULFSTREAM, and GULFSTREAM failed to tender a reasonable offer of settlement in response to that letter within the statutorily specified time period—that is, within thirty (30) days—in violation of Mass. Gen. Laws ch. 93A § 9(3).

355. This "refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated [Mass. Gen. Laws ch. 93A § 2]." Mass. Gen. Laws ch. 93A § 9(3).

356. GULFSTREAM's violation of Mass. Gen. Laws Ch. 93A § 2 by virtue of its breach of the implied warranty of merchantability entitles the Plaintiffs to an award of actual damages and reasonable attorneys' fees and costs incurred in connection with this Action.

357. Because GULFSTREAM knowingly or willfully violated Mass. Gen. Laws Ch. 93A § 2 by virtue of its breach of the implied warranty of merchantability, the Plaintiffs are entitled to

an award of up to treble, but not less than double, damages against GULFSTREAM, plus attorneys' fees and costs. Mass. Gen. Laws ch. 93A § § 9(3) & 9(3A).

358.  In addition, because GULFSTREAM's "refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated [Mass. Gen. Laws Ch. 93A § 2]," the Plaintiffs are, for this reason also, entitled to an award of up to treble, but not less than double, damages against GULFSTREAM, plus attorneys' fees and costs.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against GULFSTREAM for compensatory damages, treble damages, attorneys' fees, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT 22**
**CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE,**
**PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21,**
**AGAINST GULFSTREAM AND GULFSTREAM SERVICES**

359.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

360.  On at least a yearly basis, the Subject Aircraft was repaired, inspected, and serviced by GULFSTREAM at its facility in Savannah, Georgia.

361.  In addition, on at least one occasion, the Subject Aircraft was repaired and serviced by employees of GULFSTREAM SERVICES who worked at the GULFSTREAM SERVICES facility in Westfield, Massachusetts.

362.   After each such inspection, GULFSTREAM and GULFSTREAM SERVICES certified that the Subject Aircraft, including its gust lock system, its Mechanical Interlock, its auto-throttle, and its hydraulic assist system were current and airworthy.

363.   In fact, less than 2 years before the Subject Accident, the Subject Aircraft and its gust lock system/Mechanical Interlock underwent a major overhaul and inspection at the GULFSTREAM facility in Savannah, Georgia. After this overhaul, GULFSTREAM declared the Subject Aircraft and its gust lock system/Mechanical both current and airworthy.

364.   Both GULFSTREAM and GULFSTREAM SERVICES owed LEWIS A. KATZ a duty to use reasonable care and to exercise the highest degree of care in connection with any inspection, maintenance, service, and repair on the Subject Aircraft, its gust lock system, its Mechanical Interlock, and its auto-throttle system.

365.   In addition, GULFSTREAM and GULFSTREAM SERVICES were also subject to duties imposed by regulatory law with regard to the inspection, maintenance, service, and repair of the Subject Aircraft and its component parts.

366. GULFSTREAM and GULFSTREAM SERVICES breached the duty of care they owed to LEWIS A. KATZ in that they:

a.   Failed to identify, remedy, service, or repair the defects in the Subject Aircraft's gust lock system;

b.   Failed to warn LEWIS A. KATZ of the defects in the Subject Aircraft's gust lock system;

c.   Failed to identify, remedy, service, or repair the defects in the Subject Aircraft's Mechanical Interlock;

    d.   Failed to warn LEWIS A. KATZ of the defects in the Subject Aircraft's Mechanical Interlock;

    e.   Failed to identify, remedy, service, or repair the defects in the Subject Aircraft's auto-throttle system;

    f.   Failed to warn LEWIS A. KATZ of the defects in the Subject Aircraft's auto-throttle system;

    g.   Failed to identify, remedy, service, or repair the defects in the Subject Aircraft's hydraulic assist system; and

    h.   Failed to warn LEWIS A. KATZ of the defects in the Subject Aircraft's hydraulic assist system.

367.  GULFSTREAM and GULFSTREAM SERVICES knew or should have known that any negligent acts or omissions in connection with their inspection, maintenance, service, and repair of the Subject Aircraft or any of its component parts would create an unreasonable risk of harm or death to the people onboard the Subject Aircraft, including LEWIS A. KATZ.

368.  The negligent inspection, maintenance, service, and repair described in sub-paragraphs a-h of this Count directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. GULFSTREAM and GULFSTREAM SERVICES are therefore liable in negligence for the death of LEWIS A. KATZ.

369.  As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

    a.   Pain and suffering of LEWIS A. KATZ prior to his death;

b.  Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

c.  Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

d.  Loss of support in money and in kind;

e.  Lost net accumulations;

f.  Lost value of life;

g.  Funeral expenses; and/or

h.  Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against GULFSTREAM for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT 23**
**CLAIM OF WRONGFUL DEATH PREDICATED ON BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST ROCKWELL COLLINS**

370.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

371.  ROCKWELL COLLINS designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the Subject Aircraft's

Interlock Mechanism and gust lock system, knowing that the equipment that it designed, manufactured, and sold would be used by the aviation community for flight operations.

372. Prior to the Subject Accident, ROCKWELL COLLINS expressly and/or impliedly warranted that the Subject Aircraft's Interlock Mechanism and its gust lock system were airworthy, of merchantable quality, and fit and safe for the purposes for which they were manufactured, designed, assembled, inspected, tested, sold, serviced, repaired, maintained, overhauled, intended, and used.

373. Prior to the Subject Accident, ROCKWELL COLLINS expressly and/or impliedly warranted that the Subject Aircraft's Interlock Mechanism and its gust lock system were free from all defects, including manufacturing defects, design defects, and failure to warn defects.

374. Prior to the Subject Accident, ROCKWELL COLLINS knew that these warranties would be—and, in fact, were—relied upon.

375. ROCKWELL COLLINS breached these warranties because the Subject Aircraft's Interlock Mechanism and its gust lock system were unfit for their intended use, and were in an unreasonably dangerous and defective condition at the time of their delivery and/or sale. In fact, the Subject Aircraft's Interlock Mechanism and its gust lock system contained a variety of design defects, manufacturing defects, and inadequate and unreasonably dangerous instructions and warnings, and ROCKWELL COLLINS failed to give the FAA, the public, LEWIS A. KATZ, and the Pilots adequate warnings about the nature and extent of those dangers. Specifically:

a.  The detent pin did not meet the standard for hardness set out by the American Society for Testing and Materials ("ASTM"). As a result, the detent pin sheared, which simultaneously prevented the gust lock handle from locking into either the full "ON" or full "OFF" position. The sheared

detent pin permitted the engines to start and the throttle levers to be pushed forward far beyond 6°, even though the Subject Aircraft's controls were locked;

b.  The gust lock system was designed and manufactured without a fail-safe mechanism. That is, the gust lock system was not designed so as to have a second detent pin that could substitute for the first in case of malfunction, such as shearing.

c.  ROCKWELL COLLINS failed to conduct a Failure Mode and Effects Analysis ("FMEA") on the detent pin, which would have revealed the absence of a fail-safe mechanism;

d.  ROCKWELL COLLINS designed and manufactured the Subject Aircraft's gust lock system such that the engines could be started, even though the gust lock was engaged and the controls locked;

e.  ROCKWELL COLLINS designed and manufactured the Interlock System in such a way that it failed to prevent the throttles from moving past 6° when the gust lock was engaged;

f.  ROCKWELL COLLINS designed the Interlock System without a fail-safe mechanism. That is, the Interlock Mechanism was not designed so as to have a second mechanism that would prevent the throttles from moving past 6° in the event that the Interlock Mechanism failed;

g.  ROCKWELL COLLINS' design and manufacture of the Subject Aircraft's gust lock system failed to abide by the requirements of applicable regulations in that the gust lock did not automatically disengage

when the pilot operated the primary flight controls in a normal manner, and did not limit the operation of the airplane so that the pilot received unmistakable warning that the gust lock was engaged at the start of takeoff; and

h. ROCKWELL COLLINS failed to design and manufacture a system that would warn the Pilots that the gust lock was engaged and that the controls were locked.

376.   At all times material to this Complaint, the Subject Aircraft's Interlock Mechanism and its gust lock system were sold and/or delivered by ROCKWELL COLLINS without being altered by some other party, without substantial change in the condition in which they were sold and/or delivered by ROCKWELL COLLINS, and were being used as intended by, and/or in a manner that was reasonably foreseeable to, ROCKWELL COLLINS.

377.   The manufacturing, design, and failure to warn defects described in sub-paragraphs a-h of this Count directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. ROCKWELL COLLINS is therefore liable for the death of LEWIS A. KATZ.

378. As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

a. Pain and suffering of LEWIS A. KATZ prior to his death;

b. Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

    c.  Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

    d.  Loss of support in money and in kind;

    e.  Lost net accumulations;

    f.  Lost value of life;

    g.  Funeral expenses; and/or

    h.  Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against ROCKWELL COLLINS for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 24
## CLAIM OF CONSCIOUS SUFFERING AS A RESULT OF THE BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY, PURSUANT TO MASS. GEN. LAWS CH. 229 § 6, AGAINST ROCKWELL COLLINS

379.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

380.  ROCKWELL COLLINS designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the Subject Aircraft's Interlock Mechanism and gust lock system, knowing that the equipment that it designed, manufactured, and sold would be used by the aviation community for flight operations.

381. Prior to the Subject Accident, ROCKWELL COLLINS expressly and/or impliedly warranted that the Subject Aircraft's Interlock Mechanism and its gust lock system were airworthy, of merchantable quality, and fit and safe for the purposes for which they were manufactured, designed, assembled, inspected, tested, sold, serviced, repaired, maintained, overhauled, intended, and used.

382. Prior to the Subject Accident, ROCKWELL COLLINS expressly and/or impliedly warranted that the Subject Aircraft's Interlock Mechanism and its gust lock system were free from all defects, including manufacturing defects, design defects, and failure to warn defects.

383. Prior to the Subject Accident, ROCKWELL COLLINS knew that these warranties would be—and, in fact, were—relied upon.

384. ROCKWELL COLLINS breached these warranties, however, because the Subject Aircraft's Interlock Mechanism and its gust lock system were unfit for their intended use, and were in an unreasonably dangerous and defective condition at the time of their delivery and/or sale. In fact, the Subject Aircraft's Interlock Mechanism and its gust lock system contained a variety of design defects, manufacturing defects, and inadequate and unreasonably dangerous instructions and warnings, and ROCKWELL COLLINS failed to give the FAA, the public, LEWIS A. KATZ, or the Pilots adequate warnings about the nature and extent of those dangers. Specifically:

      a.  The detent pin did not meet the standard for hardness set out by the American Society for Testing and Materials ("ASTM"). As a result, the detent pin sheared, which simultaneously prevented the gust lock handle from locking into either the full "ON" or full "OFF" position. The sheared detent pin permitted the engines to start and the throttle levers to be

pushed forward far beyond 6°, even though the Subject Aircraft's controls were locked;

b. The gust lock system was designed and manufactured without a fail-safe mechanism. That is, the gust lock system was not designed so as to have a second detent pin that could substitute for the first in case of malfunction, such as shearing;

c. ROCKWELL COLLINS failed to conduct a Failure Mode and Effects Analysis ("FMEA") on the detent pin, which would have revealed the absence of a fail-safe mechanism;

d. ROCKWELL COLLINS designed and manufactured the Subject Aircraft's gust lock system such that the engines could be started, even though the gust lock was engaged and the controls locked;

e. ROCKWELL COLLINS designed and manufactured the Interlock System in such a way that it failed to prevent the throttles from moving past 6° when the gust lock was engaged;

f. ROCKWELL COLLINS designed the Interlock System without a fail-safe mechanism. That is, the Interlock Mechanism was not designed so as to have a second mechanism that would prevent the throttles from moving past 6° in the event that the Interlock Mechanism failed;

g. ROCKWELL COLLINS' design and manufacture of the Subject Aircraft's gust lock system failed to abide by the applicable regulations in that the gust lock did not automatically disengage when the pilot operated the primary flight controls in a normal manner, and did not limit the

operation of the airplane so that the pilot received unmistakable warning that the gust lock was engaged at the start of takeoff; and

h. ROCKWELL COLLINS failed to design and manufacture a system that would warn the Pilots that the gust lock was engaged and that the controls were locked.

385. At all times material to this Complaint, the Subject Aircraft's Interlock Mechanism and its gust lock system were sold and/or delivered by ROCKWELL COLLINS without being altered by some other party, without substantial change in the condition in which they were sold and/or delivered by ROCKWELL COLLINS, and were being used as intended by, and/or in a manner that was reasonably foreseeable to, ROCKWELL COLLINS.

386. The manufacturing, design, and failure to warn defects described in sub-paragraphs a-h of this Count directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. ROCKWELL COLLINS is therefore liable for the death of LEWIS A. KATZ.

387. As a result of the manufacturing, design, and failure to warn defects described in sub-paragraphs a-h of this Count, LEWIS A. KATZ experienced conscious suffering and endured severe injuries, which resulted in his death.

388. As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they are entitled to damages for conscious suffering and any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against ROCKWELL COLLINS for conscious suffering damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

### COUNT 25
### CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST ROCKWELL COLLINS

389.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

390.   ROCKWELL COLLINS designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the Interlock Mechanism and the gust lock system of the Subject Aircraft, knowing that the equipment that it designed, manufactured, and sold would be used by the aviation community for flight operations.

391.   At all times material to this Complaint, ROCKWELL COLLINS was engaged in the sale of aircrafts component parts, which involved placing aircraft component parts, including the Subject Aircraft's Interlock Mechanism and its gust lock system, into the stream of commerce, with full knowledge and intent that these parts would be used by purchasers, users, and operators without the opportunity for inspection or testing.

392.   At all times material to this Complaint, ROCKWELL COLLINS knew, or in the exercise of reasonable care should have known, that the failure of any of its aircraft component parts, including the Subject Aircraft's Interlock Mechanism and/or its gust lock system, would create an unreasonable risk of harm or death to persons onboard the aircraft.

393. At all times material to this Complaint, ROCKWELL COLLINS owed a duty to use reasonable care, and to exercise the highest degree of care, in planning, designing, certifying, manufacturing, assembling, installing, overhauling, modifying, repairing, testing, inspecting, marketing, and distributing its aircraft component parts, including the Subject Aircraft's Interlock Mechanism and its gust lock system.

394. This duty of care extended to those persons, including LEWIS A. KATZ, who would put the Subject Aircraft and its component parts to their intended use.

395. ROCKWELL COLLINS was under a further, continuing, and ongoing duty to, among other things:

    a. Design, manufacture, integrate, assemble, modify, install, and overhaul the Subject Aircraft's Interlock Mechanism and its gust lock system, so that they could be safely operated;

    b. Test and inspect the Subject Aircraft's Interlock Mechanism and its gust lock system for dangerous conditions that existed and were likely to exist;

    c. Modify, service, and repair dangerous conditions that were known by, or which should have been known to, ROCKWELL COLLINS in the exercise of reasonable care; and

    d. Warn and advise pilots, passengers, owners, operators, and others, including LEWIS A. KATZ, of such dangerous conditions concerning and relating to ROCKWELL COLLINS' design, assembly, manufacture, testing, and inspection of the Subject Aircraft's Interlock Mechanism and its gust lock system that were known by, or which should have been known to, ROCKWELL COLLINS.

396.  ROCKWELL COLLINS knew or should have known that its failure to properly and safely design, manufacture, assemble, install, modify, test, and inspect the Subject Aircraft's Interlock Mechanism and its gust lock system would create an unreasonable risk of harm to persons, including LEWIS A. KATZ, onboard the Subject Aircraft.

397. At all times material to this Complaint, ROCKWELL COLLINS breached the aforementioned duties, and negligently and carelessly failed to discharge the aforementioned duties, by, among other things:

a.  Failing to design, manufacture, integrate, assemble, install, overhaul, and modify the Subject Aircraft's Interlock Mechanism and its gust lock system so that they could be safely operated;

b.  Failing to test and inspect the Subject Aircraft's Interlock Mechanism and its gust lock system for dangerous conditions that existed and were likely to exist;

c.  Failing to modify, service, and repair dangerous conditions that were known by, or which should have been known to, ROCKWELL COLLINS in the exercise of reasonable care;

d.  Failing to timely warn and advise pilots, passengers, owners, operators, and others, including LEWIS A. KATZ, of such dangerous conditions concerning and relating to ROCKWELL COLLINS' design, assembly, manufacture, testing, and inspection of the Subject Aircraft's Interlock Mechanism and its gust lock system that were known by, or which should have been known to, ROCKWELL COLLINS;

e. Failing to design and manufacture a detent pin that met the standard for hardness set out by the American Society for Testing and Materials ("ASTM"). As a result, the detent pin sheared, which simultaneously prevented the gust lock handle from locking into either the full "ON" or full "OFF" position. The sheared detent pin permitted the engines to start and the throttle levers to be pushed forward far beyond 6°, even though the Subject Aircraft's controls were locked;

f. Designing and manufacturing a gust lock system without a fail-safe mechanism. That is, the gust lock system was not designed so as to have a second detent pin that could substitute for the first in case of malfunction, such as shearing;

g. Failing to conduct a Failure Mode and Effects Analysis ("FMEA") on the detent pin, which would have revealed the absence of a fail-safe mechanism;

h. ROCKWELL COLLINS designed and manufactured the Subject Aircraft's gust lock system such that the engines could be started, even though the gust lock was engaged and the controls locked;

i. ROCKWELL COLLINS designed and manufactured the Interlock System in such a way that it failed to prevent the throttles from moving past 6° when the gust lock was engaged;

j. ROCKWELL COLLINS designed the Interlock System without a fail-safe mechanism. That is, the Interlock Mechanism was not designed so as to

have a second mechanism that would prevent the throttles from moving past 6° in the event that the Interlock Mechanism failed;

k.  Failing to design and manufacture the Subject Aircraft's gust lock system to abide by the applicable regulations in that the gust lock did not automatically disengage when the pilot operated the primary flight controls in a normal manner, and did not limit the operation of the airplane so that the pilot received unmistakable warning that the gust lock was engaged at the start of takeoff; and

l.  Failing to design and manufacture a system that would warn the Pilots that the gust lock was engaged and that the controls were locked.

398.  At all times material to this Complaint, the Subject Aircraft's Interlock Mechanism and its gust lock system were sold and/or delivered by ROCKWELL COLLINS without being altered by some other party, without substantial change in the condition in which they were sold and/or delivered by ROCKWELL COLLINS, and were being used as intended by, and/or in a manner that was reasonably foreseeable to, ROCKWELL COLLINS.

399.  The manufacturing, design, and failure to warn defects described in sub-paragraphs a-l of this Count directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. ROCKWELL COLLINS is therefore liable in negligence for the death of LEWIS A. KATZ.

400. As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

a. Pain and suffering of LEWIS A. KATZ prior to his death;

b. Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

c. Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

d. Loss of support in money and in kind;

e. Lost net accumulations;

f. Lost value of life;

g. Funeral expenses; and/or

h. Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against ROCKWELL COLLINS for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

### COUNT 26
### CLAIM OF CONSCIOUS SUFFERING AS A RESULT OF NEGLIGENCE, PURSUANT TO MASS. GEN. LAWS CH. 229 § 6, AGAINST ROCKWELL COLLINS

401. The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

402. ROCKWELL COLLINS designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the Interlock Mechanism

and the gust lock system of the Subject Aircraft, knowing that the equipment that it designed, manufactured, and sold would be used by the aviation community for flight operations.

403.  At all times material to this Complaint, ROCKWELL COLLINS was engaged in the sale of aircrafts component parts, which involved placing aircraft component parts, including the Subject Aircraft's Interlock Mechanism and its gust lock system, into the stream of commerce, with full knowledge and intent that these parts would be used by purchasers, users, and operators without the opportunity for inspection or testing.

404.  At all times material to this Complaint, ROCKWELL COLLINS knew, or in the exercise of reasonable care should have known, that the failure of any of its aircraft component parts, including the Subject Aircraft's Interlock Mechanism and/or its gust lock system, would create an unreasonable risk of harm or death to persons onboard the aircraft.

405.  At all times material to this Complaint, ROCKWELL COLLINS owed a duty to use reasonable care, and to exercise the highest degree of care, in planning, designing, certifying, manufacturing, assembling, installing, overhauling, modifying, repairing, testing, inspecting, marketing, and distributing its aircraft component parts, including the Subject Aircraft's Interlock Mechanism and its gust lock system.

406.  This duty of care extended to those persons, including LEWIS A. KATZ, who would put the Subject Aircraft and its component parts to their intended use.

407.  ROCKWELL COLLINS was under a further, continuing, and ongoing duty to, among other things:

> a.  Design, manufacture, integrate, assemble, modify, install, and overhaul the Subject Aircraft's Interlock Mechanism and its gust lock system, so that they could be safely operated;

b.  Test and inspect the Subject Aircraft's Interlock Mechanism and its gust lock system for dangerous conditions that existed and were likely to exist;

c.  Modify, service, and repair dangerous conditions that were known by, or which should have been known to, ROCKWELL COLLINS in the exercise of reasonable care; and

d.  Warn and advise pilots, passengers, owners, operators, and others, including LEWIS A. KATZ, of such dangerous conditions concerning and relating to ROCKWELL COLLINS' design, assembly, manufacture, testing, and inspection of the Subject Aircraft's Interlock Mechanism and its gust lock system that were known by, or which should have been known to, ROCKWELL COLLINS.

408.  ROCKWELL COLLINS knew or should have known that its failure to properly and safely design, manufacture, assemble, install, modify, test, and inspect the Subject Aircraft's Interlock Mechanism and its gust lock system would create an unreasonable risk of harm to persons, including LEWIS A. KATZ, onboard the Subject Aircraft.

409.  At all times material to this Complaint, ROCKWELL COLLINS breached the aforementioned duties, and negligently and carelessly failed to discharge the aforementioned duties, by, among other things:

a.  Failing to design, manufacture, integrate, assemble, install, overhaul, and modify the Subject Aircraft's Interlock Mechanism and its gust lock system so that they could be safely operated;

b.  Failing to test and inspect the Subject Aircraft's Interlock Mechanism and its gust lock system for dangerous conditions that existed and were likely to exist;

c.  Failing to modify, service, and repair dangerous conditions that were known by, or which should have been known to, ROCKWELL COLLINS in the exercise of reasonable care;

d.  Failing to timely warn and advise pilots, passengers, owners, operators, and others, including LEWIS A. KATZ, of such dangerous conditions concerning and relating to ROCKWELL COLLINS' design, assembly, manufacture, testing, and inspection of the Subject Aircraft's Interlock Mechanism and its gust lock system that were known by, or which should have been known to, ROCKWELL COLLINS;

e.  Failing to design and manufacture a detent pin that met the standard for hardness set out by the American Society for Testing and Materials ("ASTM"). As a result, the detent pin sheared, which simultaneously prevented the gust lock handle from locking into either the full "ON" or full "OFF" position. The sheared detent pin permitted the engines to start and the throttle levers to be pushed forward far beyond 6°, even though the Subject Aircraft's controls were locked;

f.  Designing and manufacturing a gust lock system without a fail-safe mechanism. That is, the gust lock system was not designed so as to have a second detent pin that could substitute for the first in case of malfunction, such as shearing;

g.   Failing to conduct a Failure Mode and Effects Analysis ("FMEA") on the detent pin, which would have revealed the absence of a fail-safe mechanism;

h.   ROCKWELL COLLINS designed and manufactured the Subject Aircraft's gust lock system such that the engines could be started, even though the gust lock was engaged and the controls locked;

i.   ROCKWELL COLLINS designed and manufactured the Interlock System in such a way that it failed to prevent the throttles from moving past 6° when the gust lock was engaged;

j.   ROCKWELL COLLINS designed the Interlock System without a fail-safe mechanism. That is, the Interlock Mechanism was not designed so as to have a second mechanism that would prevent the throttles from moving past 6° in the event that the Interlock Mechanism failed;

k.   Failing to design and manufacture the Subject Aircraft's gust lock system to abide by the requirements of FAR § 25.679 in that the gust lock did not automatically disengage when the pilot operated the primary flight controls in a normal manner, and did not limit the operation of the airplane so that the pilot received unmistakable warning that the gust lock was engaged at the start of takeoff; and

l.   Failing to design and manufacture a system that would warn the Pilots that the gust lock was engaged and that the controls were locked.

410. At all times material to this Complaint, the Subject Aircraft's Interlock Mechanism and

its gust lock system were sold and/or delivered by ROCKWELL COLLINS without being altered by some other party, without substantial change in the condition in which they were sold and/or delivered by ROCKWELL COLLINS, and were being used as intended by, and/or in a manner that was reasonably foreseeable to, ROCKWELL COLLINS.

411.  The manufacturing, design, and failure to warn defects described in sub-paragraphs a-l of this Count directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. ROCKWELL COLLINS is therefore liable in negligence for the death of LEWIS A. KATZ.

412.  As a result of the manufacturing, design, and failure to warn defects described in sub-paragraphs a-l of this Count, LEWIS A. KATZ experienced conscious suffering and severe injuries prior to his death.

413.  As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they are entitled to damages for conscious suffering and any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against ROCKWELL COLLINS for conscious suffering damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 27
## CLAIM OF UNFAIR AND DECEPTIVE TRADE PRACTICES,

**PURSUANT TO MASS. GEN LAWS CH. 93A § 2,**
**AGAINST GULFSTREAM**

414.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

415.   At all times material to this Complaint, ROCKWELL COLLINS was engaged in trade and commerce throughout the United States, including within the Commonwealth of Massachusetts.

416.   ROCKWELL COLLINS designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the Interlock Mechanism and the gust lock system of the Subject Aircraft, knowing that the equipment that it designed, manufactured, and sold would be used by the aviation community for flight operations.

417.   Prior to the Subject Accident, ROCKWELL COLLINS expressly and/or impliedly warranted that the Subject Aircraft's gust lock system and its Mechanical Interlock were airworthy, of merchantable quality, and fit and safe for the purposes for which they were manufactured, designed, assembled, inspected, tested, sold, serviced, repaired, maintained, overhauled, intended, and used.

418.   Prior to the Subject Accident, ROCKWELL COLLINS expressly and/or impliedly warranted that the Subject Aircraft's gust lock system and its Mechanical Interlock were free from all defects, including manufacturing defects, design defects, and failure to warn defects.

419.   Prior to the Subject Accident, ROCKWELL COLLINS knew that these warranties would be—and, in fact, were—relied upon by individuals, like LEWIS A. KATZ, who would be flying on its aircrafts.

420.   ROCKWELL COLLINS breached these warranties, insofar as the Subject Aircraft's gust lock system and its Mechanical Interlock were unfit for their intended use, and were in an

unreasonably dangerous and defective condition at the time of their delivery and/or sale. In fact, the Subject Aircraft's gust lock system and its Mechanical Interlock contained a variety of design defects, manufacturing defects, and inadequate and unreasonably dangerous instructions and warnings, and ROCKWELL COLLINS failed to give adequate warnings about the nature and extent of those dangers. Specifically:

a. The detent pin that ROCKWELL COLLINS used did not meet the standard for hardness set out by the American Society for Testing and Materials ("ASTM"). As a result, the detent pin sheared, which prevented the gust lock handle from locking into either the full "ON" or the full "OFF" position. The sheared detent pin permitted the throttle levers to be pushed forward far beyond 6°, even though the Subject Aircraft's controls were locked;

b. ROCKWELL COLLINS designed and manufactured the gust lock system without a fail-safe mechanism. That is, the gust lock system was not designed so as to have a second detent pin that could substitute for the first in case of malfunction, such as shearing;

c. ROCKWELL COLLINS failed to conduct a Failure Mode and Effects Analysis ("FMEA") on the detent pin, which would have revealed the absence of a fail-safe mechanism;

d. ROCKWELL COLLINS designed and manufactured the Subject Aircraft's gust lock system such that the engines could be started, even though the gust lock was engaged and the controls locked;

    e.   ROCKWELL COLLINS designed and manufactured the Interlock System in such a way that it failed to prevent the throttles from moving past 6° when the gust lock was engaged;

    f.   ROCKWELL COLLINS designed the Interlock System without a fail-safe mechanism. That is, the Interlock Mechanism was not designed so as to have a second mechanism that would prevent the throttles from moving past 6° in the event that the Interlock Mechanism failed;

    g.   ROCKWELL COLLINS failed to design and manufacture the Subject Aircraft's gust lock system to abide by the applicable regulations in that the gust lock did not automatically disengage when the pilot operated the primary flight controls in a normal manner, and did not limit the operation of the airplane so that the pilot received unmistakable warning that the gust lock was engaged at the start of takeoff; and

    h.   ROCKWELL COLLINS failed to design and manufacture a system that would provide an unmistakable warning to the Pilots that the gust lock was engaged and that the controls were locked.

421. Under Massachusetts law, any breach of the express or implied warranty of merchantability constitutes a violation of the Mass. Gen. Laws Ch. 93A § 2.

422. ROCKWELL COLLINS, in furtherance of its trade and commerce, knew that failing to disclose the defects set forth in sub-paragraphs a-h of this Count would place the individuals who fly on its aircraft, including LEWIS A. KATZ, at risk of injury or death.

423. ROCKWELL COLLINS' breach of the implied warranty of merchantability, as described in sub-paragraphs a-h of this Count, was knowing and/or willful.

424.  As a direct and proximate result of ROCKWELL COLLINS' "unfair or deceptive acts or practices in the conduct of any trade or commerce," as described in this Count, LEWIS A. KATZ suffered injuries prior to his death, endured conscious suffering before death, and died.

425.  On April 8, 2016, in accordance with the provisions of Mass. Gen. Laws Ch. 93A § 9(3), the Plaintiffs, through counsel, sent a demand letter to ROCKWELL COLLINS, and ROCKWELL COLLINS failed to tender a reasonable offer of settlement in response to that letter within the statutorily specified time period—that is, within thirty (30) days—in violation of Mass. Gen. Laws Ch. 93A § 9(3).

426.  This "refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated [Mass. Gen. Laws ch. 93A § 2]." Mass. Gen. Laws ch. 93A § 9(3).

427.  ROCKWELL COLLINS' violation of Mass. Gen. Laws Ch. 93A § 2 by virtue of its breach of the implied warranty of merchantability entitles the Plaintiffs to an award of actual damages and reasonable attorneys' fees and costs incurred in connection with this Action.

428.  Because ROCKWELL COLLINS knowingly or willfully violated Mass. Gen. Laws Ch. 93A § 2 by virtue of its breach of the implied warranty of merchantability, the Plaintiffs are entitled to an award of up to treble, but not less than double, damages against ROCKWELL COLLINS, plus attorneys' fees and costs.

429.  In addition, because ROCKWELL COLLINS' "refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated [Mass. Gen. Laws Ch. 93A § 2]," the Plaintiffs are, for this reason also, entitled to an award of up to treble, but not less than double, damages against ROCKWELL COLLINS, plus attorneys' fees and costs.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against ROCKWELL COLLINS for compensatory damages, treble damages, attorneys' fees, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

**COUNT 28**
**CLAIM OF WRONGFUL DEATH PREDICATED ON THE BREACH OF THE**
**IMPLIED WARRANTY OF MERCHANTABILITY,**
**PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21,**
**AGAINST HONEYWELL**

430.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

431.  At all times material to this Complaint, HONEYWELL was engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, and distributing aircraft component parts, including the auto-throttle system of the Subject Aircraft.

432.  Prior to the Subject Accident, HONEYWELL expressly and/or impliedly warranted that the Subject Aircraft's auto-throttle system was airworthy, of merchantable quality, and fit and safe for the purposes for which they were manufactured, designed, assembled, inspected, tested, sold, serviced, repaired, maintained, overhauled, intended, and used.

433.  Prior to the Subject Accident, HONEYWELL expressly and/or impliedly warranted that the Subject Aircraft's auto-throttle system was free from all defects, including manufacturing defects, design defects, and failure to warn defects.

434.  Prior to the Subject Accident, HONEYWELL knew that these warranties would be— and, in fact, were—relied upon.

435.  HONEYWELL breached these warranties because the Subject Aircraft's auto-throttle system was unfit for its intended use, and was in an unreasonably dangerous and defective condition at the time of its delivery and/or sale. In fact, the Subject Aircraft's auto-throttle system contained a variety of design defects, manufacturing defects, and inadequate and unreasonably dangerous instructions and warnings, and HONEYWELL failed to give the FAA, the public, LEWIS A. KATZ, or the Pilots, MCDOWELL and DEVRIES, adequate warnings about the nature and extent of those dangers. Specifically:

> a.  HONEYWELL failed to design and manufacture a system that would warn the Pilots when the auto-throttle and the designated EPR were in disagreement; and
>
> b.  HONEYWELL failed to design and manufacture a system that would prevent activation of the auto-throttle when the gust lock was engaged.

436.  At all times material to this Complaint, the auto-throttle system of the Subject Aircraft was designed, manufactured, sold and/or delivered by HONEYWELL without being altered by some other party, without substantial change in the condition in which it was sold and/or delivered by HONEYWELL, and was being used as intended by, and/or in a manner that was reasonably foreseeable to, HONEYWELL.

437.  The manufacturing, design, and failure to warn defects described in sub-paragraphs a-b of this Count directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. HONEYWELL is therefore liable for the death of LEWIS A. KATZ.

438.  As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged.

Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

    a.  Pain and suffering of LEWIS A. KATZ prior to his death;

    b.  Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

    c.  Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

    d.  Loss of support in money and in kind;

    e.  Lost net accumulations;

    f.  Lost value of life;

    g.  Funeral expenses; and/or

    h.  Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against HONEYWELL for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 29
## CLAIM OF CONSCIOUS SUFFERING AS A RESULT OF THE BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY, PURSUANT TO MASS. GEN. LAWS CH. 229 § 6, AGAINST HONEYWELL

439.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

440.   At all times material to this Complaint, HONEYWELL was engaged in the business of designing, manufacturing, integrating, assembling, modifying, maintaining, inspecting, testing, servicing, marketing, and distributing aircraft component parts, including the auto-throttle system of the Subject Aircraft.

441.   Prior to the Subject Accident, HONEYWELL expressly and/or impliedly warranted that the Subject Aircraft's auto-throttle system was airworthy, of merchantable quality, and fit and safe for the purposes for which they were manufactured, designed, assembled, inspected, tested, sold, serviced, repaired, maintained, overhauled, intended, and used.

442. Prior to the Subject Accident, HONEYWELL expressly and/or impliedly warranted that the Subject Aircraft's auto-throttle system was free from all defects, including manufacturing defects, design defects, and failure to warn defects.

443. Prior to the Subject Accident, HONEYWELL knew that these warranties would be— and, in fact, were—relied upon.

444. HONEYWELL breached these warranties, however, because the Subject Aircraft's auto-throttle system was unfit for its intended use, and was in an unreasonably dangerous and defective condition at the time of its delivery and/or sale. In fact, the Subject Aircraft's auto-throttle system contained a variety of design defects, manufacturing defects, and inadequate and unreasonably dangerous instructions and warnings, and HONEYWELL failed to give the FAA, the public, LEWIS A. KATZ, and the Pilots, MCDOWELL and DEVRIES, adequate warnings about the nature and extent of those dangers. Specifically:

a.  HONEYWELL failed to design and manufacture a system that would

warn the Pilots when the auto-throttle and the designated EPR were in

disagreement; and

b.  HONEYWELL failed to design and manufacture a system that would

prevent activation of the auto-throttle when the gust lock was engaged.

445. At all times material to this Complaint, the auto-throttle system of the Subject Aircraft

was designed, manufactured, sold and/or delivered by HONEYWELL without being altered by

some other party, without substantial change in the condition in which it was sold and/or

delivered by HONEYWELL, and was being used as intended by, and/or in a manner that was

reasonably foreseeable to, HONEYWELL.

446.  The manufacturing, design, and failure to warn defects described in sub-paragraphs a-b

of this Count directly and proximately caused the Subject Accident and the death of LEWIS A.

KATZ. HONEYWELL is therefore liable for the death of LEWIS A. KATZ.

447.  As a result of the manufacturing, design, and failure to warn defects described in sub-

paragraphs a-b of this Count, LEWIS A. KATZ experienced conscious suffering and endured

severe injuries prior to his death.

448.  As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the

Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been

damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they

are entitled to damages for conscious suffering and any and all other damages to which the

survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under

applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against HONEYWELL for conscious suffering damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 30
## CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST HONEYWELL

449. The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

450. HONEYWELL designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the auto-throttle system of the Subject Aircraft, knowing that the equipment that it designed, manufactured, and sold would be used by the aviation community for flight operations.

451. At all times material to this Complaint, HONEYWELL was engaged in the sale of aircrafts component parts, which involved placing aircraft component parts, including the Subject Aircraft's auto-throttle system, into the stream of commerce, with full knowledge and intent that these parts would be used by purchasers, users, and operators without the opportunity for inspection or testing.

452. At all times material to this Complaint, HONEYWELL knew, or in the exercise of reasonable care should have known, that the failure of any of its aircraft component parts, including the Subject Aircraft's auto-throttle system, would create an unreasonable risk of harm or death to persons onboard the aircraft.

453. At all times material to this Complaint, HONEYWELL owed a duty to use reasonable care, and to exercise the highest degree of care, in planning, designing, certifying,

manufacturing, assembling, installing, overhauling, modifying, repairing, testing, inspecting, marketing, and distributing its aircraft component parts, including the Subject Aircraft's auto-throttle system.

454.  This duty of care extended to those persons, including LEWIS A. KATZ, who would put the Subject Aircraft and its component parts to their intended use.

455.  HONEYWELL was under a further, continuing, and ongoing duty to, among other things:

a. Design, manufacture, integrate, assemble, modify, install, and overhaul the Subject Aircraft's auto-throttle system, so that it could be safely operated;

b. Test and inspect the Subject Aircraft's auto-throttle system for dangerous conditions that existed and were likely to exist;

c. Modify, service, and repair dangerous conditions that were known by, or which should have been known to, HONEYWELL in the exercise of reasonable care; and

d. Warn and advise pilots, passengers, owners, operators, and others, including LEWIS A. KATZ, of such dangerous conditions concerning and relating to HONEYWELL's design, assembly, manufacture, testing, and inspection of the Subject Aircraft's auto-throttle system that were known by, or which should have been known to, HONEYWELL.

456.  HONEYWELL knew or should have known that its failure to properly and safely design, manufacture, assemble, install, modify, test, and inspect the Subject Aircraft's auto-throttle system would create an unreasonable risk of harm to persons, including LEWIS A. KATZ, onboard the Subject Aircraft.

457.  At all times material to this Complaint, HONEYWELL breached the aforementioned duties, and negligently and carelessly failed to discharge the aforementioned duties, by, among other things:

    a.  Failing to design, manufacture, integrate, assemble, install, overhaul, and modify the Subject Aircraft's auto-throttle system so that it could be safely operated;

    b.  Failing to test and inspect the Subject Aircraft's auto-throttle system for dangerous conditions that existed and were likely to exist;

    c.  Failing to modify, service, and repair dangerous conditions that were known by, or which should have been known to, HONEYWELL in the exercise of reasonable care;

    d.  Failing to timely warn and advise pilots, passengers, owners, operators, and others, including LEWIS A. KATZ, of such dangerous conditions concerning and relating to HONEYWELL's design, assembly, manufacture, testing, and inspection of the Subject Aircraft's auto-throttle system that were known by, or which should have been known to, HONEYWELL;

    e.  Failing to design and manufacture a system that would warn the Pilots when, as in this case, the auto-throttle and the designated EPR were in disagreement; and

    f.  Failing to design and manufacture a system that would prevent activation of the auto-throttle when the gust lock was engaged.

458.   At all times material to this Complaint, the auto-throttle system of the Subject Aircraft was designed, manufactured, sold and/or delivered by HONEYWELL without being altered by some other party, without substantial change in the condition in which it was sold and/or delivered by HONEYWELL, and was being used as intended by, and/or in a manner that was reasonably foreseeable to, HONEYWELL.

459.   The manufacturing, design, and failure to warn defects described in sub-paragraphs a-f of this Count directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. HONEYWELL is therefore liable in negligence for the death of LEWIS A. KATZ.

460.   As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

    a.   Pain and suffering of LEWIS A. KATZ prior to his death;

    b.   Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

    c.   Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

    d.   Loss of support in money and in kind;

    e.   Lost net accumulations;

    f.   Lost value of life;

    g.   Funeral expenses; and/or

h.  Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, judgment against HONEYWELL for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 31
## CLAIM OF CONSCIOUS SUFFERING AS A RESULT OF NEGLIGENCE, PURSUANT TO MASS. GEN. LAWS CH. 229 § 6, AGAINST HONEYWELL

461.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

462.  HONEYWELL designed, assembled, manufactured, integrated, installed, modified, inspected, tested, repaired, marketed, sold, and distributed the auto-throttle system of the Subject Aircraft, knowing that the equipment that it designed, manufactured, and sold would be used by the aviation community for flight operations.

463.  At all times material to this Complaint, HONEYWELL was engaged in the sale of aircrafts component parts, which involved placing aircraft component parts, including the Subject Aircraft's auto-throttle system, into the stream of commerce, with full knowledge and intent that these parts would be used by purchasers, users, and operators without the opportunity for inspection or testing.

464.  At all times material to this Complaint, HONEYWELL knew, or in the exercise of reasonable care should have known, that the failure of any of its aircraft component parts,

including the Subject Aircraft's auto-throttle system, would create an unreasonable risk of harm or death to persons onboard the aircraft.

465.  At all times material to this Complaint, HONEYWELL owed a duty to use reasonable care, and to exercise the highest degree of care, in planning, designing, certifying, manufacturing, assembling, installing, overhauling, modifying, repairing, testing, inspecting, marketing, and distributing its aircraft component parts, including the Subject Aircraft's auto-throttle system.

466.  This duty of care extended to those persons, including LEWIS A. KATZ, who would put the Subject Aircraft and its component parts to their intended use.

467.  HONEYWELL was under a further, continuing, and ongoing duty to, among other things:

    a.  Design, manufacture, integrate, assemble, modify, install, and overhaul the Subject Aircraft's auto-throttle system, so that it could be safely operated;

    b.  Test and inspect the Subject Aircraft's auto-throttle system for dangerous conditions that existed and were likely to exist;

    c.  Modify, service, and repair dangerous conditions that were known by, or which should have been known to, HONEYWELL in the exercise of reasonable care; and

    d.  Warn and advise pilots, passengers, owners, operators, and others, including LEWIS A. KATZ, of such dangerous conditions concerning and relating to HONEYWELL's design, assembly, manufacture, testing, and inspection of the Subject Aircraft's auto-throttle system that were known by, or which should have been known to, HONEYWELL.

468.  HONEYWELL knew or should have known that its failure to properly and safely design, manufacture, assemble, install, modify, test, and inspect the Subject Aircraft's auto-throttle system would create an unreasonable risk of harm to persons, including LEWIS A. KATZ, onboard the Subject Aircraft.

469.  At all times material to this Complaint, HONEYWELL breached the aforementioned duties, and negligently and carelessly failed to discharge the aforementioned duties, by, among other things:

a.  Failing to design, manufacture, integrate, assemble, install, overhaul, and modify the Subject Aircraft's auto-throttle system so that it could be safely operated;

b.  Failing to test and inspect the Subject Aircraft's auto-throttle system for dangerous conditions that existed and were likely to exist;

c.  Failing to modify, service, and repair dangerous conditions that were known by, or which should have been known to, HONEYWELL in the exercise of reasonable care;

d.  Failing to timely warn and advise pilots, passengers, owners, operators, and others, including LEWIS A. KATZ, of such dangerous conditions concerning and relating to HONEYWELL's design, assembly, manufacture, testing, and inspection of the Subject Aircraft's auto-throttle system that were known by, or which should have been known to, HONEYWELL;

e. Failing to design and manufacture a system that would warn the Pilots when, as in this case, the auto-throttle and the designated EPR were in disagreement; and

f. Failing to design and manufacture a system that would prevent activation of the auto-throttle when the gust lock was engaged.

470.  At all times material to this Complaint, the auto-throttle system of the Subject Aircraft was designed, manufactured, sold and/or delivered by HONEYWELL without being altered by some other party, without substantial change in the condition in which it was sold and/or delivered by HONEYWELL, and was being used as intended by, and/or in a manner that was reasonably foreseeable to, HONEYWELL.

471.  The manufacturing, design, and failure to warn defects described in sub-paragraphs a-f of this Count directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. HONEYWELL is therefore liable in negligence for the death of LEWIS A. KATZ.

472.  As a result of the manufacturing, design, and failure to warn defects described in sub-paragraphs a-f of this Count, LEWIS A. KATZ experienced conscious suffering and endured severe injuries prior to his death.

473.  As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they are entitled to damages for conscious suffering and any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against HONEYWELL for conscious suffering damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

### COUNT 32
### CLAIM OF WRONGFUL DEATH PREDICATED ON NEGLIGENCE, PURSUANT TO MASS. GEN. LAWS CH. 229 § 2 AND FLA. STAT. § 768.21, AGAINST MASSPORT

474.  The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

475.  At all times material to this Complaint, MASSPORT designed, constructed, owned, operated, repaired, inspected, and maintained the airport at Laurence G. Hanscom Field in Bedford, Massachusetts, knowing that it would be used by the aviation community for flight operations.

476.  MASSPORT is bound to follow, in a ministerial capacity, certain governmental regulations relating to aircraft rescue and firefighting operations.

477.  At all times material to this Complaint, MASSPORT knew, or in the exercise of reasonable care should have known, that its failure to abide by these regulations would create an unreasonable risk of harm or death to persons onboard the aircraft.

478.  At all times material to this Complaint, MASSPORT owed a duty to use reasonable care, and to exercise the highest degree of care, in performing rescue and firefighting operations for aircrafts involved in accidents or crashes at Hanscom Field.

479.  MASSPORT's duty of care extended to those persons, including LEWIS A. KATZ, who were passengers involved in airplane accidents or crashes at Hanscom Field.

480.  MASSPORT was under a further, continuing, and ongoing duty to, among other things:

a. Provide adequate and timely fire and rescue services, including fire-fighting foam and water to the affected crash site in an effort to minimize damages and save the lives of the people onboard the Subject Aircraft;

b. Remove the occupants of the Subject Aircraft as quickly and as expeditiously as possible;

c. Install frangible MALSR lights and antennae off of the end of the runway to limit the impact damage to airplanes that may speed off of the runway and crash into the MALSR lights or antennae; and

d. Build a bridge over the narrow ravine at the end of the runway—into which the Subject Aircraft crashed—so that airplanes that overrun the runway can avoid crashing into the ravine.

481. MASSPORT knew or should have known that its failure to properly and safely abide by the applicable regulations would create an unreasonable risk of harm or death to persons onboard the aircraft, including LEWIS A. KATZ.

482. MASSPORT knew, or in the exercise of reasonable care should have known, that its failure to use reasonable care, and to exercise the highest degree of care, in performing rescue and firefighting operations for aircrafts involved in accidents or crashes at Hanscom Field would create an unreasonable risk of harm or death to persons onboard the aircraft.

483. MASSPORT knew, or in the exercise of reasonable care should have known, that its failure to install frangible MALSR lights and frangible antennae would create an unreasonable risk of harm or death to persons onboard aircrafts that sped off of the runway.

484. At all times material to this Complaint, MASSPORT breached the aforementioned duties, and negligently and carelessly failed to discharge the aforementioned duties, by, among other things:

      a.  Waiting more than 3 minutes after the Subject Accident to begin fighting the fire with an extinguishing agent;

      b.  Failing to remove the Subject Aircraft's main cabin door until 2 hours and 11 minutes after the alarm sounded;

      c.  Running out of water during the attempted rescue;

      d.  Running out of fire-fighting foam during the attempted rescue;

      e.  Failing to install frangible MALSR lights and frangible antennae; and

      f.  Failing to build a bridge over the narrow ravine at the end of the runway—into which the Subject Aircraft crashed—so that planes that overrun the runway can avoid crashing into the ravine.

485. MASSPORT's negligence directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. MASSPORT is therefore liable in negligence for the death of LEWIS A. KATZ.

486. On June, 26, 2014, the Plaintiffs, DREW KATZ and MELISSA SILVER, through counsel, provided to John P. Pranckevicius, Director of Administration and Finance/Secretary Treasurer for MASSPORT, a letter constituting proper notice of this claim against MASSPORT, as required by Mass. Gen. Laws Ch. 91 appx. § 1-23.

487. In addition, pursuant to Mass. Gen. Laws Ch. 84 § 18, that letter properly advised MASSPORT of the "name and place of residence of the person injured and the time, place and cause of injury."

488.  As a direct and proximate result of the death of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 2, Fla. Stat. § 768.21, and any other applicable law, they are entitled to damages for:

  a.  Pain and suffering of LEWIS A. KATZ prior to his death;

  b.  Pain and suffering of LEWIS A. KATZ's survivors, beneficiaries, and heirs;

  c.  Lost society, companionship, guidance, and services of LEWIS A. KATZ to his survivors, beneficiaries, and heirs;

  d.  Loss of support in money and in kind;

  e.  Lost net accumulations;

  f.  Lost value of life;

  g.  Funeral expenses; and/or

  h.  Any and all other damages to which the survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, on behalf of themselves and as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against MASSPORT for compensatory damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

## COUNT 33
## CLAIM OF CONSCIOUS SUFFERING AS A RESULT OF NEGLIGENCE, PURSUANT TO MASS. GEN. LAWS CH. 229 § 6, AGAINST MASSPORT

489.   The Plaintiffs hereby re-allege and incorporate the allegations of paragraphs 1-132 as if fully set forth herein.

490.   At all times material to this Complaint, MASSPORT designed, constructed, owned, operated, repaired, inspected, and maintained the airport at Laurence G. Hanscom Field in Bedford, Massachusetts, knowing that it would be used by the aviation community for flight operations.

491.   MASSPORT is bound to follow, in a ministerial capacity, certain governmental regulations relating to aircraft rescue and firefighting operations.

492.   At all times material to this Complaint, MASSPORT knew, or in the exercise of reasonable care should have known, that its failure to abide by these regulations would create an unreasonable risk of harm or death to persons onboard the aircraft.

493.   At all times material to this Complaint, MASSPORT owed a duty to use reasonable care, and to exercise the highest degree of care, in performing rescue and firefighting operations for aircrafts involved in accidents or crashes at Hanscom Field.

494.   MASSPORT's duty of care extended to those persons, including LEWIS A. KATZ, who were passengers involved in airplane accidents or crashes at Hanscom Field.

495.   MASSPORT was under a further, continuing, and ongoing duty to, among other things:

      a.   Provide adequate and timely fire and rescue services, including fire-fighting foam and water to the affected crash site in an effort to minimize damages and save the lives of the people onboard the Subject Aircraft;

      b.   Remove the occupants of the Subject Aircraft as quickly and as expeditiously as possible;

    c.   Install frangible MALSR lights and frangible antennae off of the end of the runway to limit the impact damage to airplanes that may speed off of the runway and crash into the MALSR lights or antennae; and

    d.   Build a bridge over the narrow ravine at the end of the runway—into which the Subject Aircraft crashed—so that airplanes that overrun the runway can avoid crashing into the ravine.

496. MASSPORT knew or should have known that its failure to properly and safely abide by the applicable regulations would create an unreasonable risk of harm or death to persons onboard the aircraft, including LEWIS A. KATZ.

497. MASSPORT knew, or in the exercise of reasonable care should have known, that its failure to use reasonable care, and to exercise the highest degree of care, in performing rescue and firefighting operations for aircrafts involved in accidents or crashes at Hanscom Field would create an unreasonable risk of harm or death to persons onboard the aircraft.

498. MASSPORT knew, or in the exercise of reasonable care should have known, that its failure to install frangible MALSR lights and frangible antennae would create an unreasonable risk of harm or death to persons onboard aircrafts that sped off of the runway.

499. At all times material to this Complaint, MASSPORT breached the aforementioned duties, and negligently and carelessly failed to discharge the aforementioned duties, by, among other things:

    a.   Waiting more than 3 minutes after the Subject Accident to begin fighting the fire with an extinguishing agent;

    b.   Failing to remove the Subject Aircraft's main cabin door until 2 hours and 11 minutes after the alarm sounded;

    c.   Running out of water during the attempted rescue;

    d.   Running out of fire-fighting foam during the attempted rescue;

    e.   Failing to install frangible MALSR lights and frangible antennae; and

    f.   Failing to build a bridge over the narrow ravine at the end of the runway—
into which the Subject Aircraft crashed—so that planes that overrun the
runway can avoid crashing into the ravine.

500.  MASSPORT's negligence directly and proximately caused the Subject Accident and the death of LEWIS A. KATZ. MASSPORT is therefore liable in negligence for the death of LEWIS A. KATZ.

501.  On June, 26, 2014, the Plaintiffs, DREW KATZ and MELISSA SILVER, through counsel, provided to John P. Pranckevicius, Director of Administration and Finance/Secretary-Treasurer for MASSPORT, a letter constituting proper notice of this claim against MASSPORT, as required by Mass. Gen. Laws Ch. 91 appx. § 1-23.

502.  In addition, pursuant to Mass. Gen. Laws Ch. 84 § 18, that letter properly advised MASSPORT of the "name and place of residence of the person injured and the time, place and cause of injury."

503.  As a result of MASSPORT's negligence, LEWIS A. KATZ experienced conscious suffering and endured severe injuries prior to his death.

504. As a direct and proximate result of the conscious suffering of LEWIS A. KATZ, the Estate of LEWIS A. KATZ, as well as DREW KATZ and MELISSA SILVER, have been damaged. Therefore, pursuant to Mass. Gen. Laws ch. 229 § 6 and any other applicable law, they are entitled to damages for conscious suffering and any and all other damages to which the

survivors, beneficiaries, and/or the Estate of LEWIS A. KATZ may be entitled to recover under applicable law.

WHEREFORE, the Plaintiffs, DREW KATZ and MELISSA SILVER, as Co-Personal Representatives of the Estate of LEWIS A. KATZ, deceased, demand judgment against MASSPORT for conscious suffering damages, costs, and such other relief this Court deems appropriate. The Plaintiffs further demand a trial by jury of all issues triable as of right by a jury.

Dated: August 10, 2017     Respectfully submitted by Plaintiffs,
             by their attorneys:

            /s/ Steven C. Marks
            Steven C. Marks (admitted *pro hac vice* –
            Florida Bar #516414)
            Roy K. Altman (admitted *pro hac vice* –
            Florida Bar #116885)
            Podhurst Orseck, P.A.
            One SE 3rd Avenue, 2700
            Miami, FL 33131
            (305) 358-2800
            smarks@podhurst.com
            raltman@podhurst.com

## CERTIFICATE OF SERVICE

In accordance with Local Rule 5.2(b), the undersigned hereby certifies that on the 10th day of August, 2017, a true copy of the within document was electronically filed through the ECF system and will be served by regular mail, postage prepaid, and/or e-mail on anyone unable to accept electronic filing.

            /s/ Steven C. Marks